## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

_____

**DAVID SCHERMERHORN,**             )
**MARY ANN WRIGHT,**             )
**HUWAIDA ARRAF,** and           )
**MARGRIET DEKNOPPER,**        )
                                           )
           Plaintiffs,          )
                      v.           ) Civil Action No. _____
                                           )
**THE STATE OF ISRAEL,**          )
**THE MINISTRY OF DEFENSE OF ISRAEL,**   )
**THE MINISTRY OF FOREIGN AFFAIRS OF ISRAEL,**  )
**THE MINISTRY OF JUSTICE OF ISRAEL,** and  )
**THE MINISTRY OF PUBLIC SECURITY OF ISRAEL,**  )
                                           )
          Defendants.        )
_____)

### COMPLAINT
**(under the Foreign Sovereign Immunities Act)**

### Preliminary Statement

1.      Plaintiffs David Schermerhorn, Mary Ann Wright, Huwaida Arraf, and Margriet Deknopper institute this civil action for compensatory damages against the State of Israel, and compensatory and punitive damages against several of its agencies and instrumentalities, for torts committed against them while they were on board a vessel flying the flag of the United States on the high seas.

2.      On May 31, 2010, the Israeli Defense Forces ("the IDF") unlawfully intercepted and attacked six vessels sailing in international waters in the Mediterranean Sea as part of the Gaza Freedom Flotilla ("the Flotilla").  The vessels were carrying civilian passengers, as well as humanitarian aid and medical supplies intended for delivery to the residents of Gaza.  *Challenger*

1

*I*, sailing under the U.S. flag, was one of the ships intercepted and attacked by the IDF during operations on that day.

3.     The IDF's operations against *Challenger I* included torture; cruel, inhuman, or degrading treatment; arbitrary arrest and detention; assault and battery; and intentional infliction of emotional distress, as is more fully set forth below.  The attack on the high seas was unjustified and illegal under international law.

4.     IDF violence also resulted in the killing of 10 civilian passengers on board another vessel in the Flotilla, *Mavi Marmara*. Plaintiffs witnessed the attack on *Mavi Marmara* as it unfolded and escalated.

## Jurisdiction and Venue

5.     This Court has jurisdiction over this case pursuant to the Foreign Sovereign Immunities Act, as amended, and specifically 28 U.S.C. §§ 1330(a), 1330(b), 1605(a)(5) and 1605A.

6.     Venue is proper in the United States District Court of the District of Columbia pursuant to 28 U.S.C. § 1391(f)(4).

## Parties

7.     All Plaintiffs were passengers on *Challenger I* at the time it was attacked by the IDF on May 31, 2010.

8.     Plaintiff David Schermerhorn is a citizen of the United States of America.  He suffered physical harm and emotional pain and distress when a stun grenade was thrown at him by IDF soldiers and exploded one foot from his face, which caused partial loss of sight in one eye, as well as from being arbitrarily detained for an extended period of time.

9.      Plaintiff Mary Ann Wright is a citizen of the United States of America.  She suffered physical harm and emotional pain and distress as a result of the attack, including when she was arbitrarily and violently detained by the IDF for an extended period of time and was thereafter forcibly removed from the ship when it was brought to Israel.

10.     Plaintiff Huwaida Arraf is a dual citizen of the United States of America and Israel. She experienced physical harm and emotional pain and distress when IDF soldiers pushed her to the ground, slammed her head against the deck, and stood on her head.   She suffered further physical and emotional pain as a result of being arbitrarily detained and forced to adopt a kneeling position while being hooded for an extended period of time and placed in handcuffs that were too tight.

11.     Plaintiff Margriet Deknopper is a citizen of Belgium.  She suffered physical harm and emotional pain and distress when IDF personnel shot her in the face with a rubber bullet, breaking her nose, and physically restrained and arbitrarily detained her.

12.     Defendant the State of Israel is a foreign state, as that term is used in 28 U.S.C. § 1602 *et seq.*

13.     The Israeli Ministries of Defense, Foreign Affairs, Justice, and Public Security (collectively "the Ministries") are "agencies or instrumentalities" of the State of Israel, as that term is defined in 28 U.S.C. § 1603(b).  On information and belief, Plaintiffs allege that these Ministries, along with other individuals and offices within the Government of the State of Israel, including the Prime Minister, planned, approved, prepared for, ordered, and executed the illegal raid on the Flotilla while it was in international waters, and had command and control authority over the operation against *Challenger I* and the other ships that were attacked.

14.     The Ministry of Defense of Israel oversees the Israeli military in general, and the Israeli Defense Forces in particular.  The Chief of the General Staff of the IDF reports to the Ministry of Defense.  On information and belief, the Ministry was instrumental in planning, approving, preparing for, ordering, and executing the illegal IDF raid on the Flotilla while it was in international waters, and had command and control authority over the operation against *The Challenger I* and the other ships that were attacked.

15.     The Ministry of Foreign Affairs of Israel, according to its website, "develops, implements, and presents Israel's foreign policy, and promotes its economic, cultural, and scientific relations."  On information and belief, the Ministry was instrumental in planning, approving, preparing for, and ordering the illegal raid on the Flotilla while it was in international waters.

16.     The Ministry of Justice of Israel is responsible, *inter alia,* for advising other Ministries of the Government on matters relating to international law.  On information and belief, the Ministry was instrumental in planning, approving, preparing for, and ordering the illegal raid on the Flotilla while it was in international waters.

17.     The Ministry of Public Security of Israel, according to its website, is responsible for "public security, law enforcement and correction."  On information and belief, the Ministry was instrumental in planning, approving, preparing for, and ordering the illegal raid on the Flotilla while it was in international waters.

## Statement of Facts

### *The Existence of an Armed Conflict*

18.     The attack on the Flotilla occurred in the context of Israel's occupation of Gaza and the West Bank which constitutes an ongoing armed conflict between Israel and the Palestinians. That conflict is of international character, as has been attested by the Supreme Court of Israel as

well as various United Nations agencies and human rights organizations.  According to the Report of the UN Secretary-General's Panel of Inquiry on the May 31, 2010 Flotilla Incident, "the armed violence between Israel and Hamas [the governing forces in Gaza]… has all the trappings of an international armed conflict."

19.    The Office of the Prosecutor of the International Criminal Court also concluded, during its Preliminary Examination of the attack on the Flotilla, that the conflict can be considered an international armed conflict:  "[this] Office has proceeded on the basis that the situation in Gaza can be considered within the framework of an international armed conflict in view of the continuing military occupation by Israel."

20.    During an international armed conflict, the laws of war, and in particular the four Geneva Conventions of 1949, are applicable.  Both Israel and the United States are parties to the Geneva Conventions.

21.    Even if, however, the conflict in Gaza is not of international character, common Article 3 of the Geneva Conventions applies to it, and prohibits the abuses committed by Defendants herein.

### *The Naval Blockade on Gaza*

22.    Following restrictive measures imposed by the Israeli authorities on the movement of people and goods into the Gaza strip in 2007 and 2008, a maritime closure was initiated in mid-2008 and a full naval blockade was established on January 3, 2009.

23.    The announcements and advisories on the implementation of the blockade stated that "the Gaza maritime area is closed to all maritime traffic and is under blockade imposed by [the] Israeli Navy until further notice."

***The Gaza Freedom Flotilla***

24.     The Gaza Freedom Flotilla was planned by various humanitarian organizations including the Free Gaza Movement, the Foundation for Human Rights and Freedoms and Humanitarian Relief, Swedish and Greek groups both called Ship to Gaza, and the European Campaign to Break the Siege on Gaza.  The aims of the Flotilla were to draw international public attention to the situation in the Gaza Strip and the effect of the blockade, to break the blockade, and to deliver humanitarian assistance and supplies to Gaza.

25.     The Flotilla consisted of six craft at the time of the IDF's operation on May 31, 2010:

     a.)  *M.V. Mavi Marmara*, a passenger ship sailing under the flag of the Union of the Comoros;

     b.)  *M.V. Defne Y*, a cargo vessel sailing under the flag of the Republic of Kiribati;

     c.)  *M.V. Gazze*, a cargo vessel sailing under the flag of the Republic of Turkey;

     d.)  *M.V. Sfendoni*, a passenger ship sailing under the flag of the Togolese Republic;

     e.)  *M.V. Eleftheri Mesogios*, a cargo vessel sailing under the flag of the Hellenic Republic of Greece; and

     f.)  *Challenger I*, a passenger ship sailing under the flag of the United States of America.

26.     All of the vessels of the Flotilla were subject to strict security checks prior to their departures, and none had any weapons on board.

**Challenger I**

27.    From the time of its departure and throughout the entire operation against the Flotilla on May 31, 2010 and thereafter, *Challenger I* sailed under the flag of the United States of America.  *Challenger I* was at the relevant times, and is, owned by Mediterranean Trips, LLC, a limited liability company organized and existing under the laws of the State of Delaware.

28.    At the time of the IDF attack on *Challenger I* on May 31, 2010, the vessel was sailing in international waters in the Mediterranean Sea, approximately 70 nautical miles from the coast of the Gaza Strip.

29.    At the time of the attack, *Challenger I* had 17 passengers, including crew, of American, British, Irish, Australian, Dutch, Belgian, and Polish nationalities.  The passengers on the ship were humanitarian workers, medics, and several journalists wearing insignia signifying that they were press representatives.

30.    *Challenger I* carried humanitarian aid meant to be delivered to the citizens of Gaza, including medical equipment and supplies.  In addition, a large amount of media equipment – including cameras, video cameras, mobile and SAT phones, recorders, and GPS locators – were carried on board the vessel.

31.    *Challenger I* set sail from Crete on May 29, 2010.  The vessel and its passengers and cargo were subject to security checks for weapons before departure. All of the passengers and crew of *The Challenger I* were unarmed during their entire journey and specifically during the IDF attack.

32.    Before the incident, passengers and crew of *Challenger I* underwent training in passive resistance and non-violence techniques.  This training included instructions that, were

there an attempt by the IDF to board the ship, the passengers and crew should make no attempt to repel boarders with physical force.

### The planning of Israeli's operation against the Flotilla

33.     The Government of Israel became aware in February 2010 of the plans for the Flotilla to break the blockade and bring humanitarian aid and supplies into Gaza.  In mid-April, orders were given by high-level Israeli Government officials to begin preparing for an operation to intercept the Flotilla.

34.     The Government of Israel developed a plan for the operation which was approved by the Chief of the Israeli General Staff on May 13, 2010.  Defendant Ministries were all parties to planning, approving, preparing for, ordering, and executing the raid on the Flotilla, and the Government and its Ministry of Defense maintained command and control authority over the operation.

### The Unlawful Attack on the Six Vessels of the Flotilla

35.     As a result of the attack on the Gaza Freedom Flotilla, civilian passengers were killed, injured, tortured and seriously mistreated, assaulted and battered, arbitrarily arrested and detained, and intentionally subjected to emotional distress.  The ships were also damaged. *Challenger I* was seized by the IDF and has never been returned to its American owners.

36.     The IDF operation resulted in the unlawful killing of ten civilian passengers of American and Turkish nationality who were on *Mavi Marmara*.  Approximately 156 civilian passengers across the Flotilla sustained wounds, 52 of them reported to have been serious.

37.     Passengers on each of the vessels were brutally attacked, abused, and assaulted by IDF soldiers even after they tried to surrender.  They were placed in painful handcuffs and stress positions while also being kicked, beaten, and verbally harassed. The detainees were denied access

to toilet facilities and to water, food, and medical treatment.  The U.N. Human Rights Council fact-finding mission found that this treatment was in violation of international human rights law, stating that the "behaviour by Israeli officials which was aimed at humiliating individuals which, if not torture, would constitute cruel, inhumane and degrading treatment or punishment under the terms of article 16 of the Convention against Torture."

38.    Passengers, including Plaintiffs, were arbitrarily arrested and detained.  On gaining control of the vessels and its passengers, the IDF soldiers detained and held them while each vessel was either towed or escorted to the Israeli port of Ashdod.  Detained passengers were forced to stay in stress positions for the extended period of time it took for the ships to reach Ashdod.

39.    After IDF soldiers gained control of the vessels and passengers, they confiscated personal property, including money, laptops, cameras, recorders, GPS equipment, mobile and satellite phones, and clothing.  The confiscated personal property was cataloged on most of the ships, including *Challenger I*, but none was ever returned to the passengers.  In addition, the humanitarian aid and medical supplies intended for the residents of Gaza were taken by the IDF soldiers.

40.    The attack on the Flotilla, and on *Challenger I* in particular, was illegal under international law, was unjustified under any exception to the general prohibition against interference with shipping on the high seas, and was excessive and disproportionate to any threat that Defendants might have perceived.

### The Events on Challenger I

41.    During the IDF operation, *Challenger I* sailed at a distance close enough to *Mavi Marmara* such that the passengers on the vessel were able to witness the attack on that ship.  When it became clear that the IDF intended to seize and board *Challenger I*, it accelerated out of the

formation of the Flotilla, in part to delay the boarding of the vessel so that the journalists had time to transmit the reports and footage they had collected.  The ship was eventually intercepted by two Israeli boats and one helicopter, and at least one stun grenade was used before the IDF soldiers sought to board it.  The grenade exploded one foot from Plaintiff Schermerhorn's face, leaving him partly blinded in one eye.

42.     When the IDF began to board the ship, the passengers deployed passive resistance. They stood side-by-side in a fixed location, blocking the path of the IDF soldiers.  While boarding the vessel, the soldiers fired paintball and rubber bullets directly at the passengers.  These actions resulted in injuries: Plaintiff De Knoop was shot in the face with a rubber bullet that broke her nose, and another passenger was shot five times in the back by rubber bullets.  Any passengers in the way of the soldiers were forcibly removed.

43.     The soldiers also took actions immediately to detain all passengers.  For example, while attempting to climb the stairs to the fly bridge, Plaintiff Arraf was forcefully pulled off the stairs and forced to the deck.  Other passengers standing on the deck, including Plaintiff Deknopper, were pushed to the floor.  A soldier forced a passenger's face into broken glass on the deck and then stood on both her head and back.  Plaintiff Arraf's head was slammed against the deck, and a soldier then stood on it.  Soldiers carried a passenger to the edge of the ship and attempted to force her onto an Israeli boat.  Plaintiff Arraf and another passenger were both forced to kneel with tight handcuffs while hooded for an extended period of time, despite complaining of breathing difficulties.

44.     Although the passengers offered no resistance when the soldiers entered the bridge, at least two were tasered, resulting in burns and vomiting.

45.     Once the IDF detained all passengers and crew, and during the period of escorting the vessel to Ashdod, passengers were assaulted, handcuffed and forcibly detained inside the ship's cabin.   The IDF denied them access to toilets and failed to attend to their injuries despite the presence of an IDF medic on board.   All personal property and the ship's entire cargo – including all media equipment and film footage – were confiscated and never returned.

46.     On arriving in Ashdod, the passengers were forced to leave the vessel under guard to be processed in detention.   Several passengers, including Plaintiff Wright were treated violently when they refused to leave the ship, on the grounds that they had been taken to Israel against their will.   At least two passengers were threatened with electroshock weapons and two others were forcibly carried off the vessel.   When a passenger refused to leave the ship, IDF soldiers bound her arms and legs, threw her against a wall, and threatened her with a taser device.

## CLAIMS FOR RELIEF

### Count One

*(Torture, a War Crime under International Law and 18 U.S.C. § 2441(d)(1)(A),*
*And a Tort under 28 U.S.C. § 1605(a)(5))*
(Plaintiffs Arraf and Deknopper)

47.     Plaintiffs Arraf and Deknopper reallege and incorporate by reference the allegations set forth in paragraphs 1 through 46 of this Complaint as if fully set forth herein.

48.     The acts described herein against Plaintiffs Arraf (including banging her head against the deck and standing on her head, hooding her for an extended period of time, and groping her), and Deknopper (including shooting her in the face with a rubber bullet which broke her nose) placed each of them in imminent fear for her life, and caused each severe physical and mental pain and suffering.

49.     This Court has jurisdiction over the claim brought by Plaintiff Arraf, a citizen of the United States, in addition to other bases, under 28 U.S.C. § 1605A(a)(1).

50.     The acts committed by the IDF soldiers as described herein were intended to inflict severe physical and mental pain and suffering on Plaintiffs while they were under the control and custody of the IDF.

51.      These acts constituted torture as defined in international instruments and treaties to which the United States is a party, including common Article 3 of the four Geneva Conventions, the Convention Against Torture, and the International Convention of Civil and Political Rights, as well as customary international law, and as referenced in the War Crimes Act, 18 U.S.C. § 2441(d)(1)(A).  They were also torts as defined by applicable law.

### Count Two
*(Cruel and Inhuman Treatment, a War Crime under International Law*
*and 18 U.S.C. § 2441(d)(1)(B), and a Tort under 28 U.S.C. § 1605(a)(5))*
(All Plaintiffs)

52.     Plaintiffs reallege and incorporate by reference the allegations set forth in paragraphs 1 through 46 of this Complaint as if fully set forth herein.

53.     The acts described herein, included shooting Plaintiffs with rubber bullets, assaulting and abusing individuals practicing passive resistance, excessively restraining Plaintiffs by using physical force without justification, abusing them by standing on their heads and backs while they were restrained, intentionally forcing the face of a passenger into broken glass, tasering a Plaintiff practicing passive resistance, throwing a stun grenade at a Plaintiff's head, attempting forcibly to eject a passenger from the vessel, hooding and forcing Plaintiffs to stand in stress positions for extended periods of time and restraining them with handcuffs that were unjustifiably and unnecessarily painful.

54.     The acts committed by the IDF soldiers as described herein were intended to cause Plaintiffs serious physical and mental pain and suffering while they were under the control and custody of the IDF.

55.     These acts constituted cruel and inhuman treatment as defined in international treaties to which the United States is a party, including common Article 3 of the four Geneva Conventions, the Convention Against Torture, and the International Covenant on Civil and Political Rights, as well as customary international law, and as referenced in the War Crimes Act, 18 U.S.C. § 2441(d)(1)(B).  They were also torts as defined by applicable law.

**Count Three**
*(Mutilation or Maiming, a War Crime under International Law*
*And 18 U.S.C. § 2441(d)(1)(E), and a Tort under 28 U.S.C. § 1605(a)(5))*
(Plaintiff Schermerhorn)

56.     Plaintiff Schermerhorn realleges and incorporates by reference the allegations set forth in paragraphs 1 through 46 of this Complaint as if fully set forth herein.

57.     The acts committed against Plaintiff Schermerhorn described herein were committed by soldiers of the IDF who injured him in the course of committing other offenses under the War Crimes Act, namely cruel and inhuman treatment under 18 U.S.C. § 2441(d)(1)(B), and intentionally causing serious bodily injury under 18 U.S.C. § 2441(d)(1)(E).  These acts committed against a person taking no active part in any hostilities resulted in an injury that permanently disabled a member or organ of his body, specifically, the permanent partial loss of sight in one eye.

58.     The acts committed by the IDF soldiers as described herein were intended to cause Plaintiff Schermerhorn serious physical and mental pain and suffering while he was under the control and custody of the IDF.

59. These acts constituted mutilation or maiming, as defined in international treaties to which the United States is a party, including *inter alia* common Article 3 of the four Geneva Conventions, as well as customary international law, and as referenced in the War Crimes Act, 18 U.S.C. § 2441(d)(1)(B) and (E).  They were also torts as defined by applicable law.

**Count Four**
*(Intentionally Causing Serious Bodily Injury, a War Crime under International Law and 18 U.S.C. § 2441(d)(1)(F), and a Tort under 28 U.S.C. § 1605(a)(5))*
(Plaintiffs Schermerhorn, Arraf, and Deknopper)

60. Plaintiffs Schermerhorn, Arraf, and Deknopper reallege and incorporate by reference the allegations set forth in paragraphs 1 through 46 of this Complaint as if fully set forth herein.

61. The acts committed against Plaintiffs Deknopper, Arraf, and Schermerhorn by IDF soldiers as described herein included aiming and shooting rubber bullets at unarmed civilians and causing serious injuries as a result, aiming and launching a stun grenade directly at an unarmed civilian that exploded close to his face, physically assaulting and abusing passengers practicing passive resistance, excessively restraining Plaintiffs by standing on their heads and backs, shoving a passenger's face into broken glass, hooding a Plaintiff and forcing them to stand in stress positions.

62. These acts constituted intentionally causing serious bodily injury, as defined in international treaties to which the United States is a party, including *inter alia* common Article 3 of the four Geneva Conventions, as well as customary international law, and as referenced in the War Crimes Act, 18 U.S.C. § 2441(d)(1)(F).  They were also torts as defined by applicable law.

**Count Five**
*(Arbitrary Arrest and Detention, a Tort under 28 U.S.C. § 1605(a)(5))*
(All Plaintiffs)

63.     Plaintiffs reallege and incorporate by reference the allegations set forth in paragraphs 1 through 46 of this Complaint as if fully set forth herein.

64.     Plaintiffs were detained without a warrant, probable cause, articulable suspicion, or notice of charges when arrested in international waters on board *Challenger I,* a vessel sailing under the flag of the United States of America.  Plaintiffs were further denied due process and legal, consular, or familial protection and support during the course of their detention, both on board the vessel while it was being escorted to Ashdod under IDF control, and after forcibly being brought to and detained in Israel.

65.     Plaintiffs' arbitrary arrest and detention by IDF soldiers as described herein caused them severe physical and mental pain and suffering, and were in violation of customary international law as expressed, defined, and codified in multilateral treaties and other international instruments to which the United States is a party, international and domestic judicial decisions, and other authorities.

66.     The arbitrary arrest and detention of Plaintiffs constituted a tort as defined by applicable law.

**Count Six**
*(False Imprisonment, a Tort under 28 U.S.C. § 1605(a)(5))*
(All Plaintiffs)

67.     Plaintiffs reallege and incorporate by reference the allegations set forth in paragraphs 1 through 46 of this Complaint as if fully set forth herein.

68.     Plaintiffs were detained without a warrant, probable cause, articulable suspicion, or notice of charges when arrested in international waters on board *Challenger I*, a vessel sailing

under the flag of the United States.  Their imprisonment continued from the time the IDF soldiers forcibly took control of *Challenger I* and its passengers until the vessel was forcibly escorted into Ashdod nearly eight hours later, and thereafter in Israel.  During Plaintiffs' imprisonment on the vessel, they were forced to stay in a cabin in handcuffs.   Plaintiffs were denied due process or legal, consular, or familial protection and support during their detention on board the vessel and after forcibly being brought to and detained in Israel.

69.     Plaintiffs' imprisonment by IDF soldiers as described herein caused them severe physical and mental pain and suffering, and was in violation of customary international law as expressed, defined, and codified in multilateral treaties and other international instruments to which the United States is a party, international and domestic judicial decisions, and other authorities.

70.     The acts complained of herein constituted the tort of false imprisonment as defined by applicable law.

**Count Seven**
*(Assault and Battery, a Tort under 28 U.S.C. § 1605(a)(5))*
(All Plaintiffs)

71.     Plaintiffs reallege and incorporate by reference the allegations set forth in paragraphs 1 through 46 of this Complaint as if fully set forth herein.

72.     Plaintiffs were assaulted by IDF troops conducting the operation on *Challenger I*, sailing under the flag of the United States, when IDF troops attacked and took control of the vessel and while exercising passive resistance after the IDF unlawfully and forcibly boarded *Challenger I*.

73.     The acts described above placed Plaintiffs in imminent fear for their lives, health, and well-being, caused them physical and mental suffering and actual and appreciable fear of physical pain, and constituted the tort of assault and battery as defined by applicable law.

**Count Eight**
*(Intentional Infliction of Emotional Distress, a Tort under 28 U.S.C. § 1605(a)(5))*
(All Plaintiffs)

74.     Plaintiffs reallege and incorporate by reference the allegations set forth in paragraphs 1 through 46 of this Complaint as if fully set forth herein.

75.     The extreme and outrageous acts described herein had the intent and direct effect of inciting fear, anguish, and severe emotional distress.  As a result of the IDF's attack against the passengers on the vessel, Plaintiffs have suffered severe psychological injury which has continued from the time the acts were committed to date. These acts constituted the tort of intentional infliction of emotional distress as defined by applicable law.

**Count Nine**
*(Conversion, a Tort under 28 U.S.C. § 1605(a)(5))*
(All Plaintiffs)

76.     Plaintiffs reallege and incorporate by reference the allegations set forth in paragraphs 1 through 46 of this Complaint as if fully set forth herein.

77.     In the course of the unlawful attack on *Challenger I*, IDF soldiers confiscated and failed to return personal property and money belonging to Plaintiffs, including the cargo on the vessel.

78.     The IDF forces exercised, and continue to exercise, dominion and control over Plaintiffs' personal property and money.  Those actions constitute the tort of conversion as defined by applicable law.

## ALLEGATIONS COMMON TO ALL COUNTS

79.     Plaintiffs reallege and incorporate by reference the allegations set forth in paragraphs 1 through 46 of this Complaint as if fully set forth herein.

80.     The acts and omissions of Defendants set forth above were committed on board a ship sailing under the flag of the United States, and therefore were committed "in the United States" within the meaning of 28 U.S.C. § 1605(a)(5).  The claims are not "based upon the exercise or performance or the failure to exercise or perform a discretionary function" on the part of the IDF soldiers who carried out the illegal raid on the Flotilla, and who committed the offenses against Plaintiffs complained of herein.

81.     An attack on an unarmed vessel navigating on the high seas is a violation of international law, as well as domestic law, except under circumstances not applicable here.

82.     The abuses of civilians complained of herein also violated international law, as well as applicable domestic law.

83.     Defendants planned, instigated, ordered, authorized, and aided or abetted the IDF soldiers to commit the abuses suffered by Plaintiffs, and had responsibility over and commanded and controlled such forces.  Defendants knew or should have known that their subordinates had committed, were committing, or were about to commit violations and abuses, and failed to prevent them or to punish those responsible.

84.     The acts or omissions of the IDF forces injuring Plaintiffs as described herein were undertaken with the actual or apparent authority of Defendants, or with their consent or acquiescence, and under color of law.

85.     Defendants knew, had reason to know, and/or owing to the circumstances at the time should have known that their subordinates – the IDF troops – had committed, were

committing, or were about to commit crimes and abuses against Plaintiffs.  Defendants failed to prevent the abuses or to punish those responsible.

86.     The injuries inflicted on Plaintiffs were not incidental to sanctions otherwise permitted by law.

87.     As a result of the acts and omissions described above, Plaintiffs are entitled to compensatory damages in amounts to be determined at trial.

88.     Defendants' acts and omissions were deliberate, willful, intentional, wanton, malicious, and oppressive, to intimidate them and punish them for their involvement in challenging the naval blockade of Gaza, and justify an award of punitive damages against Defendant Ministries in an amount to be determined at trial.

89.     To the extent that any of the claims herein might be subject to applicable statutes of limitation, those provisions should be equitably tolled, for the following reasons:

a.      Plaintiffs and other passengers in the Flotilla have attempted to obtain relief in multiple fora, and Defendants have failed to participate meaningfully in any process that might lead to compensation for Plaintiffs' injuries, and they have therefore received no compensation;  and

b.      the wrongs of which Plaintiffs complain herein were especially egregious and flagrant, and this Court should not countenance their commission without judicial review.  No statute of limitation does or should protect persons guilty of war crimes, or those who command and control such perpetrators.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiffs David Schermerhorn, Mary Ann Wright, Huwaida Arraf, and Margriet Deknopper respectfully pray that this Honorable Court:

1.      ASSERT its jurisdiction over this matter, and proceed to resolve it on its merits;

2.      ENTER JUDGMENT against Defendants on each of the Causes of Action as set forth above;

3.      AWARD to Plaintiffs general, special, and incidental, and consequential damages in amounts to be proved at trial;

4.      AWARD to Plaintiffs exemplary and punitive damages, according to proof, in light of Defendant's deliberate and/or grossly negligent conduct as set forth above;

5.      ORDER Defendant to pay the costs of this Action, including reasonable attorneys' fees;  and

6.      AWARD such additional relief as to the Court shall appear just in the premises.

Plaintiffs demand trial by jury on all issues so triable.


Respectfully submitted,


_____
Steven M. Schneebaum
      (D.C. Bar No. 956250)
STEVEN M. SCHNEEBAUM, P.C.
2131 S Street NW
Washington, DC 20008
Tel: (202) 742-5900
Fax: (202) 449-3835
E-mail: sms@smslawdc.com


Counsel for Plaintiffs


Of counsel:    Ralph G. Steinhardt
               George Washington University Law School
               2000 H Street, N.W.
               Washington, D.C. 20052

Sir Geoffrey Nice, QC
Gresham Professor of Law
Gresham College
Barnard's Inn Hall
Holborn, London EC1N 2HH
England

Rodney Dixon, QC
Temple Garden Chambers
1 Harcourt Buildings
Temple, London EC4Y 9DA
England

Haydee Dijkstal
c/o Stoke & White
150 Minories
London EC3N 1LS
England

Dated:          January 11, 2016