# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

DAVID SCHERMERHORN, *et al.*,

      Plaintiffs,

      v.

THE STATE OF ISRAEL, *et al.*,

      Defendants.

Case No. 16-cv-49 (ABJ)

District Judge Amy Berman Jackson

## DEFENDANTS' MEMORANDUM IN SUPPORT OF THE MOTION TO DISMISS

R. Reeves Anderson
ARNOLD & PORTER LLP
370 Seventeenth Street
Suite 4400
Denver, CO  80202-1370
Tel:  (303) 863-1000
Fax:  (303) 832-0428
reeves.anderson@aporter.com

John B. Bellinger, III
Robert N. Weiner
Robert A. DeRise
ARNOLD & PORTER LLP
601 Massachusetts Ave., NW
Washington, DC  20001-3743
Tel:  (202) 942-5000
Fax:  (202) 942-5999
john.bellinger@aporter.com

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................................................. ii

INTRODUCTION ........................................................................................................... 1

BACKGROUND .............................................................................................................. 3

    A.  Israel's Blockade of the Gaza Strip ................................................................ 4

    B.  The Flotilla ....................................................................................................... 8

    C.  Israel's Interception of the Flotilla ................................................................. 9

STANDARD OF REVIEW ............................................................................................ 11

ARGUMENT ................................................................................................................. 12

I.   ISRAEL AND ITS MINISTRIES ARE IMMUNE FROM THE JURISDICTION OF THIS COURT ........................................................................................................... 12

    A.  Military and Police Operations Fall Outside the Scope of the FSIA Exceptions to Immunity ....................................................................................................... 13

    B.  The FSIA's Terrorism Exception Does Not Apply ........................................ 15

    C.  The FSIA's Non-Commercial Tort Exception Does Not Apply ..................... 16

        1.  The alleged acts did not occur "in the United States" ............................. 17

        2.  The discretionary function exclusion precludes jurisdiction .................... 23

    D.  The FSIA Precludes Punitive Damages .......................................................... 26

II.  THE POLITICAL QUESTION DOCTRINE BARS THIS SUIT ......................... 28

    A.  The Conduct of Foreign Affairs Is Committed to the Political Branches ........ 29

    B.  This Court Lacks Judicially Discoverable Standards ....................................... 31

    C.  Adjudication of this Case Risks Conflict with Coordinate Branches of Government ...... 33

III. THE ACT OF STATE DOCTRINE BARS THIS SUIT ........................................ 35

IV. THE COMPLAINT FAILS TO STATE A CLAIM ............................................. 37

    A.  The Complaint Does Not Identify Any Privately Enforceable Cause of Action ........ 37

    B.  Plaintiffs' Allegations Are Insufficient on the Merits ..................................... 39

    C.  Plaintiffs' Claims Are Untimely ...................................................................... 42

V.  ISRAEL IS THE MORE SUITABLE FORUM TO RESOLVE THIS DISPUTE ......... 43

CONCLUSION ............................................................................................................... 45

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Acree v. Repub. of Iraq*,
  370 F.3d 41 (D.C. Cir. 2004) .......................................................................... 37, 39

*Aktepe v. United States*,
  105 F.3d 1400 (11th Cir. 1997) ............................................................................ 32

*Al-Aulaqi v. Obama*,
  727 F. Supp. 2d 1 (D.D.C. 2010) .......................................................................... 28

*Ali v. Rumsfeld*,
  649 F.3d 762 (D.C. Cir. 2011) .............................................................................. 38

*Amoco Oil Co. v. Mobil Oil Corp.*,
  90 F. Supp. 2d 958 (N.D. Ill. 2000) ................................................................. 44–45

*Arango v. Guzman Travel Advisors Corp.*,
  621 F.2d 1371 (5th Cir. 1980) .............................................................................. 35

* *Argentine Repub. v. Amerada Hess Shipping Corp.*,
  488 U.S. 428 (1989) ................................................................................... *passim*

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009) .................................................................................... 12, 42

*Baker v. Carr*,
  369 U.S. 186 (1962) .......................................................................................... 29

*Banco Nacional de Cuba v. Sabbatino*,
  376 U.S. 398 (1964) .......................................................................................... 35

*Beech Aircraft Corp. v. Rainey*,
  488 U.S. 153 (1988) ............................................................................................ 5

*Belhas v. Ya'alon*,
  515 F.3d 1279 (D.C. Cir. 2008) ......................................................................... 1, 11

*Bell Atlantic Corp. v. Twombly*,
  550 U.S. 544 (2007) .......................................................................................... 12

* Asterisks indicate authorities upon which counsel chiefly relies, pursuant to Local Rule 7(a).

*Boyle v. United Tech. Corp.*,
    487 U.S. 500 (1998) ...................................................................................25

*Carpenter v. Repub. of Chile*,
    610 F.3d 776 (2d Cir. 2010) ........................................................................15

*Chowdhury v. WorldTel Bangladesh Hldg. Ltd.*,
    588 F. Supp. 2d 375 (E.D.N.Y. 2008) .........................................................40

*Cicippio-Puleo v. Islamic Repub. of Iran*,
    353 F.3d 1024 (D.C. Cir. 2004) ...................................................................37

*United States ex rel. Claussen v. Day*,
    279 U.S. 398 (1929) .....................................................................................19

\* *Corrie v. Caterpillar, Inc.*,
    503 F.3d 974 (9th Cir. 2007) ..............................................1, 28, 29, 30–31

*Cunard S.S. Co. v. Mellon*,
    262 U.S. 100 (1923) ...............................................................................19, 20

*Detroit Int'l Bridge Co. v. Gov't of Canada*,
    133 F. Supp. 3d 70 (D.D.C. 2015) .................................................................4

\* *Doe v. State of Israel*,
    400 F. Supp. 2d 86 (D.D.C. 2005) .........................................................*passim*

*El-Shifa Pharm. Indus. Co. v. United States*,
    607 F.3d 836 (D.C. Cir. 2010) .....................................................................32

*Embassy of Nigeria v. Ugwuonye*,
    901 F. Supp. 2d 136 (D.D.C. 2012) .............................................................15

*Friedar v. Gov't of Israel*,
    614 F. Supp. 395 (S.D.N.Y. 1985) .........................................................14, 37

*Gilson v. Repub. of Ireland*,
    682 F.2d 1022 (D.C. Cir. 1982) ...................................................................42

*Good v. Fuji Fire & Marine, Ins. Co., Ltd.*,
    271 F. App'x 756 (10th Cir. 2008) ...............................................................27

*Gringo Pass, Inc. v. United States*,
    542 F. App'x 642 (9th Cir. 2013) ............................................................25–26

*Heaney v. Gov't of Spain*,
    445 F.2d 501 (2d Cir. 1971) ...................................................................14, 15

*Herbage v. Meese*,
    747 F. Supp. 60 (D.D.C. 1990) ................................................................. 14–15

*Industria Panificadora, S.A. v. United States*,
    763 F. Supp. 1154 (D.D.C. 1991) .............................................................. 25, 32

*Interface Partners Int'l Ltd. v. Hananel*,
    575 F.3d 97 (1st Cir. 2009) ........................................................................ 43

*In re Iraq & Afghanistan Detainees Litig.*,
    479 F. Supp. 2d 85 (D.D.C. 2007) ............................................................. 38

*Kennedy v. Mendoza-Martinez*,
    372 U.S. 144 (1963) ................................................................................... 27

*Knievel v. ESPN*,
    393 F.3d 1068 (9th Cir. 2005) ................................................................... 5

*Kryvicky v. Scandinavian Airlines Sys.*,
    807 F.2d 514 (6th Cir. 1986) ..................................................................... 44

*Kuehne & Nagel Inc. v. A.G.R. Eshcol Overseas, Ltd.*,
    No. 13-cv-8919, 2014 WL 4059821 (S.D.N.Y. Aug. 15, 2014) ................. 43

*Lauritzen v. Larsen*,
    345 U.S. 571 (1953) ................................................................................... 20

*Lin v. United States*,
    No. 15-cv-295, 2016 WL 1273187 (D.D.C. Mar. 31, 2016) ...................... 11

*Lujan v. Defenders of Wildlife*,
    504 U.S. 555 (1992) ................................................................................... 11

*Lyles v. Micenko*,
    468 F. Supp. 2d 68 (D.D.C. 2006) ............................................................. 41–42

* *MacArthur Area Citizens Assoc. v. Repub. of Peru*,
    809 F.2d 918 (D.C. Cir. 1987) ................................................................... 23, 24, 25

*Matar v. Dichter*,
    500 F. Supp. 2d 284 (S.D.N.Y. 2007) ....................................................... 28–29

*Matar v. Dichter*,
    563 F.3d 9 (2d Cir. 2009) .......................................................................... 1

*MBI Grp., Inc. v. Credit Foncier Du Cameroun*,
    616 F.3d 568 (D.C. Cir. 2010) ................................................................... 43, 44

*McKeel v. Islamic Repub. of Iran,*
  722 F.2d 582 (9th Cir. 1983) .................................................................. 20

*McKesson Corp. v. Islamic Repub. of Iran,*
  672 F.3d 1066 (D.C. Cir. 2012) .............................................................. 12

*Medellín v. Texas,*
  552 U.S. 491 (2008) ................................................................................ 38

*Mohamad v. Rajoub,*
  634 F.3d 604 (D.C. Cir. 2011) ................................................................ 38

*Mohammadi v. Islamic Repub. of Iran,*
  782 F.3d 9 (D.C. Cir. 2015) .................................................................... 15

*Mondy v. Sec'y of the Army,*
  845 F.2d 1051 (D.C. Cir. 1988) .............................................................. 43

*Nattah v. Bush,*
  770 F. Supp. 2d 193 (D.D.C. 2011) ........................................................ 38

*Odhiambo v. Republic of Kenya,*
  764 F.3d 31 (D.C. Cir. 2014) .................................................................. 18

*Odhiambo v. Republic of Kenya,*
  930 F. Supp. 2d 17 (D.D.C. 2013) .......................................................... 11

*Oetjen v. Cent. Leather Co.,*
  246 U.S. 297 (1918) ................................................................................ 36

*Omar v. McHugh,*
  646 F.3d 13 (D.C. Cir. 2011) .................................................................. 38

*Oveissi v. Islamic Repub. of Iran,*
  573 F.3d 835 (D.C. Cir. 2009) ................................................................ 37

*Overseas Nat'l Airways, Inc. v. Cargolux Airlines Int'l, S.A.,*
  712 F.2d 11 (2d Cir. 1983) ..................................................................... 44

*In re Papandreou,*
  139 F.3d 247 (D.C. Cir. 1998) ................................................................ 35

*Perez v. The Bahamas,*
  652 F.2d 186 (D.C. Cir. 1981) ........................................................... 21–22

*Persinger v. Islamic Republic of Iran,*
  729 F.2d 835 (D.C. Cir. 1984) .......................................................... 20, 22

*Phoenix Consulting Inc. v. Repub. of Angola*,
    216 F.3d 36 (D.C. Cir. 2000) ........................................................ 12

*Pickett v. Potter*,
    571 F. Supp. 2d 66 (D.D.C. 2008) ................................................. 43

*Piper Aircraft Co. v. Reyno*,
    454 U.S. 235 (1981) ................................................................. 43, 44

*Plakas v. Drinski*,
    19 F.3d 1143 (7th Cir. 1994) ....................................................... 40

*Price v. Socialist People's Libyan Arab Jamahiriya*,
    294 F.3d 83 (D.C. Cir. 2002) ....................................................... 39

*Repub. of Austria v. Altmann*,
    541 U.S. 677 (2004) ................................................................. 13

*Repub. of Iraq v. Beaty*,
    556 U.S. 848 (2009) ................................................................. 37

*Ricaud v. Am. Metal Co.*,
    246 U.S. 304 (1918) ................................................................. 36

*Roe v. Unocal Corp.*,
    70 F. Supp. 2d 1073 (C.D. Cal. 1999) ........................................... 37

*Roeder v. Islamic Repub. of Iran*,
    333 F.3d 228 (D.C. Cir. 2003) ..................................................... 27

*Saleh v. Titan Corp.*,
    580 F.3d 1 (D.C. Cir. 2009) ....................................................... 37

* *Saltany v. Reagan*,
    886 F.2d 438 (D.C. Cir. 1989) .............................................. 3, 14, 45

*Samantar v. Yousuf*,
    560 U.S. 305 (2010) ................................................................. 16

* *Saudi Arabia v. Nelson*,
    507 U.S. 349 (1993) ..................................................... 12, 13–14, 15

*Schneider v. Kissinger*,
    412 F.3d 190 (D.C. Cir. 2005) ................................................. 28, 29

*Sea Search Armada v. Repub. of Columbia*,
    821 F. Supp. 2d 268 (D.D.C. 2011) ............................................. 42

*Sea Search Armada v. Repub. of Colombia,*
    522 F. App'x 1 (D.C. Cir. 2013) ......................................................42

*Shuler v. United States,*
    531 F.3d 930 (D.C. Cir. 2008)........................................................25

* *Smith v. Socialist People's Libyan Arab Jamahiriya,*
    101 F.3d 239 (2d Cir. 1996) ......................................................20, 21

*Sosa v. Alvarez-Machain,*
    542 U.S. 692 (2004) ................................................................38, 41

*Tarros S.p.A. v. United States,*
    982 F. Supp. 2d 325 (S.D.N.Y. 2013) ...........................................32, 33

*In re Terrorist Attacks on Sept. 11, 2011,*
    538 F.3d 71 (2d Cir. 2008) ......................................................15–16

*Transaero, Inc. v. La Fuerza Aerea Boliviana,*
    30 F.3d 148 (D.C. Cir. 1994)..........................................................27

*Underhill v. Hernandez,*
    168 U.S. 250 (1897) ....................................................................36

*United States v. Flores,*
    289 U.S. 137 (1933) ....................................................................19

*United States v. Fort,*
    921 F. Supp. 523 (N.D. Ill. 1996) ....................................................38

* *United States v. Gaubert,*
    499 U.S. 315 (1991) ............................................................23, 24, 25

*United States v. Lopez Garcia,*
    672 F.3d 58 (1st Cir. 2012)............................................................40

*United States v. Varig Airlines,*
    467 U.S. 797 (1984) ....................................................................25

*Verlinden B.V. v. Cent. Bank of Nigeria,*
    461 U.S. 480 (1983) ................................................................11–12

*Wilson v. Eckhaus,*
    349 F. App'x 649 (2d Cir. 2009) ..................................................43, 44

* *Wu Tien Li-Shou v. United States,*
    777 F.3d 175 (4th Cir. 2015) ....................................................*passim*

*In re XE Servs. Alien Tort Litig.*,
   665 F. Supp. 2d 569 (E.D. Va. 2009) .................................................................... 40

*Zhi Chen v. Monk*,
   701 F. Supp. 2d 32 (D.D.C. 2010) ......................................................................... 42

*Zuckerbraun v. Gen. Dynamics Corp.*,
   755 F. Supp. 1134 (D. Conn. 1990) ....................................................................... 32

**Statutes**

18 U.S.C. § 2441(a) ................................................................................................... 37

18 U.S.C. § 2441(d)(1)(E) ......................................................................................... 40

18 U.S.C. § 2441(d)(2)(B) ......................................................................................... 40

28 U.S.C. § 1330 ....................................................................................................... 26

*28 U.S.C. § 1603(a) ........................................................................................... 13, 26

*28 U.S.C. § 1603(c) ..................................................................................... 17, 18, 20

*28 U.S.C. § 1605(a)(5) ..................................................................................... *passim*

*28 U.S.C. § 1605(a)(5)(A) ............................................................................ 16, 17, 23

*28 U.S.C. § 1605A ............................................................................................. 13, 15

*28 U.S.C. § 1605A(a)(2)(A) .................................................................................... 15

28 U.S.C. § 1606 ....................................................................................................... 26

46 U.S.C. § 30106 ..................................................................................................... 42

D.C. Code § 12-301 ................................................................................................... 42

**Rules**

Fed. R. Civ. P. 12(b)(1) ..................................................................................... 4, 11, 28

Fed. R. Civ. P. 12(b)(2) ............................................................................................. 28

Fed. R. Civ. P. 12(b)(6) ....................................................................................... 12, 37

Fed. R. Evid. 201 ........................................................................................................ 4

**Other Federal Materials**

H.R. Rep. No. 94-1487 (1976) ...........................................................................22

H.R. Res. 951, 110th Cong. (2008) .....................................................................5

S. Res. 548, 111th Cong. (2010) .....................................................................7, 34

Designation of Foreign Terrorist Organizations, 62 Fed. Reg. 52,650 (Oct. 8,
     1997)...........................................................................................................4

*Jurisdiction of U.S. Courts in Suits Against Foreign States:  Hearings on H.R.
     11315 Before the Subcomm. on Admin. Law and Gov't Relations of the H.
     Comm. on the Judiciary*, 94th Cong. 95-96 (1976).....................................22

Review of Designation of Hamas, 77 Fed. Reg. 44,307 (July 27, 2012) .......................4

Statement of Interest of the United States, *Matar v. Dichter*, 500 F. Supp. 2d 284
     (S.D.N.Y. 2007) (05-cv-10270),
     http://www.state.gov/documents/organization/98806.pdf ...............34–35

Suggestion of Immunity of the United States, *Doğan v. Barak*, 15-cv-8130 (C.D.
     Cal. June 10, 2016), ECF 48............................................................34

United States' Br. in Support of Mot. to Dismiss, *Doe v. State of Israel*, 400 F.
     Supp. 2d 86 (D.D.C. 2005) (02-cv-1431), ECF 8 ....................................30

United States' Br. in Support of Affirmance, *Matar v. Dichter*, 563 F.3d 9 (2d Cir.
     2007) (07-2579), 2007 WL 6931924.........................................................35

U.S. Dep't of State, *Country Reports on Terrorism, ch. 2: Middle East and North
     Africa Overview* (2008), http://goo.gl/Dzfz1E  ...........................................5

U.S. Dep't of State, *Country Reports on Terrorism, ch. 2: Middle East and North
     Africa Overview* (2015), http://goo.gl/wKBn0F ...........................................16

U.S. Dep't of State, *Country Reports on Terrorism, ch. 6: Foreign Terrorist
     Organizations* (2015), http://goo.gl/tT3kTm ...........................................4

U.S. Dep't of State, Daily Press Briefing (June 2, 2010),
     http://www.state.gov/r/pa/prs/dpb/2010/06/142591.htm ...............................33–34

U.S. Dep't of State, State Sponsors of Terrorism,
     http://www.state.gov/j/ct/list/c14151.htm ........................................................16

**Other Authorities**

Australian Government, *Australian National Security, Listed Terrorist
     Organisations*, https://goo.gl/vvBd3Y  ...........................................................4

Carol Migdalovitz, Cong. Research Serv., *Israel's Blockade of Gaza, the* Mavi
Marmara *Incident, and Its Aftermath*, R41275 (June 23, 2010)............................................10

Council of the European Union, Council Decision 2015/2430, 2015 O.J. (L 334) ......................4

Government of Canada, *Public Safety Canada, Currently Listed Entities*,
http://goo.gl/eVc274 ...........................................................................................................4

Israel Ministry of Transport, Administration of Shipping and Ports, No. 1/2009
Blockade of Gaza Strip (Jan. 6, 2009), http://goo.gl/hh2ex7 ............................................6–7

The Turkel Commission, The Public Commission to Examine the Maritime
Incident of 31 May 2010 (Jan. 2011), http://goo.gl/n4DWov ..................................4

Restatement (Third) of Foreign Relations Law of the United States § 502 (Am.
Law Inst. 1987)..................................................................................................................20

*S.S. Lotus* (Fr. v. Turk.) 1927 P.C.I.J. (ser. A) No. 10 (Sept. 7)...................................................19

* Sir Geoffrey Palmer et al., *Report of the Secretary-General's Panel of Inquiry
on the 31 May 2010 Flotilla Incident* (Sept. 2011), http://goo.gl/I9roH .......................*passim*

U.K. Home Office, *Proscribed Terrorist Organisations* 9 (July 15 2016),
https://goo.gl/mGzSpF ........................................................................................................4

*UN Chief Condemns Rocket Attacks on Israel from Gaza*, UN News Centre (Sept.
20, 2015), http://goo.gl/kTKnlK ........................................................................................5

United Nations Convention on the Law of the Sea art. 92, Dec. 10, 1982, 1833
U.N.T.S. 397..................................................................................................................19

Wolff Heintschel von Heinegg, *Methods and Means of Naval Warfare in Non-
International Armed Conflicts*, 88 Int'l L. Stud. 211 (2012).................................................6

## INTRODUCTION

This lawsuit does not belong in a U.S. court.  Plaintiffs invite this Court to second-guess actions by the State of Israel and several of its Ministries to maintain Israel's naval blockade of the Gaza Strip against a Flotilla of six vessels carrying Plaintiffs and 700 other individuals who tried—and failed—to force their way through the blockade on May 31, 2010.  Plaintiffs thus would have this Court intrude on fundamental aspects of Israel's national sovereignty—its efforts, in this instance through military operations, to protect its citizens from terrorist attacks launched from the Gaza Strip as part of the armed conflict waged by Hamas and other Palestinian terrorist organizations against Israel.  No U.S. court has entangled itself in these types of national security decisions of a sovereign nation.  This Court should not be the first.

First, under the plain language of the Foreign Sovereign Immunities Act ("FSIA"), the court lacks jurisdiction over the defendants and the claims.  Federal courts (including this Court and the D.C. Circuit) have uniformly rejected previous challenges to Israeli military and security operations in Gaza and elsewhere.  *See Matar v. Dichter*, 563 F.3d 9 (2d Cir. 2009) (dismissing suit against former head of Israeli General Security Service for bombing of apartment complex in Gaza occupied by a senior Hamas terrorist); *Belhas v. Ya'alon*, 515 F.3d 1279 (D.C. Cir. 2008) (dismissing suit against former head of Israeli Army Intelligence for civilian deaths allegedly caused by Israeli military actions in southern Lebanon); *Doe v. State of Israel*, 400 F. Supp. 2d 86 (D.D.C. 2005) (dismissing suit against Israel, the Israeli Defense Forces, other ministries, officials, and military officers for alleged injuries to Palestinians in the West Bank); *see also Corrie v. Caterpillar, Inc.*, 503 F.3d 974 (9th Cir. 2007) (dismissing suit against manufacturer for selling bulldozers to Israeli Defense Forces for security operations in the West Bank and Gaza).  There is no legal distinction between those cases and this one.  The terrorism exception to the FSIA does not confer jurisdiction because the United States has not designated Israel a

1

"state sponsor of terrorism."  Indeed, Israel is a close ally of the United States at the forefront of combatting local and global terrorism.  Nor does the FSIA's non-commercial tort exception apply.  The challenged Israeli acts did not occur "in the United States," as the statute requires, and, in any event, that exception does not cover discretionary acts of the sort challenged here.

Second, this Court also lacks jurisdiction over Plaintiffs' claims because the propriety of Israel's national security and counter-terrorism policies is a paradigmatic political question. Israel is a democratic country with a well-developed judicial system committed to the rule of law.  The Israeli Government has expressed regret for the deaths and injuries of the Flotilla participants, and created an independent public commission, headed by a former Israeli Supreme Court justice, that thoroughly investigated the Flotilla incident.[1]  If this Court were now to attempt to examine the actions of Israel and its Ministries in the United States for an incident already investigated thoroughly in Israel, it would impermissibly pass judgment on the actions and national security policies of a foreign ally, breach international comity, and risk conflict with the actions of the political branches of the U.S. Government.  To contemplate how such a case would unfold is to highlight these intractable problems—with efforts to depose senior military personnel of a foreign sovereign; to ask them about strategic and tactical judgments; and to demand disclosure of the intelligence they had available, the threat assessments they undertook, their contingency plans and numerous other inquiries that no sovereign nation would remit to a

---

[1] Immediately after the Flotilla incident, Prime Minister Netanyahu stated: "We regret this loss of life.  We regret any of the violence that was there."  http://goo.gl/OMx3cu.  In March 2013, Prime Minister Netanyahu called Turkish President Erdogan and "expressed Israel's apology to the Turkish people for any mistakes that might have led to the loss of life or injury."  The Prime Minister "made clear that the tragic outcome of the Mavi Marmara incident was not intended by Israel and that Israel regrets the loss of human life and injury."  http://goo.gl/9RIzRq.

foreign court.  Such a precedent would encourage foreign courts to undertake the same type of inquiry into U.S. military operations wherever they may take place.

Third, the act of state doctrine bars Plaintiffs' claims, as they invite the Court to judge the legality of Israel's quintessentially sovereign acts of enforcing a maritime blockade to prevent weapons from entering the Hamas-controlled Gaza Strip by sea, and defending its civilians against terrorist attacks launched from the neighboring Gaza Strip.

Fourth, Plaintiffs fail to state a viable claim because, among other reasons, they assert claims under treaties and statutes that do not provide a private cause of action.

Fifth, the proper forum to litigate Plaintiffs' claims is, if anywhere, in Israel, not in a U.S. court.

These points rest on settled law in this Circuit, which Plaintiffs ask the Court to ignore. In a similar lawsuit against the United Kingdom seeking damages for injury and property loss resulting from its role in a U.S. air strike on Libya in 1986, the D.C. Circuit sanctioned plaintiffs' counsel who "surely knew" the complaint had "no hope whatsoever of success." *Saltany v. Reagan*, 886 F.2d 438, 440–41 (D.C. Cir. 1989).  The D.C. Circuit had no patience for the use of litigation for political protest:  "We do not conceive it a proper function of a federal court to serve as a forum for 'protests,' to the detriment of parties with serious disputes waiting to be heard."  *Id*. at 440.  The same is true here.  This Court is not a platform for political protests. The Complaint therefore should be dismissed.

## BACKGROUND

The conflict in the Middle East is among the most volatile, difficult, and politically fraught in the world.  Plaintiffs' description of the events underlying their claims omits this context, and, even apart from that deficiency, is distorted.  The public record—in particular, the

materials from which Plaintiffs selectively quote—illuminates the circumstances leading up to

Israel's interdiction of the unlawful Gaza Flotilla on May 31, 2010.[2]

A.      **Israel's Blockade of the Gaza Strip**

The State of Israel has maintained a naval blockade of the Gaza Strip since January 2009.

Compl. ¶ 22.  This security measure arose from the serious military threat Israel faces from

militant groups in Gaza and, in particular, the terrorist organization Hamas, which is dedicated to

the destruction of the State of Israel and creation of an Islamic state.  *See* Compl. ¶ 18.[3]  The

United States, the United Kingdom, Australia, Canada, and other countries have designated

Hamas a terrorist organization, as has the European Union.[4]  In June 2007, Hamas forcibly

seized control of the Gaza Strip, territory that Hamas controls to this day.[5]

Plaintiffs rely on a United Nations commission charged by the U.N. Secretary General

with investigating the May 31, 2010 Flotilla incident.  That commission found that militant

---

[2] The background for the Gaza Flotilla, as well as Israel's actions to prevent the arrival of the Flotilla, are described in extensive detail in Part I of the nearly 300-page report of a government commission established by the Government of Israel, The Public Commission to Examine the Maritime Incident of 31 May 2010 (the "Turkel Commission").  The Commission was chaired by former Israeli Supreme Court Justice Jacob Turkel and included former senior government officials from Canada and Northern Ireland as international observers.  The Complaint does not disclose the existence of the Turkel Commission Report ("Turkel Rpt.").  http://goo.gl/n4DWov. In providing background to the Court, this motion will primarily use the materials cited in the Complaint.  *Detroit Int'l Bridge Co. v. Gov't of Canada*, 133 F. Supp. 3d 70, 84 (D.D.C. 2015); Fed. R. Evid. 201; Fed. R. Civ. P. 12(b)(1).

[3] U.S. Dep't of State, *Country Reports on Terrorism, ch. 6: Foreign Terrorist Organizations* (2015), http://goo.gl/tT3kTm ("2015 Country Reports"); Designation of Foreign Terrorist Organizations, 62 Fed. Reg. 52,650 (Oct. 8, 1997).

[4] *E.g.*, Designation of Foreign Terrorist Organizations, 62 Fed. Reg. 52,650; Review of Designation of Hamas, 77 Fed. Reg. 44,307 (July 27, 2012); U.K. Home Office, *Proscribed Terrorist Organisations* 9 (July 15 2016), https://goo.gl/mGzSpF; Australian Government, *Australian National Security, Listed Terrorist Organisations*, https://goo.gl/vvBd3Y; Government of Canada, *Public Safety Canada, Currently Listed Entities*, http://goo.gl/eVc274; Council of the European Union, Council Decision 2015/2430, 2015 O.J. (L 334) 18, 20.

[5] 2015 Country Reports, at ch.6.

groups associated with Hamas launched over 5,000 rockets and mortar bombs from the Gaza Strip into Israel from 2005 until January 2009.  Sir Geoffrey Palmer et al., *Report of the Secretary-General's Panel of Inquiry on the 31 May 2010 Flotilla Incident*, ¶ 71 (Sept. 2011), http://goo.gl/I9roH (the "U.N. Commission" and "U.N. Rpt." respectively).[6]  These indiscriminate rocket attacks, widely condemned by the international community,[7] threaten "[h]undreds of thousands of Israeli civilians [who] live in the range of these attacks."  U.N. Rpt. ¶ 71.  Since 2001, the attacks have killed or wounded hundreds of civilians.  U.N. Rpt. ¶ 71.

After Hamas seized control of Gaza in 2007, "the rocket and mortar attacks on Israeli towns increased dramatically."  U.N. Rpt. ¶ 73 n.265.  Terrorists in Gaza fired 1,645 rockets and mortars into Israel in 2007.  By 2008, the year after the Hamas takeover, the number of attacks doubled to 3,278 mortar and rocket attacks.[8]

Accordingly, on January 3, 2009, Israel established a naval blockade of the Gaza Strip in order to "defend[ ] [Israel's] territory and population."  U.N. Rpt. ¶¶ 72, 74.  A blockade is a well-recognized and legitimate tool at a sovereign's disposal often employed in the context of international armed conflicts at sea.  U.N. Rpt. ¶ 73, U.N. Rpt. App'x ¶¶ 16, 20.  This blockade

---

[6] The Complaint incorporates by reference part of the U.N. Report.  Compl. ¶¶ 18, 20.  *See Knievel v. ESPN*, 393 F.3d 1068, 1076 (9th Cir. 2005); *see also Beech Aircraft Corp. v. Rainey*, 488 U.S. 153, 171–72 (1988) (when part of a document is introduced, another portion that, in fairness, should be considered alongside the former for completeness' sake is "ipso facto relevant").  The U.N. Report in its entirety is also properly considered on a Rule 12(b)(1) motion.  Israel's representative to the U.N. Commission registered Israel's reservations or disagreement with certain aspects of the U.N. Report, U.N. Rpt. p. 104—Israel's reference to the U.N. report for certain context underlying the Flotilla incident here does not alter that formal position.

[7] *See, e.g.*, *UN Chief Condemns Rocket Attacks on Israel from Gaza*, UN News Centre (Sept. 20, 2015), http://goo.gl/kTKnlK; H.R. Res. 951, 110th Cong. (2008) (condemning rocket attacks against Israel).

[8] U.S. Dep't of State, *Country Reports on Terrorism, ch. 2: Middle East and North Africa Overview* (2008), http://goo.gl/Dzfz1E (citing figures from Israel Ministry of Foreign Affairs).

"was designed as one way to prevent weapons reaching Gaza by sea and to prevent such attacks to be launched from the sea."  U.N. Rep. ¶ 72, *see also id.* ¶¶ 70 74; Compl. ¶ 22 (describing blockade).  Weapons traffickers had repeatedly attempted to smuggle into the Gaza Strip many tons of light and heavy weapons, which the Israeli Navy successfully intercepted on numerous occasions.  *See* U.N. Rpt. ¶ 72.  The U.N. Commission found "that Israel had a military objective" underlying its decision to implement the blockade, namely, "to prevent weapons, ammunition, military supplies and people from entering Gaza and to stop Hamas operatives sailing away from Gaza with vessels filled with explosives."  U.N. Rpt. ¶ 77.

As the Complaint and the materials it cites reflect, Israel undertook comprehensive measures to warn all vessels about the blockade of the Gaza Strip, its terms, and its coordinates, consistent with international law that a naval blockade be properly noticed and enforced against all maritime traffic.  Those measures included:

- On January 3, 2009, Israel issued a Notice to Mariners (the "NOTMAR") which described the blockade and its coordinates:

  *All mariners are advised that as of 03 January 2009, 1700 UTC, Gaza maritime area is closed to all maritime traffic and is under blockade imposed by Israeli Navy until further notice.  Maritime Gaza area is enclosed by the following coordinates …*

- Israel published the NOTMAR on the websites of the IDF the Israeli Shipping Authority and the Israeli Ministry of Transport, and on several "standard international channels"; and

- Israel broadcast the NOTMAR twice a day on an emergency radio channel for maritime communications.

Compl. ¶¶ 22, 23 (quoting NOTMAR); U.N. Rpt. ¶ 75; *see also* U.N. Rpt. ¶¶ 73–76 (blockade requirements).[9]  The Israeli Navy re-routed to the Israeli port of Ashdod any vessel attempting to

---

[9] Wolff Heintschel von Heinegg, *Methods and Means of Naval Warfare in Non-International Armed Conflicts*, 88 Int'l L. Stud. 211, 216 (2012) (describing measures notifying vessels); Israel

Footnote continued on next page

bring humanitarian relief to the Gaza Strip, and any such relief, after inspection, proceeded by land to the Gaza Strip.  *See* Compl. ¶¶ 45–46 (describing re-routing to Ashdod); U.N. Rpt. ¶ 80 ("provision was made for any essential humanitarian supplies on board the vessels to enter Gaza via the adjacent Israeli port of Ashdod").

After Israel imposed the blockade in 2009, militants continued to attempt to smuggle weapons into Gaza.  U.N. Rpt. ¶ 72.  In March 2011, for example, the Israeli Navy intercepted the *Victoria*, a vessel that stopped in Turkey and then was headed for Gaza.  Israel seized onboard twenty-five (25) tons of weapons and ammunition.  *See* U.N. Rpt. ¶ 72 n.258.

The U.N. Commission determined that Israel properly employed the blockade as a legitimate means of self-defense against attacks from the Gaza Strip and found the blockade legal under international law.   The U.N. Commission concluded that "Israel faces a real threat to its security from militant groups in Gaza," that "[t]he naval blockade was imposed as a legitimate security measure in order to prevent weapons from entering Gaza by sea," and that the blockade's "implementation complied with the requirements of international law."  U.N. Rpt. at 4, ¶ 82; *see also id.* ¶¶ 72, 81.  The United States Senate passed a resolution declaring that Israel's blockade of Gaza was "legitimate and justified" and was implemented "out of concern for the safety of its citizens," and further that the blockade "has been effective in reducing the flow of weapons into Gaza and the firing of rockets from Gaza into southern Israel."  S. Res. 548, 111th Cong. (2010).

---

Footnote continued from previous page

Ministry of Transport, Administration of Shipping and Ports, No. 1/2009 Blockade of Gaza Strip (Jan. 6, 2009), http://goo.gl/hh2ex7 (text of NOTMAR).

B.      The Flotilla

Plaintiffs, like the organizers of the May 31, 2010 Flotilla, allege that they embarked on the journey for humanitarian reasons, to "break the blockade" and deliver aid and supplies to Gaza.  Compl. ¶¶ 2, 24; *see* U.N. Rpt. ¶ 85.  Plaintiffs also admit other "aims of the Flotilla," which included "draw[ing] international public attention to the situation in the Gaza Strip and the effect of the blockade."  Compl. ¶ 24.

The U.N. Commission "seriously question[ed] the true nature and objectives of the flotilla organizers," U.N. Rpt. ¶ 86, and concluded that "the primary objective of the flotilla organizers was to generate publicity by attempting to breach the blockade."  U.N. Rpt. ¶ 90; *see id.* ¶¶ 85–87.  Evidence that Hamas had planned a public reception for the Flotilla upon its arrival in Gaza reinforced the conclusion that the Flotilla's goal was propaganda.  U.N. Rpt. ¶ 90. The U.N. Commission further found that the passengers committed in advance not to "obey [] the decisions, warnings or demands of the governments of countries in the region regarding this ship."  U.N. Rpt. ¶ 88; *see also* Compl. ¶¶ 32, 42 (describing "passive" resistance training).

Faced with this effort that effectively would reopen channels long used to smuggle weaponry, Israel diligently tried to convince Flotilla participants not to breach the naval blockade, even offering to deliver to Gaza any humanitarian supplies onboard the ships.  U.N. Rpt. ¶ 100 (citing "extensive and genuine efforts [] made by Israel to facilitate the delivery of humanitarian supplies from the flotilla to Gaza thus obviating the need to challenge the blockade"); *see* ¶¶ 80, 90 ("the flotilla rejected offers to unload any essential humanitarian supplies at other ports and have them delivered to Gaza by land").  In early 2010, upon learning of the impending Flotilla and its planned attempt to break Israel's lawful blockade, Israel engaged the Turkish government in extensive discussions at the highest levels in an attempt to

resolve the concerns of all interested parties through diplomacy.  U.N. Rpt. ¶¶ 96, 98, 100;

*cf.* Compl. ¶ 33 (Israel became aware of the Flotilla in February 2010).  Israel also pursued

diplomatic discussions with Greece, Cyprus, Egypt, the United Kingdom, and the United States.

U.N. Rpt. ¶¶ 98–99, 103.

The Flotilla consisted of six vessels embarking from Ireland, Turkey, and Greece,

including the one on which Plaintiffs rode (the *Challenger I*), as well as the *Mavi Marmara*, the

largest in the Flotilla.  Compl. ¶¶ 24, 25; U.N. Rpt. ¶ 48.  On May 30, 2010, the six vessels met

in the Mediterranean Sea south of Cyprus and sailed for the Gaza Strip, carrying about 700

passengers (most from Turkey) with passports from 40 different countries.  U.N. Rpt. ¶ 84.

### C.    Israel's Interception of the Flotilla

Late on May 30 and into May 31, 2010, as the Flotilla headed toward the Gaza Strip,

Israel broadcast four separate radio warnings to the Flotilla, indicating that it was approaching an

area subject to a naval blockade.  The first and second warnings conveyed that the vessels were

approaching a naval blockade and invited the vessels to sail to Ashdod to deliver any

humanitarian supplies to Gaza.  *See* U.N. Rpt. ¶ 106.  The U.N. Commission found that the third

and fourth warnings "were delivered emphasizing that 'all necessary measures' would be taken

to enforce the blockade, including through boarding of the vessels," *id.*, citing the language of

the fourth warning, which stated:

> *This is the Israeli Navy.  You are approaching an area of hostilities which is
> under a naval blockade.  The Gaza area is a combat zone, by entering this zone
> you are putting your vessel at risk.*
>
> *You are hereby ordered to change your course and refrain from entering the area.
> If you ignore this order and attempt to enter the blockaded area, the Israeli Navy
> will be forced to take all the necessary measures including boarding your vessel
> in order to enforce this blockade.  Be aware that you are violating a legal naval
> blockade and that the organizers and captains of this sail will be held responsible.*

U.N. Rpt. ¶ 106 n.340 (citing Turkel Rpt. at 131).[10]  The *Challenger I* disregarded the Israeli

Navy's warnings.  *See* Compl. ¶ 41 (describing evasive maneuvers); U.N. Rpt. ¶ 108.  Thus,

when the Flotilla was roughly 72 nautical miles from the coast of Gaza hours later, the IDF, as

warned, intercepted the Flotilla, including the *Challenger I*, in order to enforce the blockade.

Compl. ¶¶ 28, 41–44; U.N. Rpt. ¶ 1; *see also* Compl. ¶¶ 33–34 (plan to enforce the blockade).

When IDF personnel boarded the *Mavi Marmara*, the largest vessel, they encountered

extreme and violent resistance.  The IDF "released videos showing that individuals attacking the

[Israeli] commandos were armed with iron rods, knives, broken glass bottles, and slingshots, and

equipped with gas masks" and "night vision goggles."  Carol Migdalovitz, Cong. Research Serv.,

*Israel's Blockade of Gaza, the* Mavi Marmara *Incident, and Its Aftermath*, R41275, at 2 (June 23,

2010); *see also* U.N. Rpt. ¶ 124 (concluding that the first IDF soldiers on the *Mavi Marmara*

"faced significant, organized and violent resistance").  The U.N. Commission further found that

three IDF soldiers were "overpowered by the passengers … and were taken below [] deck."

U.N. Rpt. ¶ 125.  Ten passengers died from injuries suffered on the *Mavi Marmara*, and many

others were injured, Compl. ¶ 36; at least eight IDF soldiers were wounded.  U.N. Rpt. ¶ 124.

When the IDF approached the *Challenger I* on a speedboat, the *Challenger I* performed

evasive maneuvers in order to, as Plaintiffs admit, "delay the [IDF] boarding of the vessel …."

Compl. ¶ 41.  Plaintiffs allege that they suffered injuries when IDF soldiers ultimately boarded

the *Challenger I*, primarily including:

---

[10] There was no dispute before the U.N. Commission over the content of these warnings or the
fact of their transmission before the Israeli Navy intercepted the Flotilla.  U.N. Rpt. ¶¶ 30-31,
54.  The "announcements and advisories on the implementation of the blockade" that Israel
issued in regards to the Flotilla, Compl. ¶ 23, are also incorporated by reference because
Plaintiffs directly quoted one such advisory.

- Plaintiff Schermerhorn (a U.S. citizen) claims to have been injured by a stun grenade that caused partial blindness in one eye.  Compl. ¶¶ 8, 41.

- Plaintiff Wright (a U.S. citizen) was detained by IDF officers.  *Id.* ¶ 9.

- Plaintiff Arraf (a dual U.S.-Israeli citizen) suffered injury when IDF soldiers pushed her to the deck, causing her to hit her head.  She was detained and "placed in handcuffs that were too tight."  *Id.* ¶¶ 10, 43.

- Plaintiff Deknopper (a Belgian citizen) incurred a broken nose from a rubber bullet.  *Id.* ¶¶ 11, 43.

The IDF took all Flotilla participants to the Israeli port city of Ashdod for security processing, Compl. ¶ 46, and subsequently released them.  This lawsuit followed five-and-a-half years later.

## STANDARD OF REVIEW

As in every case, "the Court begins with the presumption that it does not have subject matter jurisdiction."  *Lin v. United States*, No. 15-cv-295, 2016 WL 1273187, at *3 (D.D.C. Mar. 31, 2016); *see Odhiambo v. Republic of Kenya*, 930 F. Supp. 2d 17, 23 (D.D.C. 2013).  Thus, to survive a Rule 12(b)(1) motion to dismiss, Plaintiffs bear the burden of demonstrating that the Court in fact does have subject matter jurisdiction over their claims.  *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992); *Odhiambo*, 930 F. Supp. 2d at 23.  Courts "must accept as true all factual allegations contained in the complaint when reviewing a motion to dismiss pursuant to Rule 12(b)(1)," but they need not accept as true "the plaintiff's legal conclusions or inferences that are unsupported by the facts alleged," and the factual allegations themselves demand "closer scrutiny in resolving a 12(b)(1) motion than in resolving a 12(b)(6) motion for failure to state a claim."  *Lin*, 2016 WL 1273187, at *1, 3.  The court "must engage in sufficient pretrial factual and legal determinations to satisfy itself of its authority to hear the case."  *Belhas v. Ya'alon*, 515 F.3d 1279, 1281 (D.C. Cir. 2008); *see Verlinden B.V. v. Cent. Bank of Nigeria*,

11

461 U.S. 480, 493–94 (1983) (foreign states should not be subjected to burdens of litigation unless a court "appl[ies] the detailed federal law standards set forth in the [Foreign Sovereign Immunities] Act" and "satisf[ies] itself that one of the exceptions [to immunity] applies").

To survive a motion to dismiss under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal quotation marks omitted). The facts alleged in the complaint "must be enough to raise a right to relief above the speculative level." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007).

## ARGUMENT

## I.   ISRAEL AND ITS MINISTRIES ARE IMMUNE FROM THE JURISDICTION OF THIS COURT

The FSIA "provides the sole basis for obtaining jurisdiction over a foreign state in federal court." *Argentine Repub. v. Amerada Hess Shipping Corp.*, 488 U.S. 428, 439 (1989). "Under the [FSIA], a foreign state is presumptively immune from the jurisdiction of United States courts; unless a specified exception applies, a federal court lacks subject-matter jurisdiction over a claim against a foreign state." *Saudi Arabia v. Nelson*, 507 U.S. 349, 355 (1993); *McKesson Corp. v. Islamic Repub. of Iran*, 672 F.3d 1066, 1075 (D.C. Cir. 2012) (noting the FSIA's "broad grant of immunity for foreign sovereigns that can only be abrogated by one of the statute's narrowly drawn exceptions"). Because foreign sovereign immunity is "an immunity from trial and the attendant burdens of litigation, and not just a defense to liability on the merits," *Phoenix Consulting Inc. v. Repub. of Angola*, 216 F.3d 36, 39 (D.C. Cir. 2000), the law provides that "[a]t the threshold of every action in a District Court against a foreign state … the court must satisfy itself that one of the exceptions applies," *Verlinden*, 461 U.S. at 493–94.

Plaintiffs concede that the State of Israel is a "foreign state" entitled to immunity. Compl. ¶ 12.  As shown in Section I.D., *infra*, the Israeli Ministry of Defense, Ministry of Foreign Affairs, Ministry of Justice, and Ministry of Public Security (the "Ministries") also constitute an integral part of the "foreign state" of Israel, and are therefore also entitled to immunity.  *See also* 28 U.S.C. § 1603(a) (defining a "foreign state").

Plaintiffs invoke two statutory exceptions to the Defendants' immunity.  For Count 1 (torture), Plaintiffs rely on the FSIA's so-called "terrorism exception," 28 U.S.C. § 1605A, and the "non-commercial tort exception," *id*. at 1605(a)(5).  For the remaining claims (Counts 2 through 9), Plaintiffs rely only on the non-commercial tort exception.  Neither exception provides jurisdiction over Israel and its Ministries in this case—for two reasons.  First, as a general matter, the FSIA does not abrogate immunity when the underlying conduct constitutes military or security operations.  Second, even if it did, Plaintiffs cannot satisfy the elements to invoke this Court's jurisdiction under either the terrorism or the non-commercial tort exception.

### A.   Military and Police Operations Fall Outside the Scope of the FSIA Exceptions to Immunity

Plaintiffs' claims fail as a matter of law because they challenge decision-making and execution of a foreign sovereign's military and national security operations.  The Supreme Court and D.C. Circuit have squarely held that such conduct falls outside *any* of the FSIA's exceptions to sovereign immunity.

The FSIA "codifies, as a matter of federal law, the restrictive theory of sovereign immunity."  *Repub. of Austria v. Altmann*, 541 U.S. 677, 691 (2004) (citation omitted).  Under the restrictive theory, "a state is immune from the jurisdiction of foreign courts as to its sovereign or public acts (*jure imperii*), but not as to those that are private or commercial in character (*jure gestionis*)."  *Nelson*, 507 U.S. at 359–60.  "[A] foreign state's exercise of the

power of its police has long been understood for purposes of the restrictive theory as peculiarly sovereign in nature." *Id.* at 361.  Thus, in *Saudi Arabia v. Nelson*, the Supreme Court held that when the "the powers allegedly abused were those of police and penal officers," a plaintiff's action "is based upon a sovereign activity immune from the subject-matter jurisdiction of United States courts." *Id.* at 363.

A foreign state's "acts concerning the armed forces" are the paradigm of "strictly political or public acts" that are immune from review in U.S. courts.  *Heaney v. Gov't of Spain*, 445 F.2d 501, 503 (2d Cir. 1971) (Friendly, C.J.).  This immunity extends broadly to a foreign sovereign's "internal administrative activity and management of its armed forces," which are considered to be "governmental acts" and "sovereign functions."  *Friedar v. Gov't of Israel*, 614 F. Supp. 395, 398–99 (S.D.N.Y. 1985).

Applying this principle, courts in the D.C. Circuit have dismissed many suits under the FSIA.  When Libyan citizens and residents sued the United Kingdom seeking damages for injury and property loss resulting from its role in a U.S. air strike on Libya in 1986, the D.C. Circuit held that the claim against the United Kingdom was "clearly doomed," and that plaintiffs' counsel "surely knew" the complaint had "no hope whatsoever of success," because "a foreign state's use of military force allegedly in violation of international law fell outside *any of the exceptions to sovereign immunity* provided by the FSIA."  *Saltany v. Reagan*, 886 F.2d 438, 440–41 (D.C. Cir. 1989) (citing *Amerada Hess*, 488 U.S. at 443) (emphasis added).  The court ultimately found the claim "frivolous" and awarded attorneys' fees.  *Id.*  This Court similarly held in another case that British security officials were immune because their challenged acts were "sovereign or governmental in nature"—*i.e.*, "[f]rom the constable carrying out the arrest, to the detective, to the prosecutor, these defendants were performing official government

functions classically belonging to the discretion of the executive, and classically immune from suit." *Herbage v. Meese*, 747 F. Supp. 60, 67 (D.D.C. 1990).

These precedents foreclose Plaintiffs' suit.  The express predicate of Plaintiffs' claims is that the "Government of Israel developed a plan for the operation which was approved by the Chief of the Israeli General Staff," and the Israeli Ministries "were all parties to planning, approving, preparing for, ordering, and executing the raid on the Flotilla, and the Government and its Ministry of Defense maintained command and control authority over the operation." Compl. ¶ 34; *see id.* ¶¶ 33, 80–84.  Such military and national security operations are sovereign functions for which foreign states are classically immune.  *Nelson*, 507 U.S. at 361; *Heaney*, 445 F.2d at 503.

### B.      The FSIA's Terrorism Exception Does Not Apply

Even if this Court were to examine the specific exceptions to immunity Plaintiffs assert, neither exception applies by its own terms.

Plaintiffs rely on the FSIA's terrorism exception as a basis for this Court's jurisdiction over their claim of torture.  Compl. ¶¶ 5, 49 (Count 1); 28 U.S.C. § 1605A.  But the terrorism exception abrogates immunity *only* when, among other requirements, the foreign country was designated a "state sponsor of terrorism at the time [of] the act.'"  28 U.S.C. § 1605A(a)(2)(A); *see also Mohammadi v. Islamic Repub. of Iran*, 782 F.3d 9, 14 (D.C. Cir. 2015).  Courts have uniformly rejected application of the FSIA's terrorism exception to foreign states that are not designated state sponsors of terrorism.  *See, e.g.*, *Embassy of Nigeria v. Ugwuonye*, 901 F. Supp. 2d 136, 140 (D.D.C. 2012) ("Since Nigeria is not a designated state sponsor of terrorism, this exception is also inapplicable."); *Carpenter v. Repub. of Chile*, 610 F.3d 776, 779 (2d Cir. 2010) ("The Republic of Chile has not been designated a state sponsor of terrorism, so this exception does not apply."); *In re Terrorist Attacks on Sept. 11, 2011*, 538 F.3d 71, 89 (2d Cir. 2008) ("The

State Department has never designated [Saudi Arabia] a state sponsor of terrorism.  As a consequence, the Terrorism Exception is inapplicable here."), *abrogated on other grounds*, *Samantar v. Yousuf*, 560 U.S. 305 (2010).

Needless to say, Israel has never been designated a state sponsor of terrorism—indeed just the opposite, the United States has recognized Israel as a "committed counterterrorism partner."[11]  Currently, the United States has designated only three countries as state sponsors of terrorism:  Iran, Sudan, and Syria.[12]  That Plaintiffs would attempt to predicate jurisdiction on the FSIA's patently inapplicable terrorism exception signals the weakness of their case.

### C.    The FSIA's Non-Commercial Tort Exception Does Not Apply

Plaintiffs also invoke this Court's jurisdiction under the FSIA's non-commercial tort exception.  Compl. ¶¶ 5, 47–78.  The non-commercial tort exception provides jurisdiction for cases involving:

> personal injury or death, or damage to or loss of property, occurring in the United States and caused by the tortious act or omission of that foreign state or of any official or employee of that foreign state while acting within the scope of his office or employment.

28 U.S.C. § 1605(a)(5).  The exception does *not* apply, however, to "any claim based upon the exercise or performance or the failure to exercise or perform a discretionary function regardless of whether the discretion be abused."  *Id*. § 1605(a)(5)(A).

The non-commercial tort exception does not afford jurisdiction over Plaintiffs' claims for two independent reasons.  First, the acts underlying Plaintiffs' Complaint did not "occur[] in the United States," as the statute requires.  28 U.S.C. § 1605(a)(5).  Congress expressly limited the

---

[11] U.S. Dep't of State, *Country Reports on Terrorism, ch. 2: Middle East and North Africa Overview* (2015), http://goo.gl/wKBn0F.

[12] U.S. Dep't of State, State Sponsors of Terrorism, http://www.state.gov/j/ct/list/c14151.htm.

non-commercial tort exception to domestic wrongdoing precisely to avoid entangling U.S. courts

in disputes like this one, challenging actions of a foreign sovereign outside U.S. borders.

Second, this case involves discretionary acts by that foreign sovereign, and thus falls squarely

within the FSIA's "discretionary function" exclusion to the non-commercial tort exception.  28

U.S.C. § 1605(a)(5)(A).

### 1. The alleged acts did not occur "in the United States"

The noncommercial tort exception abrogates foreign sovereign immunity only for injuries

caused by tortious acts that "occur[] in the United States."  28 U.S.C. § 1605(a)(5).  In the FSIA,

"[t]he 'United States' includes all territory and waters, continental or insular, subject to the

jurisdiction of the United States."  28 U.S.C. § 1603(c).[13]  That definition unequivocally

excludes the high seas.  Because none of the underlying acts in the Complaint took place on U.S.

"territory [or] waters, continental or insular," the immunity inquiry should end there.

Plaintiffs nevertheless contend that the acts aboard *Challenger I* occurred in the United

States because they were "committed on board a ship sailing under the flag of the United States."

Compl. ¶ 80.[14]  Plaintiffs' elastic definition of "the United States" would include an infinite

number of ships and vessels of all sizes all over the globe as long as they fly the U.S. flag,

contrary to the text of the FSIA and long-standing precedent.  To create such mobile exceptions

---

[13] In this context, "insular" means "those islands that are part of the United States or its
possessions."  *Amerada Hess*, 488 U.S. at 440.

[14] The interception of *Challenger I* occurred "in international waters in the Mediterranean Sea,
approximately 70 nautical miles from the coast of the Gaza Strip."  Compl. ¶ 28.  Plaintiffs also
apparently seek compensation for certain alleged acts committed on Israeli territory.  *E.g.*,
Compl. ¶ 46 (describing events that allegedly took place upon the vessel's arrival in Ashdod);
¶ 64 (claiming that Plaintiffs were denied due process "after forcibly being brought to and
detained in Israel").

to the FSIA would swallow the immunity the statute offers.  No court has ever adopted
Plaintiffs' theory.

> ### a.   A vessel flying the U.S. flag on the high seas is not "the United States" under the FSIA

Interpretation of the FSIA focuses first and foremost on its text, because "any claim to a
FSIA exception must stand on the Act's text.  Or it must fail."  *Odhiambo v. Republic of Kenya*,
764 F.3d 31, 42 (D.C. Cir. 2014) (citation and quotation marks omitted).  The text of the FSIA
on its face does not extend to acts on the high seas.  Moreover, the definition of "United States"
in the FSIA refers to "territory and waters, continental or insular."  28 U.S.C. § 1603(c).  The
phrase "continental or insular" necessarily presupposes a physical definition of "territory and
waters," *id.*, not an abstract one premised on the potential scope of the United States jurisdiction.

The Supreme Court in *Amerada Hess* recognized this point in considering whether the
FSIA permitted a U.S. court to exercise subject-matter jurisdiction over claims by a Liberian
corporation against Argentina, for damage caused to a Liberian-owned ship sailing in
international waters.  488 U.S. 428.  The petitioners argued that acts committed on the high seas
occurred "in the United States" because the high seas are within U.S. admiralty jurisdiction, and
the FSIA defines "United States" as including all "territory and waters, continental and insular,
subject to the jurisdiction of the United States."  488 U.S. at 440.  The Supreme Court found that
this interpretation would render the modifier "continental and insular" meaningless.  *Id.*  The
Court further held that the term "waters" could *not* be read to include the high seas because
"Congress knows how to place the high seas within the jurisdictional reach of a statute," but had
not done so in the FSIA.  *Id.* at 440 & n.7 (identifying other statutes extending U.S. jurisdiction
to cover the high seas).  Therefore, the Court applied "the canon of construction which teaches
that legislation of Congress, unless contrary intent appears, is meant to apply only within the

territorial jurisdiction of the United States," and held that the noncommercial tort exception did not apply. *Id.* at 440 (citation and brackets omitted).

Indeed, the Supreme Court long ago concluded that the term "in the United States" used in the Immigration Act, and defined nearly identically to the FSIA, does not include a U.S. flag vessel on the high seas. *United States ex rel. Claussen v. Day*, 279 U.S. 398, 401 (1929) ("[An American vessel] outside the United States whether on the high seas or in foreign waters is not a place included within the United States as defined by the [Immigration Act of 1917]."); *see also Cunard S.S. Co. v. Mellon*, 262 U.S. 100, 122–23, 128–29 (1923) (National Prohibition Act's text applying in "the United States and all territory subject to the jurisdiction thereof" was "not intended to apply to domestic vessels when outside the territorial waters of the United States").

Nonetheless, the Complaint repeatedly states that the *Challenger I* was flying the U.S. flag when it sought to breach the blockade. *E.g.*, Compl. ¶¶ 1, 2, 25, 27, 64, 67, 72, 80. This recitation appears designed to invoke the maritime law principle known as the "law of the flag," that "vessels on the high seas are subject to no authority except that of the State whose flag they fly." *S.S. Lotus* (Fr. v. Turk.) 1927 P.C.I.J. (ser. A) No. 10 (Sept. 7); United Nations Convention on the Law of the Sea ("UNCLOS") art. 92, Dec. 10, 1982, 1833 U.N.T.S. 397. Under this principle, the Supreme Court has allowed U.S. courts to exercise criminal jurisdiction over U.S.-flagged vessels when a federal statute expressly extends to acts "'committed upon the high seas, or … within the admiralty and maritime jurisdiction of the United States … on board any vessel belonging in whole or in part to the United States.'" *United States v. Flores*, 289 U.S. 137, 145 & n.1 (1933) (quoting 18 U.S.C. § 451 (1933)). In those limited circumstances, the Court held, a U.S.-flagged merchant vessel "is deemed to be a part of the territory" of the United States. *Id.* at 155.

But the notion that a flagged vessel is an extension of the flag state is a legal fiction that is limited to maritime law.  Restatement (Third) of Foreign Relations Law of the United States § 502, reporter's notes at 3 (Am. Law Inst. 1987); *Cunard S.S.*, 262 U.S. at 123 (notion that "a merchant ship is a part of the territory of the country whose flag she flies" is "a figure of speech, a metaphor"); *see also Lauritzen  v. Larsen*, 345 U.S. 571, 585 (1953).  The Supreme Court in *Amerada Hess* specifically "declined an invitation to equate 'territory … of the United States,' for purposes of the FSIA, with all areas over which any United States jurisdiction might be asserted."  *Smith v. Socialist People's Libyan Arab Jamahiriya*, 101 F.3d 239, 246 (2d Cir. 1996).

Numerous decisions—including ones interpreting the FSIA—have recognized that Congress's *authority* to extend Article III jurisdiction over activities outside U.S. territory is not the same as *actually extending it*.  In *Persinger v. Islamic Republic of Iran*, 729 F.2d 835 (D.C. Cir. 1984), the plaintiffs tried to invoke the non-commercial tort exception in a suit against Iran for taking hostages at the U.S. embassy.  The D.C. Circuit acknowledged Congress's undisputed power to exercise jurisdiction over certain activities occurring in U.S. embassies overseas.  But, focusing on the text, legislative history, and policies underlying the non-commercial tort exception, the court held that the U.S. Embassy in Tehran did not fall within the FSIA's definition of "the United States" in section 1603(c).  *Id.* at 839–42.  In the court's view, Congress did not intend the FSIA to extend to U.S. embassies because defining "the United States" as "all territory subject to any form of United States jurisdiction"—in light of the modifying words "continental or insular"—would be "too awkward to be countenanced."  *Id.* at 839; *see also McKeel v. Islamic Repub. of Iran*, 722 F.2d 582, 587–89 (9th Cir. 1983) (similar).

Other courts have reached the same conclusion.  The Second Circuit, for example, rejected an argument nearly identical to Plaintiffs' in a case against Libya involving the bombing of the Pan Am Flight 103 over Lockerbie, Scotland.  *Smith v. Socialist People's Libyan Arab Jamahiriya*, 101 F.3d 239 (2d. Cir. 1996).  As here, the plaintiffs in *Smith* "rel[ied] on the principle that a nautical vessel is deemed to be part of the territory of the sovereignty whose flag it flies," and argued that Pan Am Flight 103 should be considered part of the "territory" of the United States for purposes of the FSIA because the aircraft was flying the U.S. flag.  *Id.* at 246 (internal quotation marks omitted).  Given the definition of "the United States" in the FSIA, however, the Second Circuit refused to import maritime law into the statute, and in particular, into the non-commercial tort exception.  *Id.*  Echoing the long line of cases recognizing the distinction between U.S. territory and U.S. jurisdiction, the court found "the fact that a location is subject to an assertion of United States authority does not necessarily mean that it is the 'territory' of the United States for purposes of the FSIA."  *Id.*

The D.C. Circuit also recognized the limits of the law-of-the-flag fiction in a case holding that the FSIA's non-commercial tort exception did not cover acts on a U.S.-flagged vessel in another country's territorial waters.  In *Perez v. The Bahamas*, 652 F.2d 186 (D.C. Cir. 1981), the plaintiff sued the government of The Bahamas for injuries sustained by his son when a Bahamian government vessel fired upon the plaintiff's U.S.-flagged ship in Bahamian territorial waters.  As here, the plaintiff sought to subject the sovereign to jurisdiction under the non-commercial tort exception on the theory that the tort occurred "in the United States."  *Id.* at 188. The D.C. Circuit rejected the argument because the injuries occurred while the boat was in The Bahamas, not the "United States."  *Id*. at 188 (noting that U.S. "special maritime jurisdiction is no way involved here and we need not reach the question of its applicability to jurisdictional

determinations under the FSIA").  The decisions of numerous courts thus confirm that the text of the FSIA does not apply to a U.S.-flag vessel in international waters.

> **b.  Congress did not intend the noncommercial tort exception to apply to extraterritorial torts**

The legislative history of the FSIA confirms this straightforward reading of its text:  In enacting section 1605(a)(5), Congress did not abrogate sovereign immunity for injuries occurring on U.S.-flag vessels on the high seas or elsewhere beyond U.S. territorial waters.  Congress's main concern was to allow plaintiffs to obtain relief for torts committed by foreign states within the United States.  *Persinger*, 729 F.2d at 840.  Indeed, the House Report states that "the purpose of section 1605(a)(5) is to permit the victim of a traffic accident or other noncommercial tort to maintain an action against the foreign state to the extent otherwise provided by law."  H.R. Rep. No. 94-1487, at 21 (1976).  Thus, "Section 1605(a)(5) is directed primarily at the problem of traffic accidents but is cast in general terms …."  *Id.* at 20.

Consistent with these statements of congressional purpose, government witnesses discussing the scope of the non-commercial tort exception emphasized the statute's solely territorial application.  For example, Michael M. Cohen, Chairman of the Committee on Maritime Legislation of the Maritime Law Association of the United States, testified that section 1605(a)(5) "removes the defense [of sovereign immunity] for most tort suits *arising here*, which would include among other cases, automobile accidents involving diplomatic personnel and collisions involving State-owned merchant vessels or even foreign warships in *U.S. territorial waters*."  *Jurisdiction of U.S. Courts in Suits Against Foreign States:  Hearings on H.R. 11315 Before the Subcomm. on Admin. Law and Gov't Relations of the H. Comm. on the Judiciary*, 94th Cong. 95–96 (1976) (emphasis added).  Nowhere in the legislative history is

there any indication that section 1605(a)(5) would permit courts to exercise jurisdiction over foreign sovereigns in cases involving acts on a U.S. flag vessel sailing on the high seas.

In sum, the plain statutory language, the precedents interpreting it, and the legislative history of the FSIA compel the conclusion that common sense and plain meaning dictate:  The phrase "in the United States" in the FSIA does not mean "on a boat in the Mediterranean." Israel's interception of the Flotilla did not "occur[] in the United States" for purposes of the FSIA, and the non-commercial tort exception thus does not provide jurisdiction for any of Plaintiffs' claims.  Accordingly, the Court should dismiss the suit for lack of jurisdiction.

### 2. The discretionary function exclusion precludes jurisdiction

The non-commercial tort exception is inapplicable for another reason.  The FSIA bars jurisdiction under that exception over "any claim based upon the exercise or performance or failure to exercise or perform a discretionary function regardless of whether the discretion be abused."  28 U.S.C. § 1605(a)(5)(A).  Because Plaintiffs' lawsuit challenges paradigmatic discretionary acts by Israel and its Ministries, this Court cannot exercise jurisdiction over Plaintiffs' claims.  *Wu Tien Li-Shou v. United States*, 777 F.3d 175, 184–86 (4th Cir. 2015).[15]

The purpose of the discretionary function exclusion is to "prevent judicial 'second-guessing' of legislative and administrative decisions grounded in social, economic, and political policy through the medium of an action in tort."  *United States v. Gaubert*, 499 U.S. 315, 323 (1991).  The exclusion covers acts and decisions that "involve an element of judgment or choice"—that is, those that are "based on considerations of public policy."  *Id*. at 322–23;

---

[15] Like the FSIA, the Federal Tort Claims Act ("FTCA") has a discretionary function exception applicable to claims against the U.S. government—a provision that offers "guidance" regarding "what acts should be deemed discretionary for FSIA purposes."  *MacArthur Area Citizens Assoc. v. Repub. of Peru*, 809 F.2d 918, 921 (D.C. Cir. 1987).

*MacArthur*, 809 F.2d at 921 ("[A]cts or omissions of a fundamentally governmental nature' are discretionary functions for purposes of" the exclusion.).  The exclusion shields the government from liability not only "for those decisions that involve a measure of policy judgment," but also for "the execution of such decisions in specific instances by subordinates, even at the operational level, if they must exercise such judgment too."  *Id.* at 922.

The Supreme Court's decision in *Gaubert*, a seminal case about the discretionary function exclusion, demonstrates that the exclusion applies to implementing decisions.  There, the plaintiff challenged the involvement of federal banking regulators in the "day-to-day business" of a financially distressed federal savings and loan institution.  499 U.S. at 319.  The regulators' involvement included hiring a consultant on "operational and financial matters," offering advice on salary disputes, putting certain subsidiaries into bankruptcy, and participating in decision-making on litigation.  *Id.* at 319–20.  The Supreme Court held that the nature of the conduct, and not the status of the actor, determined whether the discretionary function exception applied.  The Court found it "apparent that all of the challenged actions of the federal regulators involved the exercise of discretion in furtherance of public policy goals."  *Id.* at 334; *see also MacArthur*, 802 F.2d at 923 (similar).

Plaintiffs here challenge Israel's decision to plan and execute an operation by its security forces to enforce Israel's lawful naval blockade of the Gaza Strip, in response to the approaching Flotilla, which intended to break through it.  Compl. ¶¶ 13–17, 33–34, 83.  "All military engagements involve discretionary decisions by military commanders of all ranks—choices that have to be made quickly during moments of pronounced pressure."  *Wu Tien Li-Shou*, 777 F.3d at 185.  How to respond to the Flotilla's efforts to breach the lawful blockade, in light of the military and security threats posed to Israel, necessarily involved "a great element of judgment or

choice." *See Gaubert*, 499 U.S. at 329 (internal quotation marks omitted).  Israel's conduct also

is of a fundamentally governmental nature—planning, ordering, and executing Israel's decision

to enforce its naval blockade—precisely the sort of conduct that Congress did not want courts to

"second-guess." *United States v. Varig Airlines*, 467 U.S. 797, 814 (1984); *accord Wu Tien Li-

Shou*, 777 F.3d at 185 (recognizing the "discretion inherent in sovereignty to conduct military

operations free of judicial oversight or hindsight").  Consequently, both Israel's "policy

judgments" at the Ministry level, and the "implementing decisions" by IDF forces charged with

enforcing Israel's blockade of Gaza when all diplomatic measures failed and attempting to

prevent an international incident, are shielded from liability.  *MacArthur*, 809 F.2d at 922–23.

Such decisions fall squarely within the discretionary function exclusion.  Courts applying

the analogous doctrine under the Federal Tort Claims Act have dismissed challenges to "military

policy judgments,"[16] military decisions relating to "numbers of military personnel to be utilized,

their deployment, and the kinds of orders that should be issued in furtherance thereof,"[17]

decisions regarding the timing of arrests,[18] and border security decisions.[19]  Any one of these

grounds would render Israel's conduct discretionary.  Plaintiffs' claims implicate all of them.

---

[16] *Boyle v. United Tech. Corp.*, 487 U.S. 500, 511 (1998) (exception met where decision involves "judgment as to the balancing of many technical, military, and even social considerations"); *Industria Panificadora, S.A. v. United States*, 763 F. Supp. 1154, 1158 (D.D.C. 1991) ("[I]t is clear that the discretionary function exception applies to military policy judgments."), *aff'd*, 957 F.2d 886 (D.C. Cir. 1992) (summary affirmance).

[17] *Industria Panificadora*, 763 F. Supp. at 1158.

[18] *Shuler v. United States*, 531 F.3d 930, 934 (D.C. Cir. 2008) (timing of decision to arrest is "rife with considerations of public policy").

[19] *Gringo Pass, Inc. v. United States*, 542 F. App'x 642, 643 (9th Cir. 2013) (mem. op.) (FTCA discretionary function exception applies to challenge to border fence design and maintenance because "the government constructed the fence for military and security purposes," and the "fence design was predicated on border security and other policy considerations that require government discretion").

The Fourth Circuit recently rejected a similar challenge to military policy judgments and tactical decisions, when a Taiwanese plaintiff sued the United States Navy for "the accidental killing of her husband and the intentional sinking of her husband's fishing vessel" during a NATO counter-piracy mission. *Wu Tien Li-Shou*, 777 F.3d at 178. The court found that the "suit relies on questioning the wisdom of a series of discretionary decisions," second-guessing what warnings should have been given to the vessel, "[w]hat weapons should have been used," "[a]t what range" should they have been fired, "where precisely should the fire have been directed," and other similar questions. *Id.* at 185. The Fourth Circuit held that "the conduct of a military engagement is the very essence of a discretionary function," and the United States and its NATO allies have "the discretion inherent in sovereignty to conduct [such] military operations free of judicial oversight or hindsight." *Id.* at 184–85.

The sovereign decisions Plaintiffs challenge here likewise all fall within the discretionary function exclusion. Plaintiffs therefore cannot establish jurisdiction based on the non-commercial tort exception.[20]

### D.      The FSIA Precludes Punitive Damages

The FSIA bars claims for punitive damages against a "foreign state" or its political subdivisions. 28 U.S.C. §§ 1603(a), 1606. Plaintiffs allege that they can seek punitive damages in this case because the Ministries are supposedly "agencies or instrumentalities" of Israel, and therefore not shielded by section 1606, which applies to the "foreign state." Compl. ¶ 13; *see id*. at 19–20 (Prayer for Relief). Plaintiffs' premise is incorrect. A foreign sovereign entity qualifies

---

[20] Plaintiffs invocation of 28 U.S.C. § 1330 is not a separate basis for jurisdiction. Compl. ¶ 5. The FSIA and section 1330 "work in tandem"—"§1604 bars federal and state courts from exercising jurisdiction when a foreign state *is* entitled to immunity, and § 1330(a) confers jurisdiction on federal courts to hear suits … when a foreign state is *not* entitled to immunity." *Amerada Hess*, 488 U.S. at 434 (emphasis in original).

as the "foreign state" itself, as opposed to an agency or instrumentality, if the "core functions of the foreign entity are predominantly governmental" rather than commercial.  *Transaero, Inc. v. La Fuerza Aerea Boliviana*, 30 F.3d 148, 151 (D.C. Cir. 1994).  Applying this test, the D.C. Circuit has held that "armed forces of a foreign sovereign … are as a rule so closely bound up with the structure of the state that they must in all cases be considered as the 'foreign state' itself."  *Id.* at 153.  Accordingly, the Israeli Ministry of Defense, which oversees the Israeli military and the IDF, Compl. ¶ 14, and Ministry of Public Security, which also bears responsibility for public security, law enforcement and correction, *id.* ¶ 17, count as the "foreign state" itself.  This Court made the same determination in *Doe v. State of Israel*.  400 F. Supp. 2d at 101.  Furthermore, because the conduct of foreign affairs and enforcement of the State of Israel's laws and policies (Compl. ¶¶ 14–17) constitute "indispensable" government functions, *see Kennedy v. Mendoza-Martinez*, 372 U.S. 144, 160 (1963), the Israeli Ministry of Foreign Affairs and Ministry of Justice also qualify as part of the "foreign state" of Israel itself—not agencies or instrumentalities.  *See Roeder v. Islamic Repub. of Iran*, 333 F.3d 228, 234 (D.C. Cir. 2003) (Iranian Ministry of Foreign Affairs "must be treated as the state of Iran itself"); *Good v. Fuji Fire & Marine, Ins. Co., Ltd.*, 271 F. App'x 756, 758 (10th Cir. 2008) ("[i]t is undisputed that the Ministries [of Justice, Finance, and Transportation, of Japan] are foreign states within the meaning of FSIA").

The Ministries therefore constitute the "foreign state," not agencies or instrumentalities of Israel.  Thus, Plaintiffs are not entitled to punitive damages.  Compl. ¶¶ 1, 88.

*     *     *

Neither the FSIA's terrorism exception nor the noncommercial tort exception cover Plaintiffs' claims.  Because the FSIA is "the sole basis for obtaining jurisdiction over a foreign

state in our courts," the Court must dismiss the Complaint for lack of jurisdiction.  *Amerada Hess*, 488 U.S. at 434; Fed. R. Civ. P. 12(b)(1), (2).

## II.    THE POLITICAL QUESTION DOCTRINE BARS THIS SUIT

In addition to the FSIA, the political question doctrine also bars jurisdiction over this dispute.  *Schneider v. Kissinger*, 412 F.3d 190, 193 (D.C. Cir. 2005); *Corrie v. Caterpillar, Inc.*, 503 F.3d 974, 981 (9th Cir. 2007) (the political question doctrine is "a jurisdictional limitation imposed on the courts by the Constitution, and not by the judiciary itself").  Plaintiffs challenge military and security decisions of Israel, a longstanding ally of the United States, involving the Israeli-Palestinian conflict.  This case is a political protest, not a justiciable controversy.  "[N]ational security, military matters and foreign relations are 'quintessential sources of political questions'" that warrant dismissal of cases like this one.  *Al-Aulaqi v. Obama*, 727 F. Supp. 2d 1, 45 (D.D.C. 2010) (quoting *El-Shifa Pharm. Indus. Co. v. United States*, 607 F.3d 836, 841 (D.C. Cir. 2010) (en banc)).

Federal courts have repeatedly dismissed lawsuits challenging Israel's security actions in Gaza and the West Bank as non-justiciable.  In *Doe v. State of Israel*, Judge Bates stated, "[i]t is hard to conceive of an issue more quintessentially political in nature than the ongoing Israeli-Palestinian conflict …."  400 F. Supp. 2d at 111–12 (relying on the political question doctrine in dismissing claims challenging Israeli settlement activities in the West Bank).  In *Matar v. Dichter*, the Southern District of New York likewise dismissed claims against the former head of the Israeli General Security Service for the bombing of an apartment building in Gaza occupied by a senior Hamas terrorist, because the lawsuit challenged "military actions that were coordinated by [the defendant] on behalf of Israel and in furtherance of Israeli foreign policy." 500 F. Supp. 2d 284, 294 (S.D.N.Y. 2007), *aff'd on other grounds*, 563 F.3d 9 (2d Cir. 2009). The political question doctrine precluded the court from assessing the "implement[ation of] the

anti-terrorist policy of a strategic United States ally in a region where diplomacy is vital." *Id.* at

296.  "'The character of such a claim is, at its core … undeniably political, and ultimately

nonjusticiable.'" *Id.* (quoting this Court's decision in *Doe*, 400 F. Supp. 2d at 112) (brackets

omitted).  And in *Corrie v. Caterpillar*, the Ninth Circuit affirmed dismissal of a suit in which

plaintiffs alleged that that a U.S. manufacturer sold bulldozers used by the IDF in operations in

the West Bank and Gaza.  The court was "mindful of the potential for causing international

embarrassment were a federal court to undermine foreign policy decisions in the sensitive

context of the Israeli-Palestinian conflict."  503 F.3d at 984.

In *Baker v. Carr*, 369 U.S. 186 (1962), the Supreme Court articulated six factors to

determine whether a case involves a non-justiciable political question:

> [1] a textually demonstrable constitutional commitment of the issue to a
> coordinate political department; or [2] a lack of judicially discoverable and
> manageable standards for resolving it; or [3] the impossibility of deciding without
> an initial policy determination of a kind clearly for nonjudicial discretion; or [4]
> the impossibility of a court's undertaking independent resolution without
> expressing lack of respect due coordinate branches of government; or [5] an
> unusual need for unquestioning adherence to a political decision already made; or
> [6] the potentiality of embarrassment from multifarious pronouncements by
> various departments on one question.

*Id.* at 217.  A case is non-justiciable if any one of the *Baker* factors applies.  *Schneider*, 412 F.3d

at 193–94.  This case implicates at least the first, second, fourth, and sixth factors.

### A.      The Conduct of Foreign Affairs Is Committed to the Political Branches

It is well established that "foreign policy is constitutionally committed to the political

branches, and disputes over foreign policy are nonjusticiable political questions."  *Doe*, 400 F.

Supp. 2d at 112 (citing *Haig v Agee*, 453 U.S. 280, 292 (1981)).  Adjudication of this challenge

to Israel's security policies in enforcing a legal naval blockade of Gaza would indisputably

interfere with sensitive foreign policy decisions reserved to the Executive branch and Congress.

Plaintiffs would require this Court to determine, among many highly sensitive questions, the

legality of Israel's naval blockade of Gaza, the international law standards applicable to the

conflict between Israel and Hamas, a designated terrorist organization, and the validity of Israel's

actions as self-defense.  These are all highly political foreign policy and international law

questions reserved to the political branches.

In *Doe v. State of Israel*, which involved a similar challenge to Israeli security actions in

the West Bank and the support of U.S. Government officials for those actions, Judge Bates held:

"The first *Baker* factor is undeniably implicated here … Plaintiffs ask this Court to declare that

Israel's self-defense policies are tantamount to terrorism, … or some other form of illegal

activity.  The Court can do none of this."  400 F. Supp. 2d at 112.  "Whether plaintiffs dress their

claims in the garb of … federal statutes, or the tort laws of various states, the character of those

claims is, at its core, the same:  peculiarly volatile, undeniably political, and ultimately

nonjusticiable."  *Id.*  Those decisions are the sole province of the political branches.  *Id.*  The

Court's conclusion tracked the Department of Justice's position supporting dismissal:

> What constitute legitimate actions in furtherance of Israel's internal security or
> self-defense ... are determinations for the President to make, taking into account
> complex historical, diplomatic, military and factual circumstances that are only
> developed and accessible through the conduct of the Nation's diplomatic and
> military relationships.  The same is true with respect to any assessments of
> Israel's human rights record.  All such determinations, at core, include value-
> laden judgments based on complex factual circumstances that the President is
> uniquely qualified to make and that the courts are, as an institutional matter,
> uniquely unqualified to make in these circumstances.

United States' Br. in Support of Mot. to Dismiss at 39, *Doe v. State of Israel*, 02-cv-1431

(D.D.C. Oct. 31, 2002), ECF 8.

The Ninth Circuit reached a similar conclusion in *Corrie*:  "[i]t is not the role of the

courts to indirectly indict Israel for violating international law….  'Any such policy condemning

the Israeli government must first emanate from the political branches.'"  *Corrie*, 503 F.3d at 984

(quoting *Alperin v. Vatican Bank*, 410 F.3d 532, 541 (9th Cir. 2005)) (brackets omitted).

### B.    This Court Lacks Judicially Discoverable Standards

This Court also lacks judicially discoverable standards to govern the conduct about which Plaintiffs complain (*Baker* #2).  To assess the propriety of Israel's response to Plaintiffs' intentional breach of its naval blockade, this Court would have to gauge numerous political factors, such as:  the seriousness of the threat to Israel's national security from the smuggling of weapons to Gaza; the right number of troops with the right type of training and the right weapons to prevent the Flotilla from breaching the blockade; the rules of engagement of Israeli military forces; and the viability of alternatives to implementing and enforcing the blockade, consistent with other demands on Israel's military resources and the limitations on its intelligence function and supply chain.  The Court would have to weigh the risks of *not intercepting* the Flotilla, assessing the prospect that selective enforcement could jeopardize Israel's continued ability to enforce the naval blockade at all and could encourage yet more attempts to break its lawful blockade.  How would the Court make these determinations?  Would the Court assess the credibility of Israeli intelligence to determine whether the IDF's actions were reasonable? Would the Court or the jury balance the political, military, and human consequences of *not* enforcing the naval blockade against the risk of injury to political objectors like Plaintiffs who try to intentionally defy a foreign sovereign's national security operation?

To contemplate how such inquires would unfold in the context of litigation is to highlight the intractable problems of judicial management of a political lawsuit.  Would the Court allow Plaintiffs to take depositions of senior military personnel of a foreign sovereign, ask them about strategic and tactical judgments, and seek disclosure of the intelligence they had available, their contingency plans and other inquiries that no sovereign nation would remit to a foreign court? Even a glancing preview demonstrates the potential for entanglement in issues beyond judicial competence.

This Court would tread perilously into political questions if it were to allow such invasive inquiries on sensitive questions regarding the national security of a foreign sovereign, with the ultimate purpose of prescribing how Israel and the IDF *should* have conducted this military operation.  The "decision to take military action is a 'policy determination of a kind clearly for nonjudicial discretion.'"  *El-Shifa*, 607 F.3d at 845 (quoting *Baker*, 369 U.S. at 217).  Moreover, courts have long held that they lack judicially discoverable standards by which to measure operational and tactical military decisions.  *E.g.*, *Aktepe v. United States*, 105 F.3d 1400, 1404 (11th Cir. 1997) (no judicially discoverable standards for "how a reasonable military force would have conducted the [training] drill" that resulted in injuries to Turkish sailors); *Zuckerbraun v. Gen. Dynamics Corp.*, 755 F. Supp. 1134, 1142 (D. Conn. 1990) ("courts lack standards with which to judge whether reasonable care was taken to achieve tactical objectives in combat while minimizing injury and loss of life"); *Industria Panificadora*, 763 F. Supp. at 1161 ("no judicially manageable standards" to govern Executive branch decisions, "some of which were made while military personnel were engaged in combat").

A federal court in New York recently considered these principles in a challenge to U.S. enforcement of a blockade off the coast of Libya.  *Tarros S.p.A. v. United States*, 982 F. Supp. 2d 325 (S.D.N.Y. 2013).  In *Tarros*, a shipping company alleged that a U.S. naval ship, the U.S.S. Stout, unlawfully turned away the company's ship from docking at the Libyan port of Tripoli. *Id*. at 329.  The court ruled that it had no jurisdiction because the case presented a political question.  *Id.* at 345.  The plaintiff's claims raised the question "whether the Stout—and by implication, the military—had a duty under international law to conduct operations in a specified manner" and whether they failed to meet that standard.  *Id.* at 333.  But "the political question doctrine generally precludes judicial review of discretionary military decisions related to military

operations." *Id.*  "The decision as to whether to divert a vessel bound for a wartorn nation in order to enforce an international arms embargo is a delicately-calibrated one based on military judgment, experience, and intelligence gathering." *Id*. at 334.  Adjudicating the plaintiff's claims would have required the court to "wade into the heart of military operations," which would impermissibly "interject tort law" into national security judgments. *Id.*

The Fourth Circuit reached a similar conclusion last year in a foreign national's suit against the U.S. Navy for the death of her husband and the sinking his vessel in a counter-piracy operation.  *Wu Tien Li-Shou*, 777 F.3d 175.  The court concluded it was "just not equipped to second-guess [ ] small-bore tactical decisions.  We are also ill-suited to evaluate more strategic considerations.  We do not know the waters ….  What we do know is that we are not naval commanders.  These are questions not intended to be answered through the vehicle of a tort suit." *Id*. at 181.  Those considerations apply with equal or greater force to Plaintiffs' claims challenging the planning, approval, preparation for, ordering, and execution of the IDF operation to intercept the Flotilla.  Compl. ¶ 13.

### C.   Adjudication of this Case Risks Conflict with Coordinate Branches of Government

Adjudication of Plaintiffs' claims would also implicate *Baker*'s fourth and sixth factors by expressing a lack of respect due to the political branches responsible for the conduct of foreign affairs and risking multifarious pronouncements from different branches of government.

The political branches of the U.S. Government already have considered Israel's operation to intercept the Flotilla and rejected Plaintiffs' characterization of wrongdoing.  The State Department issued a statement shortly after the incident "recogniz[ing] that Israel has legitimate security concerns given the attacks that have emanated from Gaza in recent months and years

that have endangered the Israeli people."[21]   The U.S. Senate passed a resolution recognizing

Israel's right to self-defense and "condem[ning]" the "destabilizing" actions of the passengers

aboard the *Mavi Marmara*.  S. Res. 548, 111th Cong. (2010).  The Senate also recognized

Israel's blockade as a "legitimate and justified" defensive security measure.  *Id.*  Most recently,

the Department of Justice filed a Suggestion of Immunity in a lawsuit against then-Israeli

Defense Minister Ehud Barak for his role in the IDF operation to intercept the Flotilla.  Because

the case challenged Minister Barak's official and discretionary functions undertaken in his

official capacity as Israel's Minister of Defense, the Executive branch determined that he was

immune from suit.  Suggestion of Immunity of the United States, at 8–10, *Doğan v. Barak*, 15-

cv-8130 (C.D. Cal. June 10, 2016), ECF 48.

This Court should reject Plaintiffs' invitation to supplement or supplant the views of the

political branches on such politically-fraught issues.  As the U.S. Government explained in its

brief in *Matar v. Dichter*:

> To allow overseas hostilities to become fodder for federal lawsuits would invite a
> stream of unpredictable commentary from the courts, creating "the potential of
> embarrassment from multifarious pronouncements by various departments on one
> question." *Baker v. Carr*, 369 US 186, 217 (1962).  Moreover, such suits would
> subject the foreign states and officials involved to the burdens and
> embarrassments of litigation, leading to strains in U.S. relations.  In both respects,
> such litigation would undermine the Executive's ability to manage the conflict at
> issue through diplomatic means, or to avoid becoming entangled in it at all.

Statement of Interest of the United States at 44–45, *Matar v. Dichter*, 500 F. Supp. 2d 284

(S.D.N.Y. 2007) (05-cv-10270), http://www.state.gov/documents/organization/98806.pdf.

Pronouncements of the type sought by Plaintiffs may not only conflict with the U.S. Government

---

[21] U.S. Dep't of State, Daily Press Briefing (June 2, 2010),
http://www.state.gov/r/pa/prs/dpb/2010/06/142591.htm.

positions in foreign affairs, but may further risk a "conflict with actions taken by the Executive in its conduct of military relations."  *Id.* at 45 n.30.

In addition, permitting this lawsuit to go forward against Israel jeopardizes another policy of the United States Government.  "[A]llow[ing] this kind of suit to go forward in our courts— with the potential for discovery and passing of judgment concerning [a] foreign state's intelligence-gathering and the political and military decision-making of its top officials," would not only "intrude on core aspects of the foreign state's sovereignty and give rise to serious diplomatic tensions," but it would present an "*acute risk*" that "*our own officials … [would be] subjected to politically driven lawsuits abroad in connection with controversial U.S. military operations*."  United States' Br. in Support of Affirmance at 24–25, *Matar v. Dichter*, 563 F.3d 9 (2d Cir. 2007) (07-2579), 2007 WL 6931924 (emphases added).

Plaintiffs' claims invite this Court to rule that Israel's conduct is unlawful and indeed, an act of terrorism, contradicting the measured position already taken by the political branches of the U.S. Government in dealing with a paradigmatic and highly charged political dispute.

## III.   THE ACT OF STATE DOCTRINE BARS THIS SUIT

Were the Court to find that it has jurisdiction, the act of state doctrine would bar Plaintiffs' claims.  *In re Papandreou*, 139 F.3d 247, 256 (D.C. Cir. 1998).  "The act of state doctrine in its traditional formulation precludes the courts of this country from inquiring into the validity [or legality] of the public acts a recognized foreign sovereign power [has] committed within its own territory."  *Banco Nacional de Cuba v. Sabbatino*, 376 U.S. 398, 401 (1964).  It is grounded upon "the deference to be accorded the sovereignty of other nations," such that the one sovereign's courts do not "sit[ ] in judgment over the public acts of another."  *Arango v. Guzman Travel Advisors Corp.*, 621 F.2d 1371, 1380 (5th Cir. 1980) (citing *Alfred Dunhill of London, Inc. v. Republic of Cuba*, 425 U.S. 682, 697 (1975)).

The Supreme Court's seminal decision in *Underhill v. Hernandez*, 168 U.S. 250 (1897), bars adjudication of this lawsuit. In *Underhill*, the Court rejected an American citizen's tort claims for confinement and "alleged assaults and affronts" by the soldiers of a military commander of the (later-recognized) Venezuelan government. *Id.* at 251. The Court held that, because "[t]he acts complained of were the acts of a military commander representing [Venezuela]," the "acts of the defendant were the acts of the government of Venezuela, and as such are not properly the subject of adjudication in the courts of another government." *Id.* at 254; *see also Ricaud v. Am. Metal Co.*, 246 U.S. 304, 306, 310 (1918) (order given "in his capacity as a commanding officer" covered by act of state doctrine); *Oetjen v. Cent. Leather Co.*, 246 U.S. 297, 303 (1918) (actions of "duly commissioned military commander" to seize property are "not subject to re-examination and modification by the courts of this country"). In *Doe v. State of Israel*, Judge Bates concluded, citing *Underhill*, that the case implicated "classic acts of state" because "[t]ort challenges brought against foreign military officials for such alleged harms as unlawful detention … implore the courts to declare invalid and deny legal effect to acts of a military commander representing the government." 400 F. Supp. 2d at 97, 113 (internal quotation marks and ellipsis omitted).

The act of state doctrine likewise requires dismissal of this case. Plaintiffs' claims rest on the allegation that "Defendants planned, instigated, ordered, authorized, and aided or abetted" the interception of the Flotilla in May 2010. Compl. ¶ 83. According to Plaintiffs, such conduct was "illegal under international law." Compl. ¶ 3; *see also id.* ¶¶ 80 ("illegal raid on the Flotilla"), 81 ("an attack on an unarmed vessel … is a violation of international law"), 82 ("abuses of civilians … also violated international law"). Most of the challenged conduct by Defendants—planning, ordering, and authorizing the Flotilla interception—occurred within the territory of Israel, as did

all of Plaintiffs' claims arising after their transport to the Israeli port of Ashdod (Counts 5, 6, and 9).  Because Israeli military officers "acted on behalf of [the] recognized government" of Israel, and the lawsuit "turns on a challenge to the officer['s] order, then the act of state doctrine bars adjudication of the matter."  *Roe v. Unocal Corp.*, 70 F. Supp. 2d 1073, 1079 (C.D. Cal. 1999).[22]

## IV.   THE COMPLAINT FAILS TO STATE A CLAIM

The Court also should dismiss the Complaint under Rule 12(b)(6) because, even taking the allegations in the Complaint as true, Plaintiffs do not state an actionable claim.

### A.    The Complaint Does Not Identify Any Privately Enforceable Cause of Action

"[A] plaintiff proceeding under the FSIA must identify a particular cause of action arising out of a specific source of law."  *Acree v. Repub. of Iraq*, 370 F.3d 41, 59 (D.C. Cir. 2004), *abrogated on other grounds by Repub. of Iraq v. Beaty*, 556 U.S. 848 (2009); *see also Oveissi v. Islamic Repub. of Iran*, 573 F.3d 835, 840 (D.C. Cir. 2009).  To the extent the Complaint identifies "a specific source of law" for Plaintiffs' claims, *id.*, those statutes and treaties do not provide any privately enforceable cause of action.

The Complaint cites two statutes and three treaties in support of Counts 1–4, but none of those legal sources provides a private civil remedy.  First, the Complaint contends that Israel's conduct violated the War Crimes Act, 18 U.S.C. § 2441(a), but the War Crimes Act is a *criminal* statute.  It does not "create a civil tort cause of action."  *Saleh v. Titan Corp.*, 580 F.3d 1, 13 n.9 (D.C. Cir. 2009).  Second, Plaintiffs invoke the FSIA's non-commercial tort exception, *see* Compl. ¶¶ 47–78, but the FSIA is a jurisdictional statute.  It does not create a cause of action against a foreign sovereign.  *Cicippio-Puleo v. Islamic Repub. of Iran*, 353 F.3d 1024, 1033 (D.C. Cir. 2004).

---

[22] If the court dismisses the case on act of state grounds, it need not consider whether the Defendants are also immune from suit under the FSIA.  *Friedar*, 614 F. Supp. at 399 n.4.

The three treaties cited in the Complaint likewise do not provide privately enforceable rights.  *See Medellín v. Texas*, 552 U.S. 491, 506 n.3 (2008) (the D.C. Circuit, among others, "presumes that treaties do not create privately enforceable rights in the absence of express language to the contrary") (citing *Canadian Transp. Co. v. United States*, 663 F.2d 1081, 1092 (D.C. Cir. 1980)).  First, the International Covenant on Civil and Political Rights (cited in support of Counts One and Two) does not "create obligations enforceable in the federal courts." *Sosa v. Alvarez-Machain*, 542 U.S. 692, 735 (2004).  Second, the Convention Against Torture (also cited in support of Counts One and Two) "is non-self-executing and thus does not itself create any rights enforceable in U.S. courts."  *Omar v. McHugh*, 646 F.3d 13, 17 (D.C. Cir. 2011).  Third, Plaintiffs rely on Common Article III to the Geneva Conventions of 1949, but this Court has held that the Geneva Convention "does not create a right of action for private individuals to enforce its terms."  *Nattah v. Bush*, 770 F. Supp. 2d 193, 204 (D.D.C. 2011); *see also In re Iraq & Afghanistan Detainees Litig.*, 479 F. Supp. 2d 85, 118 (D.D.C. 2007), *aff'd sub nom. Ali v. Rumsfeld*, 649 F.3d 762 (D.C. Cir. 2011); *accord United States v. Fort*, 921 F. Supp. 523, 526 (N.D. Ill. 1996) ("courts have consistently held that the Geneva Conventions … are not self-executing and, thus, provide no basis for the enforcement of private rights in domestic courts").

In the absence of any statute or treaty affording a privately enforceable cause of action, the Complaint vaguely relies upon general "international law" or "customary international law" to support each of the first four counts in the Complaint.  Compl. ¶¶ 51, 55, 59, 62.  However, the D.C. Circuit has "cautioned against … imply[ing] a federal common law claim for a violation of the law of nations."  *Mohamad v. Rajoub*, 634 F.3d 604, 609 (D.C. Cir. 2011).

Counts 5–9 suffer the same defect, as the Complaint did not "identify a particular cause of action arising out of a specific source of law" for any of those claims.  *Acree*, 370 F.3d at 59; Compl. ¶¶ 63–78.  Accordingly, the Court should dismiss all counts for failure to state a claim.

### B.  Plaintiffs' Allegations Are Insufficient on the Merits

Even if the Complaint had identified a privately actionable claim for relief, many of Plaintiffs' claims are patently insufficient on their merits to state a claim:

- Count One:  Plaintiffs allege that IDF's use of force—the restraint of Plaintiff Arraf and that Deknopper suffered a broken nose when she was hit with a rubber bullet from the IDF—was torture.  Compl. ¶¶ 47–51.  A claim of torture, however, requires pain or suffering of "sufficiently extreme and outrageous" severity to warrant "universal condemnation"; "torture can occur under the FSIA only when the production of pain is purposive," inflicted "cruelly and deliberately," not merely an "unforeseen or unavailable incident of some legitimate end."  *Price v. Socialist People's Libyan Arab Jamahiriya*, 294 F.3d 83, 92–93 (D.C. Cir. 2002).  "Torture is a label that is 'usually reserved for extreme, deliberate, and unusually cruel practices—for example, sustained systemic beating, application of electric currents to sensitive parts of the body, and tying up or hanging in positions that cause extreme pain.'"  *Id*. (citation omitted).  Plaintiffs' characterization of IDF's actions in intercepting the *Challenger I* as "torture" is hyperbole, not a valid cause of action.

- Count Two:  Plaintiffs allege that IDF's use of force restraining Plaintiffs, including Deknopper's nose being broken and Schermerhorn's claimed loss of sight from a stun grenade were "cruel and inhuman treatment."  Compl. ¶¶ 52–55.  This claim fails for the same reason as Count One.  Israel's alleged acts in intercepting *Challenger I*—

using rubber bullets and a stun grenade—are not "sufficiently heinous under well established authority so that they clearly fall within the handful of prohibited types of conduct." *Chowdhury v. WorldTel Bangladesh Hldg. Ltd.*, 588 F. Supp. 2d 375, 382–83 (E.D.N.Y. 2008).

- Count Three:  Plaintiffs' purported claim for "mutilation or maiming" arises from Schermerhorn's alleged loss of sight from a stun grenade, Compl. ¶¶ 56–59, but the Complaint does not plausibly establish Israel's specific intent to "mutilate or maim" Schermerhorn or to injure him in any way, *see* 18 U.S.C. § 2441(d)(1)(E) (defining mutilation and maiming).

- Count Four:  Plaintiffs allege that all the aforementioned acts give rise to a claim for a war crime of "intentionally causing serious bodily injury."  Compl. ¶¶ 60–62.  The War Crimes Act defines "serious bodily injury" to include "substantial risk of death," "extreme physical pain," "protracted and obvious disfigurement," or "protracted loss or impairment of the function of a bodily member, organ, or mental faculty."  18 U.S.C. § 2441(d)(2)(B) (incorporating 18 U.S.C. §§ 113(b)(2), 1365(h)(3)).  Rubber bullets and stun grenades are not lethal weapons.  *United States v. Lopez Garcia*, 672 F.3d 58, 60 (1st Cir. 2012) (Souter, J.) (stun grenades); *Plakas v. Drinski*, 19 F.3d 1143, 1150 n.6 (7th Cir. 1994) (rubber bullets).  The Complaint "do[es] not allege any facts which would create a plausible inference that [the IDF] possessed the requisite intent to … inflict serious bodily injury."  *In re XE Servs. Alien Tort Litig.*, 665 F. Supp. 2d 569, 591 (E.D. Va. 2009).

- Count Five:  Plaintiffs' allegations that they were detained without a warrant, probable cause, articulable suspicion, or notice of any charges on the *Challenger I*

and afterward do not state a plausible cause of action for arbitrary arrest and

detention.  Compl. ¶¶ 63–66.  Plaintiffs fail to allege the duration of their detention;

they state only that they were on the *Challenger I* in IDF's custody for eight hours

before the vessel docked at Ashdod.  Compl. ¶ 68.  Without knowing the alleged

duration of detention, the Court cannot determine whether that detention plausibly

violates a settled norm of customary international law.  *Sosa*, 542 U.S. at 738 (illegal

detention of less than one day not actionable).  Nor can Plaintiffs maintain that their

detention was "arbitrary," given their intentional attempt to breach a legal naval

blockade.

- Count Six:  Neither do Plaintiffs' allegations that they were detained for a prolonged

  period without a warrant, probable cause, articulable suspicion, or notice of any

  charges on the *Challenger I* and afterward, state a claim for false imprisonment.

  Compl. ¶¶ 67–70.  To ground a claim for false arrest or false imprisonment, Plaintiffs

  must allege unlawful detention.  *Lyles v. Micenko*, 468 F. Supp. 2d 68, 74 (D.D.C.

  2006).  However, on the facts as alleged, Plaintiffs' detention in this case was entirely

  lawful and, indeed, foreseeable given Plaintiffs' avowed intent to breach an

  established, lawful naval blockade.

- Count Eight:  Plaintiffs generally allege that the IDF used force against them when

  they were "exercising passive resistance," Compl. ¶ 72, but that fails to state a

  plausible claim for intentional infliction of emotional distress because Israel's actions

  to enforce its naval blockade do not involve "extreme and outrageous conduct" that is

  "so extreme in degree, as to go beyond all possible bounds of decency, and to be

regarded as atrocious, and utterly intolerable in a civilized community." *Lyles*, 468 F. Supp. 2d at 75.

- Count Nine:  Plaintiffs' conversion claim is the epitome of a "threadbare" recital of the elements of a cause of action that runs afoul of *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  Compl. ¶¶ 76–78.  Plaintiffs never identify any property taken from them.

## C.     Plaintiffs' Claims Are Untimely

Counts 5–9 are also barred by the statute of limitations, the longest of which is three years under D.C. law.  *Gilson v. Repub. of Ireland*, 682 F.2d 1022, 1024 n.7 (D.C. Cir. 1982) (relevant statute of limitations is determined by the local law of the forum); *Sea Search Armada v. Repub. of Columbia*, 821 F. Supp. 2d 268, 272 (D.D.C. 2011) (same).  Plaintiffs are suing for conduct that occurred on or around May 31, 2010.  Plaintiffs did not file their Complaint until January 11, 2016—nearly five and a half years later.

Plaintiffs' claims for arbitrary arrest and detention (count 5), false imprisonment (count 6), assault and battery (count 7), and intentional infliction of emotional distress (count 8) are all subject to a one-year statute of limitations.  D.C. Code § 12-301(4); *Zhi Chen v. Monk*, 701 F. Supp. 2d 32, 36–37 (D.D.C. 2010) (IIED claim is subject to same period as the underlying tort). Plaintiffs' conversion claim has a three-year statute of limitations.  D.C. Code § 12-301(2), (3); *Sea Search Armada v. Repub. of Colombia*, 522 F. App'x 1, 2 (D.C. Cir. 2013).[23]

Apparently recognizing their claims are time-barred, Plaintiffs contend in the Complaint that they are entitled to equitable tolling because Plaintiffs purportedly "attempted to obtain

_____

[23] Even if the court were to apply the limitations period under federal maritime law, the three-year limitation for personal injuries for maritime torts has elapsed.  46 U.S.C. § 30106.

relief in multiple fora," but "Defendants have failed to participate meaningfully in any process" leading to compensation.  Compl. ¶ 89.  Plaintiffs offer no details or facts to substantiate these assertions.  Plaintiffs, however, bear the burden to plead sufficient facts supporting equitable tolling.  Their conclusory and unsupported allegations that they sought but failed to receive relief in "other fora" does not suffice.  *Pickett v. Potter*, 571 F. Supp. 2d 66, 70 (D.D.C. 2008).  Equitable tolling applies "only in extraordinary and carefully circumscribed instances."  *Mondy v. Sec'y of the Army*, 845 F.2d 1051, 1057 (D.C. Cir. 1988).  Plaintiffs have not even identified, much less demonstrated, circumstances warranting equitable tolling here.

Accordingly, Plaintiffs' claims are time-barred and they have not pleaded any basis to circumvent the governing statute of limitations.

## V.     ISRAEL IS THE MORE SUITABLE FORUM TO RESOLVE THIS DISPUTE

This suit also should be dismissed under the *forum non conveniens* doctrine (FNC) so that Plaintiffs' claims can be resolved in Israel.  Israel is a far more appropriate forum than the United States for Plaintiffs to pursue claims contesting the legality of Israel's national security operations.

Dismissal is appropriate on FNC grounds when (1) there is an adequate alternative forum available and (2) a balancing of the private and public interests favors dismissal.  *Piper Aircraft Co. v. Reyno*, 454 U.S. 235, 254 n.22 (1981); *MBI Grp., Inc. v. Credit Foncier Du Cameroun*, 616 F.3d 568, 571 (D.C. Cir. 2010).  On the first factor, there can be no doubt that Israeli courts provide an adequate alternative forum, as numerous courts have held.  *E.g.*, *Interface Partners Int'l Ltd. v. Hananel*, 575 F.3d 97, 103 (1st Cir. 2009); *Wilson v. Eckhaus*, 349 F. App'x 649 (2d Cir. 2009); *Kuehne & Nagel Inc. v. A.G.R. Eshcol Overseas, Ltd.*, No. 13-cv-8919, 2014 WL 4059821, at *6 (S.D.N.Y. Aug. 15, 2014) (collecting cases).

43

The public interest factors strongly favor litigating this dispute in Israel, which has a paramount "interest in having localized controversies decided at home." *MBI Grp.*, 616 F.3d at 576. Here, "Plaintiffs' allegations concerning the Israeli military and Israeli foreign policy counsel in favor of a *forum non conveniens* dismissal." *Wilson*, 349 F. App'x at 652 (affirming *forum non conveniens* dismissal of claims against maker of Israeli military satellite technology). Israel's public interests include its border security, military policy and operations, and Israeli-Palestinian relations. *Cf. Doe*, 400 F. Supp. 2d at 111–12 ("hard to conceive of an issue more quintessentially political in nature than the ongoing Israeli-Palestinian conflict"). In contrast, the United States has little, if any, public interest adjudicating a lawsuit against a close ally relating to its national security measures that took place thousands of miles from the United States.

The private interest factors also favor resolution of this dispute in Israel. Israeli courts will have superior "ease of access to sources of proof," including lower costs of obtaining attendance of willing witnesses, and the availability of compulsory process for unwilling witnesses. *MBI Grp.*, 616 F.3d at 576. The Israeli navy intercepted the *Challenger I* off the coast of Israel, and the vessel was brought into the Israeli port of Ashdod. Compl. ¶¶ 45–46. The location of the incident, as well as most of the evidence underlying Plaintiffs' claims, is in Israel. *MBI Grp.*, 616 F.3d at 576; *Kryvicky v. Scandinavian Airlines Sys.*, 807 F.2d 514, 516 (6th Cir. 1986) (factors weighed heavily in favor of Spain where it was the situs of the accident; records were still in possession of Spanish authorities; and most witnesses resided there). In contrast, no relevant evidence outside of Plaintiffs' control is located in the United States.

A plaintiff's choice of forum is entitled to deference, not freedom from review. *Piper*, 454 U.S. at 255–56; *Overseas Nat'l Airways, Inc. v. Cargolux Airlines Int'l, S.A.*, 712 F.2d 11, 13–14 (2d Cir. 1983). Where, as here, the plaintiffs' chosen forum "has no significant

connection to [the] claim," Plaintiffs' choice is "only one of the many factors the court considers." *Amoco Oil Co. v. Mobil Oil Corp.*, 90 F. Supp. 2d 958, 960–61 (N.D. Ill. 2000). Under these circumstances, *forum non conveniens* embodies common sense, and it dictates dismissal of the Complaint.

## CONCLUSION

When Plaintiffs sought intentionally to breach Israel's naval blockade in May 2010, they may have hoped to communicate a public political message of dissent.  This lawsuit is also a public protest, just in another form, as evidenced by the absence of any jurisdictional or substantive basis for Plaintiffs' claims.  *Cf. Saltany v. Reagan*, 886 F.2d 438, 440 (D.C. Cir. 1989) (plaintiffs' counsel "surely knew" their complaint had "no hope whatsoever of success."). Israel and its Ministries are immune from suit; the case is barred by the political question and act of state doctrines; and Plaintiffs' claims are untenable and untimely.  If this case should be heard anywhere, it is in Israel, where the alleged conduct took place.  The last thing that this Court, or any U.S. court, would wish to do is interfere with the foreign policy of the United States with respect to the security operations of a close ally, or interfere with that ally's defense against existential terrorist threats.  This case—from its overheated allegations of "war crimes" to its perverse characterization of Israel as a state sponsor of terrorist activity—exemplifies the risks of judicial intervention.  The Court should decline Plaintiffs' invitation to leap into the political thicket of second-guessing the security policies and military operations of the State of Israel. Defendants respectfully request that this Court dismiss the Complaint with prejudice.

Respectfully submitted,

August 8, 2016                      /s/ John B. Bellinger, III
                                   John B. Bellinger, III (DC Bar 405059)
                                   Robert N. Weiner (DC Bar 298133)
                                   Robert A. DeRise (DC Bar 1005355)
                                   ARNOLD & PORTER LLP
                                   601 Massachusetts Ave., NW
                                   Washington, DC  20001-3743
                                   Tel:  (202) 942-5000
                                   john.bellinger@aporter.com

                                   R. Reeves Anderson (DC Bar 994989)
                                   ARNOLD & PORTER LLP
                                   Suite 4400
                                   370 Seventeenth Street
                                   Denver, CO  80202-1370
                                   Tel:  (303) 863-1000

**CERTIFICATE OF SERVICE**

I hereby certify that on this 8th day of August, 2016, I have caused to be served, by this

Court's ECF system, a true and correct copy of this document on all counsel of record.


                                        /s/  John B. Bellinger, III
                                        John B. Bellinger, III
                                        (DC Bar 405059)