### UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF COLUMBIA

_____

|  |  |  |
|---|---|---|
| **DAVID SCHERMERHORN**, *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| v. | ) | Civil Action No. 1:16-cv-49 (ABJ) |
| | ) | |
| **THE STATE OF ISRAEL**, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

_____

## PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES
## IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

Steven M. Schneebaum
   (D.C. Bar No. 956250)
STEVEN M. SCHNEEBAUM, P.C.
1776 K Street, N.W.; Suite #800
Washington, D.C. 20006
Tel: (202) 742-5900
Fax: (202) 449-3835
E-mail: sms@smslawdc.com
*Counsel of Record for Plaintiffs*

*Of Counsel*:
Ralph G. Steinhardt
GEORGE WASHINGTON UNIVERSITY
   LAW SCHOOL
2000 H Street, N.W.
Washington, D.C. 20052
Tel: (202) 994-5739
Email:  rstein@law.gwu.edu

Haydee Dijkstal
Sehriban Dogan
c/o STOKE & WHITE
150 Minories
London, EC3N 1LS, England
Email: haydeedijkstal@googlemail.com;
serhiban@stokewhite.com

Rodney Dixon, QC
TEMPLE GARDEN CHAMBERS
1 Harcourt Buildings
Temple, London EC4Y 9DA, England
Tel: 44 (0)20 7583 1315
Email: RodneyDixonQC@tgchambers.com

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................. ii

Introduction and Summary ................................................................................................1

Plaintiffs' Statement of Facts.............................................................................................2

ARGUMENT .......................................................................................................................6

I. Defendants Are Not Immune from Suit. ..........................................................................6

  A. The FSIA Assigns Sovereign Immunity to the Judiciary.  ...........................................7

  B. Defendants Are Not Entitled to Immunity Under the FSIA. ........................................9

    1. The Tort Exception Applies, Because the Tortious Acts on *The Challenger I*
      Occurred "in the United States" within the Meaning of the FSIA ..........................9

    2. Tortious Acts Are Not Automatically Exempted from
      Judicial Scrutiny When the State Responsible Deems Them
      to Be Part of "Security Operations."......................................................................16

    3. Defendants Are Not Shielded by Statutory Immunity
      That Attaches to the Exercise of "Discretionary Functions." ..................................19

    4. The FSIA Exception Applies Because Its Invocation Is Not Restricted
      to Defendants Designated by the Executive Branch as
      "State Sponsors of Terrorism."................................................................................22

  C. Plaintiffs Do Not Insist on an Award of Punitive Damages.  .......................................25

  D. The Complaint Does Not Present Unreviewable "Political Questions." ......................25

    1. Defendants' Argument Rests on a Strategic Mischaracterization
      of the Complaint.  ...................................................................................................26

    2. Defendants Ignore the D.C. Circuit's Specific Limitations on the
      Political Question Doctrine in FSIA Cases..............................................................28

    3. This Litigation, Including Discovery, Could Be Conducted in Accordance
      with Judicially Manageable Standards.  ...................................................................31

  E. Defendants May Not Claim the Act of State Doctrine as a Shield
    Against Judicial Review.  .........................................................................................33

i

II.  The Complaint States a Claim for Which Relief May Be Granted. ....................................36

  A.  Plaintiffs Do Not Claim a "Private Right of Action" under
       the War Crimes Act. ...................................................................................................37

  B.  Whether Plaintiffs' Treatment by Defendants' Agents Constituted Torture
       Is a Question of Fact Not to Be Resolved on a Rule 12(b)(6) Motion. .......................39

  C.  No Applicable Statute of Limitations Bars This Action.  ...........................................41

III.  The Prerequisites to Invocation of the Doctrine of *Forum Non Conveniens*
      Are Not Present. ...........................................................................................................42

Conclusion ..........................................................................................................................45

# TABLE OF AUTHORITIES

**Cases**                                                                 **Page(s)**

*Abelesz v. Magyar Nemzeti Bank*,
   692 F.3d 661 (7th Cir. 2012) ...........................................................................32

*Acree v. Repub. of Iraq*,
   370 F.3d 41 (D.C. Cir. 2004) ..........................................................................39

*Agudas Chasidei Chabad v. Russian Fed'n*,
   466 F.Supp.2d 6 (D.D.C. 2006) *rev'd in part on other grounds*,
   528 F.3d 934 (D.C. Cir. 2008) ....................................................................8, 43

*Am. Int'l Grp., Inc. v. Islamic Repub. of Iran*,
   493 F.Supp. 522 (D.D.C. 1980), *vacated and remanded on other grounds*,
   657 F.2d 430 (D.C. Cir. 1981) .........................................................................35

*Arango v. Guzman Travel Advisors Corp.*,
   621 F.2d 1371 (5th Cir. 1980) .........................................................................34

*Arbaugh v. Y & H Corp.*,
   546 U.S. 500 (2006).............................................................................................8

*\*Argentine Repub. v. Amerada Hess Shipping Corp.*,
   488 U.S. 428 (1989)..............................................................................6, 8, 10

*Arriba Ltd. v. Petroleos Mexicanos*,
   962 F.2d 528 (5th Cir. 1992) ...........................................................................31

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2007)...................................................................................37, 38

*Baker v. Carr*,
   369 U.S. 186 (1962)............................................................................... *passim*

*Banco Nacional de Cuba v. Sabbatino*,
   376 U.S. 398 (1964)...................................................................... 33, 35-36

*\*Bank Markazi v. Peterson*,
   136 S. Ct. 1310 (2016)..............................................................................22, 24

*Barr v. Clinton*,
   370 F.3d 1196 (D.C. Cir. 2004) .........................................................................6

*Barnhart v. Peabody Coal Co.*,
  537 U.S. 149 (2003) ..................................................................................9

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (2007) ................................................................................37

*Bell v. Hood*,
  327 U.S. 678 (1946) ..................................................................................8

*BG Group PLC v. Repub. of Argentina*,
  134 S.Ct. 1198 (2014) .............................................................................29

*Boumediene v. Bush*,
  553 U.S. 723 (2008) ................................................................................27

*Cicippio-Puleo v. Islamic Repub. of Iran*,
  353 F.3d 1024 (D.C. Cir. 2004) ..............................................................23

*Cohens v. Virginia*,
  6 Wheat. 264 (1821) .................................................................................1

*Corrie v. Caterpillar, Inc.*,
  503 F.3d 974 (9th Cir. 2007) ..................................................................30

*Cunard S.S. Co. v. Mellon*,
  262 U.S. 100 (1923) ................................................................................13

*Daliberti, et al. v. Repub. of Iraq*,
  97 F.Supp.2d 38 (D.D.C. 2000) ...............................................6, 32, 36

*De Csepel v. Repub. of Hungary*,
  2016 WL 1048758 (D.C. Cir. 2016) ......................................................7, 8

*De Csepel v. Repub. of Hungary*,
  808 F.Supp.2d 113 (D.D.C. 2011), *aff'd in part, rev'd in part*,
  714 F.3d 591 (D.C. Cir. 2013) ...........................................................8, 29

*De Csepel v. Repub. of Hungary*,
  75 F.Supp.3d 380 (D.D.C. 2014) ............................................................32

*Doe I v. State of Israel*,
  400 F.Supp.2d 86 (D.D.C. 2005) ............................................................34

*Doe v. Exxon Mobil Corp.*,
  69 F.Supp.3d 75 (D.D.C. 2014) ..............................................................45

*Elbasir v. Kingdom of Saudi Arabia,*
    484 F.Supp.2d 155 (2007) ........................................................................7

*El–Fadl v. Cent. Bank of Jordan,*
    75 F.3d 668 (D.C. Cir. 1996) ..................................................................43

*El–Shifa Pharm. Indus. Co. v. United States,*
    607 F.3d 836 (D.C. Cir. 2010) ...........................................................26, 28

*Fed. Trade Comm'n v. Morton Salt Co.,*
    334 U.S. 37 (1948)..............................................................................19, 31

*Friedar v. Gov't of Israel,*
    614 F.Supp. 395 (S.D.N.Y. 1985) ..........................................................17

*\*Gerritsen v. de la Madrid Hurtado,*
    819 F.2d 1511 (9th Cir. 1987) ...........................................................20, 21

*Gulf Oil Corp. v. Gilbert,*
    330 U.S. 501 (1947).............................................................................43, 45

*\*Hamdan v. Rumsfeld,*
    548 U.S. 557 (2006)...........................................................................27, 28

*Heaney v. Gov't of Spain,*
    445 F.2d 501 (2d Cir. 1971)....................................................................17

*Helmerich & Payne Int'l Drilling Co. v. Bolivarian Repub. of Venezuela,*
    2016 WL 2771117 (D.D.C. May 13, 2016) .............................................32

*Herbage v. Meese,*
    747 F.Supp. 60 (D.D.C. 1990) ...........................................................17, 18

*\*Hourani v. Mirtchev,*
    796 F.3d 1 (D.C. Cir. 2015) ............................................................. *passim*

*In re Estate of Ferdinand Marcos, Human Rights Litig.,*
    25 F.3d 1467 (9th Cir. 1994) ..................................................................36

*INS v. Chadha,*
    462 U.S. 919 (1983)............................................................................26, 29

*Interface Partners Int'l Ltd. v. Hananel,*
    575 F.3d 97 (1st Cir. 2009)......................................................................44

*Japan Whaling Ass'n v. Am. Cetacean Soc.*,
  478 U.S. 221 (1986) ........................................................................................1

*Joseph v. Consulate Gen'l of Nigeria*,
  830 F.2d 1018 (9th Cir. 1987), *cert. denied*, 485 U.S. 905 (1988) ....................21

*Kalamazoo Spice Extraction Co. v. Provisional Military Gov't of Socialist Ethiopia*,
  729 F.2d 422 (6th Cir. 1984) ...........................................................................35

*Kaplan v. Central Bank of Islamic Repub. of Iran*,
  961 F.Supp.2d 185 (D.D.C. 2013) ...................................................................30

*Kilburn v. Socialist People's Libyan Arab Jamahiriya*,
  376 F.3d 1123 (D.C. Cir. 2004) .......................................................................32

*Kiobel v. Royal Dutch Petroleum Co.*,
  133 S. Ct. 1659 (2013) .............................................................................11, 36

*Koster v. Lumbermens Mut. Cas. Co.*,
  330 U.S. 518 (1947) .................................................................................43, 45

*Kuehne & Nagel Inc. v. A.G.R. Eshcol Overseas, Ltd.*,
  2014 WL 4059821 (S.D.N.Y. Aug. 15, 2014) ...................................................44

*Lantheus Med. Imaging, Inc. v. Zurich Am. Ins. Co.*,
  841 F.Supp.2d 769 (S.D.N.Y. 2012) ................................................................31

*Lauritzen v. Larsen*,
  345 U.S. 571 (1953) .........................................................................................13

*Letelier v. Republic of Chile*,
  488 F.Supp. 665 (D.D.C. 1980) .......................................................................19

*MacArthur Area Citizens Ass'n v. Repub. of Peru*,
  809 F.2d 918 (D.C. Cir.), *modified*, 823 F.2d 606 (D.C. Cir. 1987) ................20

*Marx v. Gen. Revenue Corp.*,
  133 S. Ct. 1166 (2013) ......................................................................................9

*MBI Grp., Inc. v. Credit Foncier du Cameroun*,
  616 F.3d 568 (D.C. Cir. 2010) .........................................................................44

*McKeel v. Islamic Repub. of Iran*,
  722 F.2d 582 (9th Cir. 1983) .....................................................................14, 15

*McKesson Corp. v. Islamic Repub. of Iran,*
    672 F.3d 1066 (D.C. Cir. 2012) ................................................................33, 34

*Meredith v. United States,*
    330 F.2d 9 (9th Cir.), *cert. denied*, 379 U.S. 867 (1964) ...................................14

*Milner v. Dep't of the Navy,*
    562 U.S. 562 (2011) .............................................................................................25

*Mobarez v. Kerry,*
    2016 WL 2885871 (D.D.C. May 17, 2016) ........................................................26

*Mohamoud v. Rajoub,*
    634 F.3d 604 (D.C. Cir. 2011), *aff'd,* 132 S. Ct. 1702 (2012) ..........................39

*Murray v. Schooner Charming Betsy,*
    6 U.S. (2 Cranch) 64 (1804) ...............................................................................11

*Nat'l Airmotive Corp. v. Gov't & State of Iran,*
    499 F. Supp. 401 (D.D.C. 1980) ....................................................................8, 18

*Nixon v. United States,*
    506 U.S. 224 (1993) .............................................................................................27

*O'Bryan, et al. v. Holy See,*
    556 F.3d 361 (6th Cir. 2011) .................................................................................7

*Odhiambo v. Repub. of Kenya,*
    930 F.Supp.2d 17 (D.D.C. 2013) ...........................................................................7

*Olsen v. Government of Mexico,*
    729 F.2d 641 (9th Cir.), *cert. denied*, 469 U.S. 917 (1984) ..............................20

*Owens v. Repub. of Sudan,*
    374 F.Supp.2d 1 (D.D.C. 2005) ...........................................................................30

*Patterson v. Eudora,*
    190 U.S. 169 (1903) .............................................................................................12

*Perez v. The Bahamas,*
    652 F.2d 186 (D.C. Cir. 1981) .............................................................................12

*Persinger v. Islamic Repub. of Iran,*
    729 F.2d 835 (D.C. Cir. 1984) .......................................................................14, 15

*Pierce Cty., Wash. v. Guillen*,
  537 U.S. 129 (2003) ................................................................................24

*Piper Aircraft Co. v. Reyno*,
  454 U.S. 235 (1981) ..................................................................43, 44, 45

*Phoenix Consulting Inc. v. Repub. of Angola*,
  216 F.3d 36 (D.C. Cir. 2000) ....................................................................7

*Price v. Socialist People's Libyan Arab Jamahiriya*,
  294 F.3d 82 (D.C. Cir. 2002) ............................................................40, 41

*Ramirez de Arellano v. Weinberger*,
  745 F.2d 1500 (D.C. Cir. 1984), *judgment vacated on other grounds*,
  471 U.S. 1113 (1985) ..............................................................................35

*Rasul v. Bush*,
  542 U.S. 466 (2004) ................................................................................10

*Repub. of Argentina v. Weltover, Inc.*,
  504 U.S. 607 (1992) ..........................................................................16, 24

*Repub. of Iraq v. Beaty*,
  556 U.S. 848 (2009) ................................................................................39

*Repub. of Mexico v. Hoffman*,
  324 U.S. 30 (1945) ..................................................................................29

*Riggs Nat'l Corp. & Subsidiaries v. Commissioner of IRS*,
  163 F.3d 1363 (D.C. Cir. 1999) ........................................................33, 34

*Roe v. Unocal Corp.*,
  70 F.Supp.2d 1073 (C.D. Cal. 1999) ......................................................34

*Ross v. McIntyre*,
  140 U.S. 453 (1891) ..........................................................................12, 15

*Rundquist v. Vapiano SE*,
  798 F.Supp.2d 102 (D.D.C. 2011) ..........................................................44

*Saleh v. Titan Corp.*,
  580 F.3d 1 (D.C. Cir. 2009) ....................................................................39

*Samantar v. Yousuf*,
  560 U.S. 305 (2010) ..........................................................................18, 43

*Saltany v. Reagan*,
    886 F.2d 438 (D.C. Cir. 1989) .......................................................................................17

*Saqui v. Pride Cent. Am., LLC*,
    595 F.3d 206 (5th Cir. 2010) ..........................................................................................44

*Saudi Arabia v. Nelson*,
    507 U.S. 349 (1993) .................................................................................................17, 18

*\*Simon v. Repub. of Hungary*,
    812 F.3d 127 (D.C. Cir. 2016) ..................................................................................26, 29

*Smith v. Socialist People's Libyan Arab Jamahiriya*,
    101 F.3d 239 (2d Cir. 1996) *cert. denied*, 520 U.S. 1204 (1997).....................................15

*The Schooner "Exchange" v. M'Faddon*,
    11 U.S. 116 (1812)..........................................................................................................12

*Sosa v. Alvarez-Machain*,
    542 U.S. 692 (2004)..........................................................................................36, 38, 39

*Stone v. INS*,
    514 U.S. 386 (1995)..........................................................................................................24

*Stromberg v. Marriott Int'l, Inc.*,
    474 F. Supp. 2d 57 (D.D.C.) *aff'd*, 256 F. App'x 359 (D.C. Cir. 2007) ...........................44

*TMR Energy Ltd. v. State Prop. Fund of Ukraine*,
    411 F.3d 296 (D.C. Cir. 2005) ...................................................................................43, 44

*Underhill v. Hernandez*,
    168 U.S. 250 (1897)..........................................................................................................34

*United States v. Baker*,
    609 F.2d 134 (5th Cir. 1980) ..........................................................................................13

*United States v. Carvajal*,
    924 F.Supp.2d 219 (D.D.C. 2013) ..................................................................................13

*United States v. Flores*,
    289 U.S. 137 (1933)...................................................................................................12, 13

*United States v. Marino-Garcia*,
    679 F.2d 1373 (11th Cir. 1982) .....................................................................................12

*United States v. Mitchell*,
    553 F.2d 996 (5th Cir. 1977) ......................................................................13

*United States v. Reagan*,
    453 F.2d 165 (6th Cir. 1971), *cert. denied*, 406 U.S. 946 (1972)......................13

*United States v. Riker*,
    670 F.2d 987 (11th Cir. 1982) ...................................................................13

*United States v. Miranda*,
    780 F.3d 1185 (D.C. Cir. 2015) ..................................................................12

*United States v. Smith*,
    18 U.S. (5 Wheat.) 153 (1820)...................................................................16

*United States v. Varig Airlines*,
    467 U.S. 797 (1984)...............................................................................19

*United States v. Vonn*,
    535 U.S. 55 (2002)...................................................................................9

*Victory Transport, Inc. v. Comisaria General*,
    336 F.2d 354 (2d Cir. 1964)......................................................................17

*World Wide Minerals, Ltd. v. Repub. of Kazakhstan*,
    296 F.3d 1154 (D.C. Cir.) *cert. denied*, 537 U.S. 1187 (2002) .......................34

*W.S. Kirkpatrick & Co., Inc. v. Environmental Tectonics Corp.*,
    493 U.S. 400 (1990)................................................................................33

*Wu Tien Li-Shou v. United States*,
    777 F.3d 175 (4th Cir.), *cert. denied*, 136 S. Ct. 139 (2015)...........................21

*\*Zivotofsky ex rel. Zivotofsky v. Clinton*,
    132 S. Ct. 1421 (2012)............................................................... *passim*

Cases principally relied upon are marked with an asterisk (*).

## Statutes

9 U.S.C. § 15..............................................................................................36

18 U.S.C. § 451...........................................................................................12

18 U.S.C. § 2441(a) ..................................................................................37, 38

22 U.S.C. § 2370(e)(2)........................................................................................36

22 U.S.C. § 2371.........................................................................................22, 23

22 U.S.C. § 2780(d)...........................................................................................22

28 U.S.C. § 1330(a)..............................................................................................6

28 U.S.C. § 1350................................................................................................36

28 U.S.C. § 1350, note..................................................................................39, 41

28 U.S.C. § 1602............................................................................................7, 24

28 U.S.C. § 1603(d)............................................................................................16

28 U.S.C. § 1604..............................................................................................7, 8

28 U.S.C. § 1605(a).....................................................................................*passim*

28 U.S.C. § 1605A.......................................................................................*passim*

28 U.S.C. § 1605(g)............................................................................................32

28 U.S.C. § 2680................................................................................................19

50 U.S.C. App. § 2405(j)....................................................................................23

50 U.S.C. App. § 4605(j)....................................................................................22

## Rules

Fed. R. Civ. P. 12(b)(1)...............................................................................4, 6, 37

Fed. R. Civ. P.  12(b)(6)................................................................. 36-37, 39, 41

## Other Authorities

*Report of the International Fact-Finding Mission to Investigate Violations
   of International Law, Including International Humanitarian and
   Human Rights Law, Resulting from the Israeli Attacks on the Flotilla of Ships
   Carrying Humanitarian Assistance*, U.N. Doc. A/HRC/15/21 (September 27, 2010),
   http://www2.ohchr.org/english/bodies/hrcouncil/docs/15session/A.HRC.15.21_en.pdf ..4, 6

Sir Geoffrey Palmer, et al*., Report of the Secretary-General's Panel of Inquiry
   on the 31 May 2010 Flotilla Incident*, (Sept. 2011),
   http://www.un.org/News/dh/infocus/middle_east/Gaza_Flotilla_Panel_Report.pdf. ......4, 5, 6, 40

The Turkel Commission , The Public Commission to Examine the Maritime
 Incident of 31 May 2010 (Jan. 2011), http://goo.gl/n4DWov ..................................................3

21 Am. Jur. 2d Criminal Law § 438 .....................................................................................12

Restatement (Second) of the Foreign Relations Law of the United States
 (Am. Law Inst. 1965).......................................................................................................14

Restatement (Third) of the Foreign Relations Law of the United States
 (Am. Law Inst. 1987).......................................................................................................33

*The Queen v. Anderson*, [1868] 1 L.R. Cr. Cas. Rep. 161 ........................................................12

*The S.S. Lotus [Fr. v. Turk.],* [1927 P.C.I.J.], ser. A, No. 10 (Sept. 7).............................. 11-13

The United Nations Convention on the Law of the Sea, 1833 UNTS 3 (1982)...................................11

Geneva Convention on the High Seas, (opened for signature April 29, 1958),
 [1962] 13 U.S.T. 2313, T.I.A.S. No. 5200, 450 U.N.T.S. 82)...............................11, 15, 35

United Nations Convention against Torture and Other Cruel, Inhuman or
 Degrading Treatment or Punishment, GA res. 39/46, annex, 39 UN GAOR
 Supp. (No. 51) at 197, UN Doc. A/39/51 (1984); 1465 U.N.T.S. 85 .........................35, 40

Fourth Geneva Convention Relative to the Protection of Civilian Persons
 in Time of War, (Aug. 12, 1949), 75 U.N.T.S. 287....................................................35, 38

**Introduction and Summary**

This is an action in tort.  The Complaint alleges that Defendants, through their agents, were responsible for tortiously injuring Plaintiffs, under circumstances that provide Defendants no immunity from suit.

It is not an action whose adjudication would require the Court to embroil itself in foreign affairs, or to interfere with the policies determined by or within the exclusive province of coordinate branches of our Government.  It is not an action whose resolution would demand of this Court any more than the performance of its proper constitutional function.  Plaintiffs do not ask the Court to second-guess any nation's political or military operations, whatever their motivation and regardless of their proffered justification (or lack thereof).

Defendants begin their political essay, styled a Motion to Dismiss, with the confident assertion that "this lawsuit does not belong in a U.S. court."  Defendants' Motion (Doc. No. 17-1) ("D. Mot."), p. 1.  Plaintiffs' answer to the rhetorical question that permeates the Motion – "what is this case doing here?" – was provided by the United States Supreme Court many years ago:

> it is error to suppose that every case or controversy which touches foreign relations lies beyond judicial cognizance. Our cases in this field seem invariably to show a discriminating analysis of the particular question posed, in terms of the history of its management by the political branches, of its susceptibility to judicial handling in the light of its nature and posture in the specific case, and of the possible consequences of judicial action.

*Baker v. Carr*, 369 U.S. 186, 211 (1962).  *See also Japan Whaling Ass'n v. Am. Cetacean Soc.*, 478 U.S. 221, 230 (1986) ("one of the Judiciary's characteristic roles is to interpret statutes, and we cannot shirk this responsibility merely because our decision may have significant political overtones"); *Zivotofsky ex rel. Zivotofsky v. Clinton*, 132 S. Ct. 1421, 1427 (2012) ("In general, the Judiciary has a responsibility to decide cases properly before it, even those it 'would gladly avoid.' *Cohens v. Virginia*, 6 Wheat. 264, 404, 5 L.Ed. 257 (1821).").

1

The Foreign Sovereign Immunities Act ("FSIA"), 28 U.S.C. §§ 1601-10, provides two distinct exceptions to the presumptive immunity of foreign states and their agencies, either of which is sufficient to anchor the Court's assertion of jurisdiction over this case.  Existing jurisprudence does not cloak the tortious acts of Defendants' agents in immunity simply because they were allegedly committed as part of what is claimed to have been a military campaign, or because they were said to have been designed as part of a national security policy.

It may well be, as Defendants argue, that "the **propriety** of Israel's national security and counter-terrorism policies is a paradigmatic political question," D. Mot., p. 2 (emphasis added). But Plaintiffs have not placed such a question before the Court.  They do not ask the Court to participate in, much less to resolve, the fraught and contentious debates concerning war and peace in the Middle East.  It is Defendants, not Plaintiffs, that would have the Court focus on political motivations and "policies," rather than physical acts.[1]  It is Defendants, not Plaintiffs, whose theory of the case would lead the Court to the edge of the constitutional separation of powers.

### Plaintiffs' Statement of the Facts

Plaintiffs take serious issue with the tendentious eight-page narrative that Defendants have placed before the Court as if it were a neutral and verifiable statement of the facts and circumstances giving rise to this case.  Defendants portray the attack on a U.S. ship on the high seas on May 31, 2010, as a measured response to deliberate provocations resulting from the hubris or political agenda of its victims.  According to their account, while the excessive use of force may

---

[1] Defendants present to the Court as a fact that the Prime Minister of Israel announced his Government's "regret" for the incident giving rise to this Complaint, and his assurance that "the tragic outcome … was not intended by Israel."  http://goo.gl/9RIzRq; *see* D. Mot., p. 2, n.1.  But if the "outcome," presumably including the tortious injuries to Plaintiffs on board *The Challenger I* were "not intended by Israel," it is hard to see how "the propriety" of Israel's military and security policies would necessarily be part of what the Court must take into consideration.  It is also not clear, if the attacks and their consequences are not denied but are truly "regretted" by Israel, why claims like the instant ones are so vigorously opposed.

begrudgingly have been recognized as regrettable, Israel and its agencies acted in full conformity with the rules of international law and diplomacy.

Moreover, Defendants use the introduction to their brief to disparage Plaintiffs by suggesting that they were somehow connected with "terrorist organizations" like Hamas, with attacks on Israeli civilians, and with the smuggling of weapons into Gaza.   None of these allegations is substantiated, all are roundly denied by Plaintiffs, and none is remotely material to the tort claims now before this Court.   Defendants point to no evidence that Plaintiffs were anything other than what they say they were: unarmed civilians seeking to deliver humanitarian aid to the residents of the Gaza Strip.

Given Defendants' extensive political defense of their actions with respect to the flotilla including the American-flagged vessel *The Challenger I*, Plaintiffs take this opportunity to set out their own account of the facts, as verified by independent international fact-finding reports. Defendants start with arguments for the legality of the naval blockade of Gaza, and from there they proceed to attempt justification of the raid on *The Mavi Marmara* convoy as a necessary and even measured response to threats against that assertedly lawful program.   The weight of Defendants' narrative is placed on the "Turkel Commission Report," prepared by appointees of the Israeli Government, from which Defendants quote liberally and which they present to the Court as if it were a neutral, objective study which can be relied upon with confidence.

Indeed, Defendants point out that "[t]he Complaint does not disclose the existence of the Turkel Commission Report," D. Mot., p. 4, inviting the inference that this 'definitive' investigation has resolved all factual and legal disputes.   Defendants do acknowledge that Plaintiffs cite in their Complaint a review by the United Nations, the so-called "Palmer Panel Report," dated September

2011.  Complaint, ¶ 18; D. Mot., pp. 4-5.[2]  An independent U.N. body (consisting of a former Prime Minister of New Zealand, a former President of Colombia, and representatives of Turkey and Israel) found that Israel had used excessive force when boarding the ships in the flotilla. Defendants, however, themselves neglect to refer to the report of another international fact-finding mission, this one appointed by the United Nations Human Rights Council ("the UNHRC Report"), also cited in the Complaint.[3]  This independent mission found that the blockade inflicted disproportionate damage on civilians that could not be sustained as a matter of law even on security grounds.[4]  The mission observed that the same view had been taken by other U.N. organs and fact-finding delegations and by the International Committee of the Red Cross.[5]  The UNHRC Report was especially critical of the degree of force used by Israeli agents in the raid on the flotilla.

There are only two reasons behind Defendants' insistence on their selective citations to the reports most favorable to their position: (a) to suggest a deeply political coloration to this entire subject matter, suggesting to the Court that this Action lies well outside its competence; and (b) to persuade the Court that it should have no compunction in leaving Plaintiffs – who, in the vernacular for blaming the victim, "had it coming," or "asked for it" – without a judicial remedy.

Plaintiffs' purpose in this discussion is not to ask this Court to endorse one of the reports over any other, but rather only to insure the Court's awareness that, according to credible observers, the facts should not be assumed to be as Defendants paint them, that the descriptions

---

[2] The parties agree that, because the Palmer Panel Report is referenced in the Complaint, it "is also properly considered [by the Court] on a Rule 12(b)(1) motion." D. Mot., p. 5 n.6. The Report may be found at http://www.un.org/News/dh/infocus/middle_east/Gaza_Flotilla_Panel_Report.pdf.
[3] U.N. Doc. A/HRC/15/21 (Sep. 27, 2010),
http://www2.ohchr.org/english/bodies/hrcouncil/docs/15session/A.HRC.15.21_en.pdf.
The UNHRC Report is referenced in ¶ 37 of the Complaint and is, therefore, properly before the Court, as Defendants acknowledge. D. Mot., p. 5, n.6 (citing cases).
[4] UNHRC Report, ¶¶ 48-61 and ¶¶ 261-263.
[5] *Id.*, ¶ 54.

on which Defendants rely are subjective, and that the world community has not unified in concluding that the acts of which Plaintiffs complain in this lawsuit were even remotely justified.

While Defendants mention the Palmer Panel Report, they say nothing at all about its key overall findings, which are entirely contrary to their assertions that Israel's violent raid on the vessels was consistent with international law.  Indeed, the Panel expressly found that "Israel's decision to board the vessels with such substantial force at a great distance from the blockade zone and with no final warning immediately prior to the boarding was excessive and unreasonable."[6]

Nor do Defendants acknowledge the specific findings in the UNHRC Report about the events on *The Challenger I*.  Those directly undercut the misleading impression Defendants attempt to convey of Plaintiffs as part of a violent group seeking to "reopen channels long used to smuggle weaponry," D. Mot., p. 8, whom the Israeli soldiers were thus justified in attacking.

The conclusions of the UNHRC Report were also ignored by Defendants, most notably:

> Insofar as the Israeli interception of the flotilla was unlawful –and the Mission considers that it was unlawful – the use of force by the Israeli forces in seizing control of *The Mavi Marmara* and other vessels was also prima facie unlawful since there was no legal basis for the Israeli forces to conduct an assault and interception in international waters. Moreover, in undertaking these operations and regardless of the legality of the operation, the Israeli forces were obliged to do so in accordance with the law, including Israel's international human rights obligations.[7]

> \*\*\*\*

> The Mission is also concerned with the nature of the force used by the Israeli forces in the interception of [*inter alia*, *The Challenger I*]. … The Mission has found that the force used by the Israeli soldiers in intercepting *The Challenger I* … was unnecessary, disproportionate, excessive and inappropriate, and amounted to violations of the right to physical integrity, as stipulated in article 7 of the International Covenant on Civil and Political Rights ["the ICCPR"].[8]

---

[6] The Panel noted that various alternative peaceful methods could have been used.  *See* Palmer Panel Report, *supra* note 2, p. 4-5 and ¶¶ 114-17.  *See also id.*, ¶¶ 126-28, 131-32, 135-45.

[7] *Id.*, ¶ 163.

[8] *Id.*, ¶ 173.  *See also id.*, ¶¶ 137-142, 179-181.

There is no evidence in the UNHRC Report or the Palmer Panel Report – or in any other source cited by Defendants – that Plaintiffs were seeking to smuggle weapons, or were trying to "breach" the blockade for any military purpose.   Their aim was purely humanitarian.   *See* Complaint, ¶¶ 24, 29, 30, 33.   They were unarmed civilians, and the insinuation that they could have links with Hamas or terrorists is strenuously denied.

Thus the "Background" that Defendants present to the Court consists not of established fact, but of innuendo; not of objective truth, but of contested opinion.   It is Defendants, not Plaintiffs, who ask the Court to base its dismissal of this Action on such unstable ground.   Plaintiffs do not seek judicial resolution of political questions; they seek redress for wrongs done to them. Plaintiffs will demonstrate that Defendants' unlawful conduct against the people on *The Challenger I* and their property cannot be legally justified, irrespective of its "wider context."   As a result, Plaintiffs are entitled under U.S. law to a hearing in this Court, and ultimately to redress and compensation for the tortious injuries inflicted on them.

## Argument

### I.       Defendants Are Not Immune from Suit.

Federal district courts have original jurisdiction over any non-jury civil action against a foreign state, regardless of the amount in controversy, provided that the defendant is not entitled to immunity. 28 U.S.C. § 1330(a); *Daliberti v. Republic of Iraq*, 97 F.Supp.2d 38, 42 (D.D.C. 2000), citing *Argentine Republic v. Amerada Hess Shipping Corp*., 488 U.S. 428, 434 (1989).  As a general rule, in evaluating a motion to dismiss for lack of subject matter jurisdiction under Rule 12(b)(1), the Court is to treat the complaint's factual allegations as true and must grant the plaintiff "the benefit of all inferences that can be derived from the facts alleged." *Barr v. Clinton,* 370 F.3d 1196, 1199 (D.C. Cir. 2004) (citations omitted).

In FSIA cases, the plaintiff bears the burden of establishing jurisdiction by a preponderance of the evidence. *Odhiambo v. Republic of Kenya*, 930 F.Supp.2d 17, 23 (D.D.C. 2013).   However, "[o]nce the defendant has asserted the jurisdictional defense of immunity, the court's focus shifts to exceptions to immunity laid out in 28 U.S.C. §§ 1604, 1605, and 1607." *Phoenix Consulting Inc. v. Republic of Angola*, 216 F.3d 36, 40 (D.C. Cir. 2000).   The defendant sovereign then has the burden of proving that "the plaintiff's allegations do not bring the case within a statutory exception to immunity." *Elbasir v. Kingdom of Saudi Arabia*, 464 F.Supp.2d 155, 160 (2007).

Where the defendant attacks the factual basis for subject matter jurisdiction under one of the FSIA exceptions, "the court may not deny the motion to dismiss merely by assuming the truth of the facts alleged by the plaintiff and disputed by the defendant." *De Csepel v. Republic of Hungary*, 2016 WL 1048758 (D.C. Cir. 2016), citing *Phoenix Consulting*, 216 F.3d 36, 40. However if, as here, Defendants challenge only the legal sufficiency of Plaintiffs' jurisdictional allegations, the Court should take those factual claims as true. *Id.*, 216 F.3d 36, 39; *see also O'Bryan, et al. v. Holy See*, 556 F.3d 361, 376 (6th Cir. 2011).   Defendants do not appear to contest the allegations that the raid on *The Challenger I* took place as alleged, and that Plaintiffs suffered the injuries that they report in the Complaint.   Where, as here, the claims on the merits set out in the Complaint directly mirror the jurisdictional standard, Plaintiffs "need only show that [their] claim is 'non-frivolous' at the jurisdictional stage and need not definitively prove its claim as [they] would at the merits stage." *De Csepel*, 2016 WL 1048758, at p. *9.

## A.   The FSIA Assigns Sovereign Immunity Determinations to the Judiciary.

In enacting the FSIA, Congress codified its intentions: "Claims of foreign states to immunity **should henceforth be decided by courts** of the United States and of the States in conformity with the principles set forth in this chapter."   28 U.S.C. § 1602 (emphasis added).   And

as one Judge of this Court observed, "A primary purpose of that Act was to depoliticize sovereign immunity decisions by transferring them from the Executive to the Judicial Branch of government, thereby assuring litigants that such decisions would be made on legal rather than political grounds." *Nat'l Airmotive Corp. v. Gov't & State of Iran*, 499 F. Supp. 401, 406 (D.D.C. 1980).

The expression of confidence in the judiciary implicit in the statutory language set the courts free to treat claims of immunity the way they review other asserted exemptions from their scrutiny.  The courts were, in short, assigned to do what courts normally do: interpreting statutory texts, analyzing precedents, marshalling evidence, and evaluating the quality of competing legal arguments.   Congress did not provide short-cuts: it did not offer magic words whose pronouncement by a sovereign defendant would guarantee entitlement to immunity from suit.

The FSIA does provide a presumption of immunity: a foreign state "shall be immune from the jurisdiction of the courts of the United States and of the States except as provided" elsewhere in the Act.  28 U.S.C. § 1604.  Jurisdiction over a case against a sovereign defendant must be grounded in one of the Act's exceptions.  *Amerada Hess*, 488 U.S. 428, 434–35.  That much is settled law, and Plaintiffs do not dispute it.

However where, as here,

> jurisdiction depends on the plaintiffs having asserted a particular **type** of claim, "there typically is jurisdiction unless the claim is immaterial and made solely for the purpose of obtaining jurisdiction or ... wholly insubstantial and frivolous, *i.e.*, the general test for federal-question jurisdiction under *Bell v. Hood*, 327 U.S. 678, 682–83 (1946), and *Arbaugh v. Y & H Corp.*, 546 U.S. 500, 513 & n. 10 (2006)."

*De Csepel v. Republic of Hungary*, 808 F.Supp.2d 113, 128 (D.D.C. 2011) (emphasis in original), *aff'd in part, rev'd in part*, 714 F.3d 591 (D.C. Cir. 2013), citing *Agudas Chasidei Chabad v. Russian Fed'n*, 466 F.Supp.2d 6, 14 (D.D.C. 2006), *rev'd in part on other grounds*, 528 F.3d 934, 940 (D.C. Cir. 2008).  It is, in other words, up to Defendants to show that the nature of Plaintiffs'

claims to justify an exception to immunity renders them sufficiently flimsy on their face to preclude the Court from proceeding to entertain them.   However, two separate provisions of the FSIA – 28 U.S.C. §§ 1605(a)(5) and 1605A – provide this Court an adequate basis to assert jurisdiction over this case, and over Defendants.

**B.   Defendants Are Not Entitled to Immunity under the FSIA.**

1.   The Tort Exception Applies, Because the Tortious Acts on *The Challenger I* Occurred "in the United States" within the Meaning of the FSIA.

The FSIA provides that sovereign immunity may **not** be invoked in actions

in which money damages are sought against a foreign state **for personal injury** or death, or damage to or loss of property, occurring **in the United States** and caused by **the tortious act** or omission of that foreign state or of any official or employee of that foreign state while acting within the scope of his office or employment.

28 U.S.C. § 1605(a)(5) (emphasis added), with exceptions that do not apply here.[9]

The statute defines the term "the United States" to "include[] all territory and waters, continental or insular, subject to the jurisdiction of the United States."  28 U.S.C. § 1603(c).  The statute does not, however, expressly state that such definition constitutes the term's **entire** reach. As the Supreme Court has taught,

the *expressio unius* canon does not apply "unless it is fair to suppose that Congress considered the unnamed possibility and meant to say no to it," *Barnhart v. Peabody Coal Co.*, 537 U.S. 149 (2003), … the canon can be overcome by "contrary indications that adopting a particular rule or statute was probably not meant to signal any exclusion," *United States v. Vonn*, 535 U.S. 55, 65 (2002).

*Marx v. Gen. Revenue Corp.*, 133 S. Ct. 1166, 1175 (2013).  Here, nothing in the text of the FSIA, or in the statute's legislative history, suggests that Congress intended to extend sovereign

---

[9] Defendants do not seem to contest the characterization of the Complaint as one alleging "personal injury," or the claims that the acts giving rise to this case were committed by Israel or "official[s] or employee[s] of [Israel] while acting within the scope of [their] office or employment."   Those other prerequisites for application of the § 1605(a)(5) exception are therefore not discussed further in this submission.

immunity to a state whose agents committed torts aboard a U.S.-flagged vessel on the high seas, much less that it meant to bestow on such tortfeasors an impunity that they do not deserve.

Plaintiffs respectfully submit that the correct reading of § 1605(a)(5) includes, within the meaning of "the United States," ships flying the American flag in international waters, which are, like U.S. "territory and waters, continental or insular," certainly "subject to the jurisdiction of the United States."   And they argue that this inclusion would not open the door to exceptions to immunity for torts committed on the premises of U.S. diplomatic missions abroad, or in U.S.-registered aircraft flying in the airspace of foreign nations.   Nor would it extend to "an infinite number of ships of all sizes all over the globe as long as they fly the U.S. flag."   D. Mot., p. 17.

Defendants read the definition in § 1603(c) as relating to physical location only, as distinguished from the "abstract" or juridical reading urged by Plaintiffs.   D. Mot., p. 18.   But they do that only by excising from the definition the words "subject to the jurisdiction of the United States."   The precise definition of the words "territory … subject to the jurisdiction of the United States" is no simple matter: it is not answered simply by looking at a map.   *See*, for example, *Rasul v. Bush*, 542 U.S. 466 (2004) (in which the Court concluded that the United States had "plenary and exclusive jurisdiction, but not 'ultimate sovereignty,'" over the Guantanamo Bay Naval base on Cuban soil, 542 U.S. 466, 475).   And indeed geography does not provide the definitive answer, as is demonstrated by the many cases concluding that U.S.-flagged ships on the high seas not only are subject to U.S. jurisdiction, but are actually part of the territory of the United States.

Plaintiffs do not argue, as did the owners of the bombed tanker in *Amerada Hess*, that the term "the United States" includes the vastness of the high seas, simply because the Constitution confers admiralty jurisdiction upon the judicial branch.   U.S. Constitution, Art. III, sec. 2.   That argument was rejected by the Supreme Court, 488 U.S. 428, 440-41, and is foreclosed here.   But

10

the tanker in that case flew not the Stars and Stripes but the flag of the Republic of Liberia.  The decision of the Court says and implies nothing about whether **U.S. ships** on the high seas – as opposed to the seas themselves that cover some 70% of the total surface area of our planet – come within the reach of the FSIA tort exception.

International law, as evidenced in treaties such as the Geneva Convention on the High Seas,[10] certainly affirms the exclusive, plenary jurisdiction of flag states over their ships when they are not in the waters of another state.[11]  The criminal laws of the United States generally extend to U.S.-flagged ships on the high seas unless their reach is limited, and this extension is consistent with and not a derogation from any presumption against construing statutes to apply extraterritorially.  *See Kiobel v. Royal Dutch Petroleum Co.*, 133 S. Ct. 1659, 1664 (2013) (discussing the "canon of statutory interpretation known as the presumption against extraterritorial application").  And under another cardinal principle of statutory construction, deriving from *Murray v. Schooner Charming Betsy*, 6 U.S. (2 Cranch) 64, 118 (1804), statutes should, where possible, always be interpreted consistently with international law.

Defendants disparage the decision of the Permanent Court of International Justice in *The S.S. Lotus [Fr. v. Turk.]*, (1927) P.C.I.J., ser. A, No. 10, and its discussion of ships as "floating islands" of the states whose flags they fly, as dealing in mere "legal fiction."  D. Mot., pp. 19-20.  Yet, while of course the "floating island" meme is meant to be understood metaphorically and not literally, the principle for which it stands is far from fictional.  Indeed, it has been upheld and expressly cited by U.S. courts on numerous occasions.  While on the high seas, "vessels are normally considered within the exclusive jurisdiction of the country whose flag they fly."  *United*

---

[10] Opened for signature April 29, 1958, [1962] 13 U.S.T. 2313, T.I.A.S. No. 5200, 450 U.N.T.S. 82.

[11] The United Nations Convention on the Law of the Sea ("UNCLOS"), 1833 UNTS 3 (1982), which has 167 states parties although it has not (yet) been ratified by the United States, is completely in accord (*see* art. 94), and is generally considered to be declaratory of contemporary customary international law.

*States v. Marino-Garcia*, 679 F.2d 1373, 1380 (11th Cir. 1982) (*citing The S.S. Lotus*; other citations omitted); *see also United States v. Carvajal*, 924 F.Supp.2d 219, 243 (D.D.C. 2013) (per Collyer, J.), *aff'd sub nom. United States v. Miranda*, 780 F.3d 1185 (D.C. Cir. 2015).[12]

Nor is there any lack of federal court jurisprudence referring to U.S.-flagged ships not only metaphorically as "floating islands," and not only as subject to specific statutory jurisdiction, but actually as part of the territory of the United States.  As long ago as 1891, the Supreme Court observed that "[t]he deck of a private American vessel …is considered, for many purposes, constructively as territory of the United States."  *Ross v. McIntyre*, 140 U.S. 453, 464 (1891).  The Court cited with approval an English decision in *The Queen v. Anderson*, [1868] 1 L.R. C.C.R. 161, to the effect that, at least while not in the territorial waters of another country, "a ship which bears a nation's flag is to be treated as a part of the territory of that nation. A ship is a kind of floating island."  *Ross*, 140 U.S. 453, 477; *Patterson v. Eudora*, 190 U.S. 169, 176-77 (1903).[13]

Defendants portray *United States v. Flores*, 289 U.S. 137 (1933), as establishing that a U.S.-flagged merchant vessel is "deemed to be part of the territory of the United States" only in "limited circumstances," and specifically, for justifying the extension of criminal jurisdiction to acts "committed upon the high seas, or … on board any vessel belonging in whole or in part to the United States."  D. Mot., p. 19, citing 18 U.S.C. § 451.  But Defendants would have the Court

---

[12] It is not clear why Defendants find some consolation in *Perez v. The Bahamas*, 652 F.2d 186 (D.C. Cir. 1981), in which the Circuit Court concluded that an act committed on a U.S.-flagged vessel **in Bahamian waters** did not take place "in the United States."  D. Mot., pp. 21-22.  Not only does the location of the vessel – which was within the territorial jurisdiction of another country – critically distinguish that case from this one, but in the very passage cited by Defendants the Court of Appeals noted that it did not need to look further into the FSIA exceptions: "Appellant's injuries were not suffered on the high seas but, rather, were inflicted within Bahamian territorial waters."  652 F.2d 186, 189.

[13] "A ship on the high seas **is considered foreign territory**, functionally, a floating island of the country to which it belongs."  21 Am. Jur. 2d Criminal Law § 438 (citation omitted; emphasis added).  Much of the early reported jurisprudence on this subject simply assumed that a ship was part of the nation whose flag it flew, but addressed the more complicated question whether a foreign state into whose waters such a ship might venture had any right to jurisdiction over it, and if so, how much.  *See*, for example, the opinion of Marshall, C.J., in *The Schooner "Exchange" v. M'Faddon*, 11 U.S. 116 (1812)

overlook the fact that the Supreme Court found such a statutory provision to be constitutional **precisely because** its reach was a qualification of, and not an exception to, "the territorial principle." As the Court observed, the presumption that legislation is not to be read extraterritorially by implication "has never been thought to be applicable to a merchant vessel which, for purposes of the jurisdiction of the courts of the sovereignty whose flag it flies to punish crimes committed upon it, **is deemed to be a part of the territory of that sovereignty**." *U.S. v. Flores*, 289 U.S. 137, 155 (emphasis added).

There is no question but that Congress has the authority to extend the tort exception to immunity to U.S. ships on the high seas. The question before this Court is whether, in enacting the FSIA, it used that authority. As the Eleventh Circuit observed in *United States v. Riker*, 670 F.2d 987, 988 (11th Cir. 1982):

> The principle that the law of the flag governs conduct aboard ship is a principle that antedates the Republic. *See United States v. Flores*, 289 U.S. 137, 150-51; cf. *The S.S. Lotus* (law of the flag is a part of customary international law). The United States has power to define and punish criminal offenses aboard ship just as it has power to do so upon American territory. *Lauritzen v. Larsen*, 345 U.S. 571, 585 (1953); *United States v. Flores*, 289 U.S. at 151-52; *United States v. Reagan*, 453 F.2d 165, 170 & n.2 (6th Cir. 1971), *cert. den.*, 406 U.S. 946 (1972). The question, therefore, is not whether the United States has the power to reach appellants' conduct but whether Congress intended to exercise that power in enacting [the criminal statute at issue]. *See United States v. Baker*, 609 F.2d 134, 138 (5th Cir. 1980); *United States v. Mitchell*, 553 F.2d 996, 1001 (5th Cir. 1977).

It is hard to see why a ship flying the flag of the United States should be deemed part of the country's territory for the purposes of prosecuting criminal offenses, but not in the context of statutory language authorizing pursuit of actions in tort.[14] Plaintiffs concede that they can point to

---

[14] Little guidance can be derived from *Cunard S.S. Co. v. Mellon*, 262 U.S. 100 (1923), which concluded that the language, history, and context of the National Prohibition Act did not extend the Eighteenth Amendment to U.S. ships on the high seas, although it did cover foreign ships when within the physical jurisdiction of the United States. There is simply no comparable legislative history of the relevant FSIA provision, nor is there any language in the statute itself that might justify any inference of comparable congressional intent.

no case specifically holding that the FSIA exception in § 1605(a)(5) lifts the immunity of a foreign sovereign responsible for torts committed on board a U.S. vessel in international waters. Nor can Defendants cite any case for the contrary proposition that they proffer. Yet the consistency with which the extension of jurisdiction over U.S. vessels in international waters has been upheld by the courts provides powerful incentive to decide this dispute in line with those precedents.

Certainly cases refusing to apply the exception to torts committed in U.S. diplomatic premises, such as *Persinger v. Islamic Republic of Iran*, 729 F.2d 835 (D.C. Cir. 1984), are of no relevance. International law dictates that embassies and their personnel are subject to the laws of the sending state for some purposes, and of the receiving state for others. There is simply no such overlap in jurisdictional claims with respect to ships on the high seas. While international law dictates that "[t]he premises of the [diplomatic] mission shall be inviolable," and "[t]he agents of the receiving state may not enter them, except with the consent of the head of the mission," Vienna Convention on Diplomatic Relations,[15] it is not and has never been the case that an embassy is "part of the territory" of the sending state. And indeed, as Judge Bork made clear for the majority in *Persinger*, the U.S. Embassy in Tehran, even when in the throes of the hostage crisis of 1979-81, was indisputably the territory of Iran, not of the United States. 729 F.2d 835, 842.[16]

After observing that the legislative history of the provision offers little by way of guidance, the Circuit Court correctly observed in *Persinger* that some consequences of extending § 1605(a)(5) to embassies abroad could be, for example, that

---

[15] T.S. 993, 59 Stat. 1031 (entered into force Dec. 13, 1972), art. 22.

[16] The Ninth Circuit reached the same result in *McKeel v. Islamic Republic of Iran*, 722 F.2d 582 (9th Cir. 1983), citing the RESTATEMENT (SECOND) [OF THE FOREIGN RELATIONS LAW OF THE UNITED STATES], § 77, cmt. A, for the proposition that "A United States embassy, however, remains the territory of the receiving state," and concluding "United States embassies are not within the territorial jurisdiction of the United States." 722 F.2d 582, 588, *citing Meredith v. United States*, 330 F.2d 9, 10–11 (9th Cir.), *cert. denied*, 379 U.S. 867 (1964) (emphasis added).

the French government [would] be subject to suit in the United States if a French government vehicle were involved in an automobile accident on the U.S. embassy grounds in West Germany. Furthermore, foreign states "might hesitate in providing services to U.S. embassies or consulates" were they to be subject to suit in U.S. courts for negligent acts or omissions on those premises. *Id.*, at 10. In addition, since some foreign states base their sovereign immunity decisions on reciprocity, or parity of reasoning, it is possible that a decision to exercise jurisdiction in this case would subject the United States to suits abroad for torts committed on the premises of embassies located here.

*Persinger*, 729 F.2d 835, 841 (citations omitted). Those are untenable outcomes.

Plaintiffs do not argue here that U.S.-flagged vessels on the high seas are part of U.S. territory because the United States exercises "some form of jurisdiction" over them, as the unsuccessful plaintiffs contended with respect to embassies in *Persinger* and *McKeel*. Rather, because of the unique status of ships deriving from centuries of legal evolution, and according to a line of precedent tracing back at least to the nineteenth century, "[t]he deck of a private American vessel … is considered, for many purposes, constructively as territory of the United States." *Ross v. McIntyre*, 140 U.S. 453, 464 (1891).[17]

The jurisdiction of the flag state over ships in international waters is plenary, and it is exclusive. "Ships shall sail under the flag of one State only and, save in exceptional cases expressly provided for in international treaties or in these articles, shall be subject to its exclusive jurisdiction on the high seas." Geneva Convention on the High Seas, art. 6.1. The sending state's jurisdiction over its embassies abroad is neither.

---

[17] The same cannot be said, of aircraft registered in the United States. In *Smith v. Socialist People's Libyan Arab Jamahiriya*, 101 F.3d 239, 246 (2d Cir. 1996), *cert. denied*, 520 U.S. 1204 (1997), the Circuit Court correctly observed that a plane flying over the sovereign territory of another state – Scotland, in the case of the doomed PanAm 103 – is more akin to an embassy than to a ship on the high seas, and concluded that "[i]f FSIA immunity prevails with respect to torts in United States embassies, it cannot be displaced with respect to United States aircraft **flying over a foreign land**." *Id.* (emphasis added). The Court was not asked to decide, and did not decide, whether the situation might have been different had PanAm 103 been destroyed over the Atlantic Ocean.

Congress may beyond doubt define and punish criminal offenses committed on vessels flying the American flag in international waters.  U.S. Constitution, art. I, sec. 8, cl. 10; *see United States v. Smith*, 18 U.S. (5 Wheat.) 153 (1820).  There is no logical basis for concluding that it cannot also provide for jurisdiction over tort suits arising out of acts committed on such vessels when no other state's laws reach them.  Plaintiffs contend that in enacting the tort exception as part of the FSIA, 28 U.S.C. § 1605(a)(5), Congress denied immunity from suit to foreign sovereigns whose agents commit torts against passengers on board U.S.-flagged ships in international waters. Without that immunity, Defendants the State of Israel and its agencies are answerable before this Court for the tortious acts of which they stand accused in the Complaint.

2.  Tortious Acts Are Not Automatically Exempted from Judicial Scrutiny
When the State Responsible Deems Them to Be Part of "Security Operations."

Defendants painstakingly explain to the Court that the FSIA enshrines "the restrictive theory," D. Mot, pp. 13-14, meaning that the presumption of immunity is not overcome with respect to acts "*de jure gestionis*," but not those "*de jure imperii*."  However, a careful reading of the FSIA shows that Congress took a far subtler and more nuanced approach than this binary distinction.  The statute lays down that in determining the applicability of the "commercial activity" exception to immunity – 28 U.S.C. § 1605(a)(2), which is invoked almost exclusively in contract actions – the courts are to be guided by "the nature of the course of conduct or particular transaction or act, rather than by reference to its purpose."  28 U.S.C. § 1603(d).

Whether a sovereign is entitled to immunity under the commercial activities exception depends upon "whether the particular actions that the foreign state performs (whatever the motive behind them) are the **type** of actions by which a private party engages in 'trade and traffic or commerce.'" *Republic of Argentina v. Weltover, Inc*., 504 U.S. 607, 614 (1992) (citations omitted; emphasis in original).  The consequence of this is that even in cases alleging breaches of contract,

the courts may not accept a simple description of the transaction at issue: it has to permit development of the facts.  A state is not immune from suit based on a contract for the purchase of combat boots, for example, because it was undertaken as part of the sovereign activity of outfitting military personnel.  Rather, because the **nature** of that contract – the acquisition of footwear – describes something in which private actors routinely engage, immunity does not attach, and an action for breach may proceed.[18]  In this case, Plaintiffs do not allege that Defendants have lost their entitlement to immunity by virtue of a commercial activity under § 1605(a)(2).  Thus the Supreme Court's analysis in *Saudi Arabia v. Nelson*, 507 U.S. 349 (1993), is not apposite.

*Nelson* and the other cases cited by Defendants in support of the claim that "military and police operations" are *ipso facto* exempt from judicial review do not actually say such a thing.  The Courts in those cases held that the treatment of a person under arrest on Saudi soil (in *Nelson* itself), or an American citizen's claim that he was not adequately compensated for services as a soldier in a foreign army, *Friedar v. Gov't of Israel*, 614 F.Supp. 395 (S.D.N.Y. 1985),[19] are not commercial matters.  And in *Saltany v. Reagan*, 886 F.2d 438, 440-41 (D.C. Cir. 1989), the plaintiffs invoked an entirely separate exception to sovereign immunity (an express conflict with an international agreement in effect in 1976, under § 1605(a)(4)), which the Court summarily dispatched for failure to provide any basis for the claim.[20]

---

[18] Defendants direct the Court's attention to the pre-FSIA decision in *Heaney v. Gov't of Spain*, 445 F.2d 501, 504 (2d Cir. 1971), D. Mot., p. 14, in which the Second Circuit opined that the "conclusion that a contract by a foreign government for the purchase of bullets for its army or for the erection of fortifications do [*sic*] not constitute sovereign acts" would be "rather astonishing," citing *Victory Transport, Inc. v. Comisaria General*, 336 F.2d 354, 359 (2d Cir. 1964).  Applying the FSIA would almost certainly have dictated a different result in *Heaney*, since under § 1605(a)(2), a commercial contract to purchase bullets affords no immunity from suit (an outcome that, post-FSIA, would be normal, and hardly "astonishing").

[19] In a standard application of § 1605(a)(2), the *Friedar* Court noted that "recruiting soldiers and determining eligibility for veterans' benefits are activities conducted only by governments."  614 F.Supp. 395, 399.

[20] Defendants also rely on *Herbage v. Meese*, 747 F.Supp. 60 (D.D.C. 1990).  D. Mot., pp. 14-15.  In that case, however, the decision of this Court was premised on its understanding that the FSIA governed a suit against foreign agents in their individual capacities: a proposition that the Supreme Court definitively and

These cases stand for no more than the proposition, not contested here, that military activities are not "commercial" in nature.  But that does not mean that a sovereign defendant's mere assertion that challenged activities were undertaken as part of a military policy provides a blanket exclusion from the FSIA tort exception.

The caselaw interpreting 28 U.S.C. § 1605(a)(2) does, however, shed some light on general considerations to be taken into account in determining the applicability of the other statutory exceptions.  The principle to be distilled from that caselaw is this: a sovereign should be denied immunity for conduct that, were it undertaken by a private actor in similar circumstances, would give rise to liability.  Just as a government may not enter into a commercial contract and then shield itself from its enforcement, a sovereign defendant is not entitled to exemption from judicial review of tortious conduct that would otherwise be actionable if carried out by a private party.

That is the gravamen of the suit here: Defendants' agents raided a United States-flagged ship on the high seas without justification, and seriously injured unarmed people in so doing.  Had the individuals who committed those acts been the agents of a private security company, they and the claims against them would certainly be subject to this Court's jurisdiction.  Interpreting § 1605(a)(2) to deny immunity in such circumstances is thus consistent with the object and purpose of the FSIA.  *See Nat'l Airmotive Corp., supra,* 499 F.Supp. 401, 406.

In any event, whether what Defendants' agents did on board *The Challenger I* on May 31, 2010, was or was not "sovereign activity immune from the subject-matter jurisdiction of United States courts," *Nelson*, 507 U.S. 349, 363, is a question of fact.  Plaintiffs contest that characterization, and claim that the injuries done to them on that day were neither necessary to nor

---

unanimously rejected in *Samantar v. Yousuf*, 560 U.S. 305, 319 (2010) ("this meaning was not what Congress enacted").  So the precedential value of *Herbage* has been severely compromised.

a part of any policing or self-defense activity of the Israeli state.  The two independent United Nations reviews of the raid on *The Mavi Marmara* flotilla (*see* pp. 3-6, *supra*) concluded that the use of force against the passengers was excessive and unwarranted.  Given that it is Defendants who claim immunity under the FSIA based on the premise that the attacks were a part of legitimate security operations, it is they who bear the burden of persuasion with respect to it.  "[T]he general rule of statutory construction that the burden of proving justification or exemption under a special exception to the prohibitions of a statute generally rests on one who claims its benefits."  *Fed. Trade Comm'n v. Morton Salt Co*., 334 U.S. 37, 44–45 (1948).  The mere recitation that tortious acts were committed as part of a national security of police exercise is not sufficient to defeat the jurisdiction of the Court, or to turn Plaintiffs away without a remedy.

### 3. Defendants Are Not Shielded by Statutory Immunity That Attaches to the Exercise of "Discretionary Functions."

Defendants next argue that even if the exception to immunity in 28 U.S.C. § 1605(a)(5) would otherwise apply, they are saved by the provision that excludes "any claim based upon the exercise or performance or the failure to exercise or perform a discretionary function regardless of whether the discretion be abused."  28 U.S.C. § 1605(a)(5)(A).  But this exception-to-the-exception does not provide the support that Defendants are seeking.  This is true because Plaintiffs' claims are not based on the performance of discretionary functions, and in any event, there is no discretion to violate international law. *See Letelier v. Republic of Chile*, 488 F.Supp. 665, 673 (D.D.C. 1980) ("Accordingly, there would be no 'discretion' within the meaning of § 1605(a)(5)(A) to order or to aid in" acts in violation of national and international law.).

The Supreme Court has provided guidance on this issue in interpreting the parallel discretionary function exclusion in the Federal Tort Claims Act, 28 U.S.C. § 2680 ("the FTCA").  "First, it is the nature of the conduct, rather than the status of the actor, that governs whether the

discretionary function exception applies in a given case."   And second, "whatever else the discretionary function exception may include, it plainly was intended to encompass the discretionary acts of the Government acting in its role as a regulator of the conduct of private individuals." *U.S. v. Varig Airlines*, 467 U.S. 797, 813–14 (1984).

Here, Plaintiffs' grievance is not against Israeli Government officials who made plans sitting behind desks; it is against the soldiers who beat them on board *The Challenger I* without any justification in law, international or domestic.  Defendants are liable for the illegal acts of those IDF soldiers.  As the Supreme Court taught, the nature of the conduct governs, and if the exception applies to the setting of policies, it does not follow that it applies also to their implementation. Indeed, the distinction between decisions made "at operational level," which are not protected by the exception, and those "at planning level," which are, is well enshrined in the caselaw interpreting § 1605(a)(5)(A).  *Olsen v. Government of Mexico*, 729 F.2d 641, 647 (9th Cir.), *cert. denied*, 469 U.S. 917 (1984); *Gerritsen v. de la Madrid Hurtado*, 819 F.2d 1511, 1518 (9th Cir. 1987) (the assaults and other violent acts alleged in the complaint "are not decisions to 'establish governmental policy,' or decisions at the 'planning level,' but rather are acts to 'carry out policy, or acts at the operational level.'").

Defendants' reliance on *MacArthur Area Citizens Ass'n v. Republic of Peru*, 809 F.2d 918 (D.C. Cir.), *modified*, 823 F.2d 606 (D.C. Cir. 1987), is misplaced.  There, the plaintiffs complained that the construction of a new Peruvian embassy in their neighborhood violated local ordinances.  This Court held Peru immune from suit and the Circuit affirmed, noting that "[i]t is beyond serious question that establishing a chancery in the District of Columbia to conduct foreign relations is a discretionary public policy decision."  809 F.2d 918, 922.  In that case, it was the very policy decision itself that was the gravamen of the suit, while here, what is at issue is the

**implementation** of the Government agencies' decision to impede the flotilla from navigating the high seas. Defendants unleashed those who committed illegal and tortious acts, and they are responsible for the wrongdoing of their agents.[21]

The case on which Defendants principally rely for the proposition that the torts of which Plaintiffs complain are protected from judicial review by the discretionary functions exception, *Wu Tien Li-Shou v. United States*, 777 F.3d 175, 185 (4th Cir.), *cert. denied*, 136 S. Ct. 139 (2015), cannot bear the weight that Defendants place on it. In *Wu Tien*, the widow of a Taiwanese citizen killed during a NATO counter-piracy operation filed a tort suit governed by the FTCA against the United States. Her request that the Court assess the actions that led to her husband's death had, of necessity, to focus on mission **planning**, thereby "questioning the wisdom of a series of discretionary decisions." 777 F.3d 175, 185. Moreover, while she argued for the inapplicability of the discretionary function, she was unable to "identify a law that would permissibly have circumscribed" the Government agents' course of action. *Id*. Here, by contrast, it is implementation, not setting, of policy that is the basis of Plaintiffs' claims. And Plaintiffs **do** point to laws – in this case, treaties – declaring the conduct of which they complain to be illegal.[22] As in *Gerritsen*, 819 F.2d 1511, 1518, the torts of which Plaintiffs were the victims were acts "at the operational level" to carry out policy, not to establish it, and therefore are not shielded by the discretionary function exception in 28 U.S.C. § 1605(a)(5)(A).

---

[21] In the *MacArthur Area Citizens* case, had a neighbor of the new chancery been injured by the careless (or deliberate) actions of a construction worker hired by the Peruvian Government, it is inconceivable that the "discretionary function exception" would have protected the Government from responsibility. *See Joseph v. Consulate Gen'l of Nigeria*, 830 F.2d 1018 (9th Cir. 1987), *cert. denied*, 485 U.S. 905 (1988).

[22] The relevant treaties do not need to be "self-executing" in order to play such a function. As the Fourth Circuit held, the question is whether some binding legal authority rendered the course of action illegal. It is not whether such authority creates private causes of action. Plaintiffs respectfully suggest that Judge Wilkinson's discussion of self-executing treaties in *Wu Tien* was both *obiter dictum* and incorrect as a matter of law.

21

4. The § 1605A Exception Applies Because Its Invocation Is Not Restricted
to Defendants Designated by the Executive Branch as "State Sponsors of Terrorism."

Section 1605A of the FSIA, added in 2008, is what is generally referred to as "the terrorism exception." But to conclude that the Court has jurisdiction over this Action pursuant to 28 U.S.C. § 1605A it is not necessary to invoke that misused, incendiary epithet. Plaintiffs do not ask the Court to find that Israel a "terrorist state" in order for this civil action to proceed. It is sufficient, rather, to show that the Foreign Sovereign Immunities Act provides an exception to the presumption of immunity for certain acts deemed to constitute "terrorism," and that Congress then defined that word by listing specific conduct that comes within the reach of the statute and therefore the jurisdiction of the Courts. 28 U.S.C. § 1605A(1). As summarized recently by the Supreme Court,

> American nationals may file suit against state sponsors of terrorism in the courts of the United States. Specifically, they may seek "money damages ... against a foreign state for personal injury or death that was caused by" acts of terrorism, including "torture, extrajudicial killing, aircraft sabotage, hostage taking, or the provision of material support" to terrorist activities. This authorization – known as the "terrorism exception" – is among enumerated exceptions prescribed in the [FSIA] to the general rule of sovereign immunity.

*Bank Markazi v. Peterson*, 136 S. Ct. 1310, 1317 (2016) (citations and footnote omitted). Defendants argue that this exception is "patently inapplicable," D. Mot., p. 16, not because the attack on *The Challenger I* would not be actionable had it been carried out by Somali pirates or political radicals, but solely because Israel has not been designated as a "state sponsor of terrorism" within 50 U.S.C. App. § 4605(j), 22 U.S.C. § 2371, or 22 U.S.C. § 2780(d).

If Congress had not amended the FSIA in 2008 using language that explicitly modified the requirement of such designation, Defendants would be right. But it did, and they aren't.

Doubtless, the pre-2008 version of the terrorism exception required the State Department's designation of a state as a sponsor of terrorism before the exception could apply.  In 1996, in the Antiterrorism and Effective Death Penalty Act ("AEDPA"), Congress denied sovereign immunity to any foreign state officially designated by the Department as a terrorist state if it committed a terrorist act, or provided material support and resources to an individual or entity that committed such an act, which resulted in the death or injury to a United States citizen.  *See* 28 U.S.C. § 1605(a)(7) (1996).  But after the U.S. Court of Appeals for the District of Columbia Circuit held in *Cicippio-Puleo v. Islamic Republic of Iran*, 353 F.3d 1024 (D.C. Cir. 2004), that § 1605(a)(7) did not provide a private cause of action, Congress in 2008 repealed that provision and replaced it with what is now § 1605A.  Pub.L. 110-181, Div. A, § 1083(b)(1)(A)(iii), 122 Stat. 341.

The language of § 221 of the AEDPA, entitled "Jurisdiction for Lawsuits Against Terrorist States" – that is, the original § 1605(a)(7) – could not have been clearer:

> the court shall decline to hear a claim under this paragraph (A) **if the foreign state was not designated as a state sponsor of terrorism** under section 6(j) of the Export Administration Act of 1979 (50 U.S.C. App. § 2405(j)) or section 620A of the Foreign Assistance Act of 1961 (22 U.S.C. § 2371) at the time the act occurred, unless later so designated as a result of such act.

Pub. L. No. 104-132, 110 Stat. 1214 (emphasis added).  Under the terms of that provision, in other words, the designation of the defendant state was a necessary, albeit not a sufficient, condition for a denial of immunity under the terrorism exception.

But in the 2008 legislation, Congress altered this language.  It replaced the "red light" that **stopped** a case in the **absence** of a designation, with a mandatory "green light" that **required** that cases proceed in the **presence** of one, as follows:

> (1) **No immunity**.--A foreign state **shall not be immune** from the jurisdiction of courts of the United States or of the States in any case not otherwise covered by this chapter in which money damages are sought against a foreign state for personal injury or death that was caused by an act of

> torture, extrajudicial killing, aircraft sabotage, hostage taking, or the provision of material support or resources for such an act if such act or provision of material support or resources is engaged in by an official, employee, or agent of such foreign state while acting within the scope of his or her office, employment, or agency.

§ 1605A(a)(1).  The statute goes on to provide, in § 1605A(a)(2)(A)(i)(I) (emphases added):

> (2) **Claim heard**. – **The court shall hear a claim** under this section if — (A)(i)(I) the foreign state **was designated** as a state sponsor of terrorism at the time the act described in paragraph (1) occurred, or was so designated as a result of such act, and, … either remains so designated when the claim is filed under this section or was so designated within the 6-month period before the claim is filed under this section.

Assuring immunity from suit when the defendant state is **not** designated – as under the AEDPA language – is obviously not equivalent to requiring that the case be heard when it **is** designated as a sponsor of terrorism, as under the 2008 amendments.  The language adopted by Congress in 2008 abandoned the designation requirement in the AEDPA, and left open the possibility that a non-designated state could be a defendant under the new § 1605A exception.  Certainly Justice Ginsburg's summary of the current language of the § 1605A exception in *Bank Markazi* last April, *see* p. 22 *supra*, says nothing about any requirement that a sovereign be designated by the Secretary of State as a sponsor of terrorism before a case against it may proceed.  Definitively shifting the power to decide claims of immunity from the executive branch to the judiciary in this way has been one of the core accomplishments of the FSIA. *See* 28 U.S.C. § 1602.

Defendants may try to minimize the significance of the statutory changes in 2008, but they can no longer ignore them.  The Courts are obliged to interpret the explicit language of a statute and to honor the logical implications of the words that Congress actually employed.  "The question … is not what Congress 'would have wanted' but what Congress enacted in the FSIA." *Argentina v. Weltover, Inc.*, 504 U.S. 607, 618 (1992). Defendants are certainly not free to interpret § 1605A(a)(2) as if the words "only if," rather than "if," preceded the references to designation.

24

When statutory language is altered, neither the parties nor the Courts may simply assume that the amendment is meaningless, without effect, or ill-considered. "When Congress acts to amend a statute, we presume it intends its amendment to have real and substantial effect." *Stone v. INS*, 514 U.S. 386, 397 (1995); *Pierce Cty., Wash. v. Guillen*, 537 U.S. 129, 145 (2003). Nor can the legislative history of the statute be used to create an ambiguity when there is none in the text itself. *See*, *e.g.*, *Milner v. Dep't of the Navy*, 562 U.S. 562, 574 (2011) ("Legislative history, for those who take it into account, is meant to clear up ambiguity, not create it.").

Plaintiffs acknowledge that some judicial decisions since 2008 have perpetuated the old designation requirement. Some of these are cited in Defendants' Motion, at p. 15. However, a thorough examination of the filings in each of those cases reveals that the effect of the 2008 amendments on the requirement of designation was not briefed in any of them. This is, therefore, a case of first impression, requiring the Court for the first time to apply the explicit text of § 1605A as it is, not as it was, beginning with the proposition that a foreign state "shall not be immune from the jurisdiction of courts of the United States" in cases – like this one – in which plaintiffs seek money damages for personal injuries resulting from certain kinds of acts.

### C. **Plaintiffs Do Not Insist on an Award of Punitive Damages.**

Plaintiffs acknowledge the unavailability of punitive damages as a remedy against Defendants. They withdraw ¶ 4 of the Prayer for Relief set out at page 20 of their Complaint.

### D. **The Complaint Does Not Present Unreviewable "Political Questions."**

Defendants inject politics into the Complaint and then urge the Court to dismiss it because it presents non-justiciable political questions. D. Mot., pp. 28-35. As shown below, they thus insist on a measure of judicial protection to which the Government of the United States itself is not entitled under the political question doctrine. Even on its own terms, the doctrine does not apply after *Zivotofsky*, *supra*, the Supreme Court's most recent treatment of the political question

doctrine. Defendants do not cite, let alone discuss, *Zivotofsky*, perhaps because the Court there rejected the application of the doctrine in a case that involved the high politics of the Israeli-Palestinian conflict.[23]  *Zivotofsky* reaffirms a jurisprudence dating back at least to *Baker v. Carr*, defining when federal judges may abstain from hearing cases and when they may not.  At base,

> [t]he doctrine of which we treat is one of 'political questions,' not one of 'political cases.'  The courts cannot reject as 'no law suit' a bona fide controversy as to whether some action denominated 'political' exceeds constitutional authority. The cases we have reviewed show the necessity for discriminating inquiry into the precise facts and posture of the particular case, and the impossibility of resolution by any semantic cataloguing.

*Baker v. Carr*, 369 U.S. 186, 217.  It is just such a summary resolution – blowing past the precise claims in the Complaint – that Defendants demand and that *Baker* instructed the courts to avoid.

Nor do Defendants cite or discuss the D.C. Circuit's recent analyses of the doctrine in *Hourani v. Mirtchev*, 796 F.3d 1 (D.C. Cir. 2015) and *Simon v. Republic of Hungary*, 812 F.3d 127 (D.C. Cir. 2016) (citations omitted), which – though distinguishable in some respects – addressed the limited role of the political question doctrine post-*Zivotofsky* and expressly undermined its relevance in cases that arise under the FSIA, like this one.

1. Defendants' Argument Rests on a Strategic Mischaracterization of the Complaint.

As this Court recently recognized in *Mobarez v. Kerry*, No. 15-CV-516 (KBJ), 2016 WL 2885871, at *4 (D.D.C. May 17, 2016), "[t]he D.C. Circuit has announced that a court identifies a non-justiciable political question by '[c]onducting [a] discriminating analysis of the particular

---

[23] *Zivitovsky* concerned whether an American citizen born in the City of Jerusalem could have his passport identify his place of birth as "Jerusalem, Israel."  But the Court was not distracted by the politics: citing the venerable teachings of *Marbury v. Madison*, 1 Cranch 137, 177 (1803), that it is "duty of the judicial department to say what the law is," Chief Justice Roberts wrote that "[t]hat duty will sometimes involve the '[r]esolution of litigation challenging the constitutional authority of one of the three branches,' but courts cannot avoid their responsibility merely 'because the issues have political implications.'"  132 S. Ct. 1421, 1427–28, *citing INS v. Chadha*, 462 U.S. 919, 943 (1983). Defendants offer no justification for ignoring Chief Justice Roberts's admonition in *Zivotofsky* that "the Judiciary has a responsibility to decide cases properly before it, even those it 'would gladly avoid.'" 132 S.Ct. at 1427 (citation omitted).

question posed by the claims the plaintiffs press.'" *Id.* at \*4, *citing El–Shifa Pharm. Indus. Co. v. United States*, 607 F.3d 836, 844 (D.C. Cir. 2010) (*en banc*). The Court of Appeals in *El-Shifa* could not have been clearer: "the presence of a political question in these cases **turns not on the nature of the government conduct under review** but more precisely on the question the plaintiff raises about the challenged action." *Id.*, at 842 (citation omitted, emphasis added). As a consequence, Defendants' alarmist assertion that "Plaintiffs challenge military and security decisions of Israel," D. Mot., p. 28, even if it were a fair portrayal of the Complaint, is insufficient in this Circuit to trigger the political question doctrine.

The United States Government unsuccessfully sought an analogous shield in litigation challenging its treatment of detainees at the Guantanamo Bay Naval base in Cuba.  The challenged Government actions unambiguously involved its "military and national security decisions" in the aftermath of the September 11 attacks.  But the Supreme Court heard and resolved the plaintiffs' cases nonetheless, because the specific challenge to those decisions rested on the application of legal standards to the facts alleged.  *See, e.g., Hamdan v. Rumsfeld*, 548 U.S. 557 (2006) (reversing the D.C. Circuit's refusal to apply the Geneva Conventions), *superseded by statute on other grounds*, Military Commissions Act of 2006, Pub.L. No. 109–366, § 7(b), 120 Stat. 2600, 2636 (2006); *Boumediene v. Bush*, 553 U.S. 723, 753-54 (2008) (rejecting the application of the political question doctrine as urged by the U.S. Government). These politically-charged cases vividly illustrate the black-letter limitations on the political question doctrine. As in *Zivotofsky*, they did not involve "a textually demonstrable constitutional commitment of the issue to a coordinate political department; or a lack of judicially discoverable and manageable standards for resolving it." 132 S.Ct. 1421, 1427, *citing Nixon v. United States*, 506 U.S. 224, 228 (1993) (*quoting Baker v. Carr*, 369 U.S. 186, 217 (1962)).

Defendants deserve no greater deference than that to which the U.S. Government was held entitled in *Hamdan* and *Boumediene.* A "discriminating analysis" of the claims in the instant Complaint and the Motion to Dismiss – as required under *El-Shifa*, *supra* – shows that it is Defendants who stress the political and military nature of the actions at issue here.  The allegations in the Complaint require this Court only to assess the legality of actions taken against U.S. citizens and others on a U.S.-flagged vessel peacefully transiting the high seas.  As in *Hamdan*, 548 U.S. 557, 561, Plaintiffs seek to have this conduct assessed under the Geneva Conventions and similar treaties to which the United States and Israel are both parties.  Despite Defendants' heated rhetoric, the legality of the Gaza blockade, set against the long crisis in the Middle East, is no more relevant here than was the legality of the wars in Afghanistan and Iraq in *Hamdan*.

*Hamdan* involved constitutional and statutory questions not present here, but the holding in the case rests on the Supreme Court's clear-eyed assessment of the legality of the procedures adopted to try Hamdan under the Geneva Conventions, explicitly reversing the D.C. Circuit for failing to apply those treaty standards.  Of greatest relevance here, the Supreme Court declined to treat that question as though it were "textually committed" to the Executive Branch in its conduct of a war or its treatment of irregular combatants.  There was no "lack of judicially discoverable and manageable standards" in applying the treaty standard.  *Baker v. Carr*, *supra.*  Plaintiffs in this case seek only their day in court to prove that Defendants' specific actions violated similar legal standards.  Defendants' policies and motivations could not be less relevant to the questions of law (or the mixed questions of law and fact) that are actually raised in the Complaint.

    2.   Defendants Ignore the D.C. Circuit's
        Specific Limitations on the Political Question Doctrine in FSIA Cases.

Last year, the D.C. Circuit disapproved the use of the political question doctrine to defeat jurisdiction that is otherwise proper under the Foreign Sovereign Immunities Act. In *Hourani v.*

*Mirtchev*, *supra,* the Court of Appeals first noted that as "the Supreme Court has reminded, even though civil litigation can sometimes affect the Nation's foreign relations, 'courts cannot avoid their responsibility merely 'because the issues have political implications.'" 796 F.3d at 8, *quoting Zivotofsky*, 132 S.Ct. at 1428 (*quoting INS v. Chadha*, 462 U.S. 919, 943 (1983)). The *Hourani* Court continued: "Indeed, both before and since the enactment of the [FSIA], courts have often heard cases directly involving the conduct of foreign governments and foreign officials." *Id.* There follows a list of illustrative cases in the Supreme Court and the D.C. Circuit which allowed actions against foreign governments to go forward – despite the potential political complications – so long as sovereign immunity was first correctly denied. *BG Group PLC v. Republic of Argentina*, 134 S.Ct. 1198 (2014); *Republic of Mexico v. Hoffman*, 324 U.S. 30, 36, (1945); and *de Csepel v. Republic of Hungary*, 714 F.3d 591, 594 (D.C. Cir. 2013).

In language that requires the rejection of Defendants' argument under the political question doctrine, the Court of Appeals in *Hourani* concluded that "[a]djudicating the lawfulness of those acts of a foreign sovereign that are subject to the United States' territorial jurisdiction, in other words, **is not an issue that the Constitution entirely forbids the judiciary to entertain**, or commits exclusively to the Political Branches." 796 F.3d 1, 8–9 (D.C. Cir. 2015) (emphasis added). In denying the applicability of the political question doctrine in a case where FSIA jurisdiction could be established, the D.C. Circuit declared earlier this year that "[t]here is no across-the-board constitutional bar preventing the Judiciary's consideration of actions arising out of the wartime conduct of a foreign sovereign." *Simon v. Republic of Hungary*, *supra,* 812 F.3d at 150 (citations omitted).

The Court of Appeals has thus rightly understood that Congress used the FSIA to define a set of cases that fall within the jurisdiction of the United States courts, and those cases, though

they necessarily involve the legality of a foreign government's conduct or that of its officials, are

not for that reason automatically non-justiciable under the political question doctrine.  Otherwise,

a judge-made policy of judicial abstention would supersede the legislative judgments of Congress,

in violation of the very separation of powers principles that lie at the heart of the political question

doctrine.  In this Circuit, if Plaintiffs are right that the attack on *The Challenger I* falls within at

least one of the FSIA's exceptions to sovereign immunity, its legality *vel non* is simply not

removed from judicial determination.[24]

This fundamentally distinguishes this case from *Corrie v. Caterpillar, Inc.*, 503 F.3d 974

(9th Cir. 2007), on which Defendants heavily rely. Nothing in *Corrie* implicated the judgment of

Congress to assure jurisdiction in defined circumstances against a foreign sovereign. Precisely to

the contrary, the *Corrie* plaintiffs asked the Court to second-guess a statutory enactment

concerning foreign aid and the President's decisions in implementing it. The Ninth Circuit rightly

invoked the political question doctrine:

> The executive branch has made a policy determination that Israel should
> purchase Caterpillar bulldozers. It advances that determination by financing
> those purchases under a program authorized by Congress. A court could not
> find in favor of the plaintiffs without implicitly questioning, and even
> condemning, United States foreign policy toward Israel.

---

[24] This Court anticipated this analysis in *Kaplan v. Central Bank of Islamic Republic of Iran*, 961 F.Supp.2d 185 (D.D.C. 2013).  In *Kaplan*, Judge Lamberth found jurisdiction proper under the FSIA and dismissed the defendants' political question defense:

> As in *Zivitofsky*, the plaintiffs in this action do not ask the Court to "supplant a foreign
> policy decision of the political branches with the courts' own unmoored determination" of
> whether the rocket attacks at issue here were examples of "war" or "terrorism," *see id*. at
> 1427, but rather seek relief under several federal statutes authorizing recovery for specific
> conduct. Drawing a clean line between "war" and "terrorism" may be a difficult and
> sensitive political issue. Fortunately, **it is one that Congress has completed** – leaving it
> to the Court to apply their definition.

*Id*. at 192 (emphasis added). Judge Lamberth's analysis applies equally well to this case: so long as the FSIA provides jurisdiction, it follows that foreign relations concerns will not derail the case through the political question doctrine. *Accord*, *Owens v. Republic of Sudan*, 374 F.Supp.2d 1 (D.D.C. 2005) (no political question concerns arise once jurisdiction is established under an exception to the FSIA).

503 F.3d 974, 983–84 (emphasis added).  **That** is the danger the Supreme Court warned about in

*Baker*, and it is not present in this case. While Defendants indicate that the Secretary of State and

the United States Senate have taken certain positions on the legality of the blockade of Gaza,[25] or

Israel's right to defend its borders, D. Mot., pp. 33-34, those issues are not before the Court in a

case for personal injuries that *ex hypothesi* falls within exceptions to the FSIA.[26]

### 3.  This Litigation, Including Discovery, Can Be Conducted in Accordance with Traditional, Judicially Manageable Standards.

Defendants complain that discovery in this case could not be undertaken without intruding

on areas where the Court must fear to tread.  They suggest that resolving discovery disputes would

necessarily require the Court to make decisions barred by the political question doctrine. D. Mot.,

pp. 31-33. This argument, however, ignores the traditional supervisory powers of trial courts to

limit discovery to the narrow issues framed by the Complaint, to issue protective orders when

justified, and to arrange depositions at a distance when necessary. Defendants' argument founders

on the reality that judicially manageable standards have become routine in FSIA litigation over the

40 years since the statute was adopted, including pre-trial discovery. *See*, *e.g*., *Lantheus Med.*

*Imaging, Inc. v. Zurich Am. Ins. Co*., 841 F.Supp.2d 769 (S.D.N.Y. 2012) (authorizing the issuance

---

[25] Obviously the Constitution does not confer authority on the United States Senate to determine the legality of actions challenged in court. That three weeks after the event, well before any objective investigation was undertaken, the Senate passed a resolution blaming the passengers on board *The Mavi Marmara* for what happened to them and exonerating Israel, demonstrates that the resolution (S. Res. 548, 111th Cong.) was a purely political act. It has no consequences for this Court or this case.  But if the asserted legality of the raid on the convoy of ships were a factor militating in favor of Defendants, it would be in the nature of an affirmative defense, and Defendants would bear the burden of persuasion with respect to it. *See*, *e.g*., *Morton Salt Co*., *supra*, 334 U.S. 37, 44–45.

[26] For this reason, the two cases on which Defendants principally rely are readily distinguished. In *Doe v. State of Israel*, 400 F.Supp.2d 86 (D.D.C. 2005), Judge Bates found no jurisdiction under any of the exceptions to the FSIA and portrayed the case as a challenge to Israel's policies concerning settlements on the West Bank, with only the most tenuous connections to the United States. Similarly, in *Matar v. Dichter*, 500 F.Supp.2d 284 (S.D.N.Y. 2007), *aff'd*, 563 F.3d 9 (2d Cir. 2009), the Court found that "Plaintiffs make no attempt to show that Dichter's purported actions fall within an [FSIA] exception."  500 F. Supp. at 292. And like the plaintiffs in *Doe*, Matar argued against broad policies, asking the Court essentially to determine that Israel was engaged in an extensive and long-term pattern of human rights violations.

of letters rogatory requesting production of testimonial and documentary evidence from a foreign governmental instrumentality despite its claims of immunity); *Arriba Ltd. v. Petroleos Mexicanos*, 962 F.2d 528, 534, 537 n.17 (5th Cir. 1992) (A "prerequisite to an order for limited discovery is a district court's clear understanding of the plaintiff's claims against a sovereign entity . . . [and] discovery may be used to confirm specific facts that have been pleaded as a basis for enforcing the commercial activities exception, but it cannot supplant the pleader's duty to state those facts at the outset of the case.").  Without minimizing the logistical difficulties that discovery frequently poses in such cases, they simply do not justify the dismissal of the Complaint altogether.  If the procedural complexity of litigation, and the danger that political considerations might lead to discovery disputes, were by themselves sufficient reason to slam the courthouse door, every complicated FSIA case involving a taking,[27] or a commercial activity with a nexus to the United States,[28] or predicate acts of terrorism,[29] should have been dismissed for this same reason.

Israel, like the United States, is a party to The Hague Convention on the Taking of Evidence Abroad in Civil or Commercial Matters, which offers a protocol for assuring that evidence can be obtained once the parties under the Court's supervision have agreed on a discovery plan. Moreover, in enacting § 1605A, Congress explicitly anticipated complex pretrial procedural issues and adopted special rules regarding discovery requests to the U.S. Government. *See* 28 U.S.C. §

---

[27] *See*, *e.g.*, *Abelesz v. Magyar Nemzeti Bank*, 692 F.3d 661, 666 (7th Cir. 2012) ("direct[ing] the district court to allow jurisdictional discovery with respect to whether the national railway is engaged in 'commercial activity' in the United States, as required by the expropriation exception to the FSIA.").

[28] *See*, *e.g.*, *Helmerich & Payne Int'l Drilling Co. v. Bolivarian Republic of Venezuela*, No. 11-CV-01735 (CRC), 2016 WL 2771117 (D.D.C. May 13, 2016) (holding that plaintiffs were entitled to jurisdictional discovery of information concerning whether corporate subsidiary was agency or instrumentality of Venezuela engaged in commercial activity in the United States). *Accord*, *de Csepel v. Republic of Hungary*, 75 F.Supp.3d 380 (D.D.C. 2014).

[29] *Kilburn v. Socialist People's Libyan Arab Jamahiriya*, 376 F.3d 1123 (D.C. Cir. 2004) (allowing jurisdictional discovery in case under precursor of § 1605A); *Daliberti*, *supra* (finding that FSIA terrorism exception applied and ordering the case to proceed to discovery and trial).

1605(g).  At the least, it is premature to dismiss a case before the parties have even begun to discuss the modalities for discovery, out of concern that certain questions in certain depositions might lead to objections whose propriety the Court would be required to adjudicate.  *See* D. Mot., p. 31.

In summary, the political question doctrine as developed by the Supreme Court in *Baker v. Carr* and its progeny, like *Zivitofsky*, combined with the D.C. Circuit's limitation on the doctrine in FSIA cases, does not apply to this case.

### E.  Defendants May Not Claim the Act of State Doctrine as a Shield against Judicial Review.

Defendants ask the Court to dismiss this case on the ground that the "act of state doctrine would bar Plaintiffs' claims." D. Mot., p. 35. But the Israeli Government's apparent sensitivity to the allegations stated in the Complaint is an insufficient reason to apply the doctrine.  "The act of state doctrine does not establish an exception for cases and controversies that may embarrass foreign governments."  *W.S. Kirkpatrick & Co., Inc. v. Env. Tectonics Corp*., 493 U.S. 400, 405 (1990). The doctrine is far more limited: it precludes courts only "from inquiring into the validity of the public acts of a recognized foreign sovereign power committed within its own territory." *Banco Nacional de Cuba v. Sabbatino*, 376 U.S. 398, 421 (1964).  *See* RESTATEMENT (THIRD) OF THE FOREIGN RELATIONS LAW OF THE UNITED STATES, §§ 443, 444.

According to the Court of Appeals for this Circuit, the act of state doctrine "directs United States courts to refrain from deciding a case when the outcome turns upon the legality or illegality ... of official action by a foreign sovereign performed within its own territory." *Riggs Nat'l Corp. & Subsidiaries v. Comm'r of IRS*, 163 F.3d 1363, 1367 (D.C. Cir. 1999) (*citing Kirkpatrick*, 493 U.S. 400, 406). In short, "the doctrine … requires courts to deem valid the acts of foreign sovereigns taken within their own jurisdictions." *McKesson Corp. v. Islamic Republic of Iran*, 672 F.3d 1066, 1073 (D.C. Cir. 2012) (*citing Kirkpatrick*, 493 U.S. 400, 409).

This body of precedent established by the Supreme Court and the D.C. Circuit demonstrates that the act of state doctrine cannot apply in this case for three independent reasons. First, the doctrine covers conduct only **within** the territory of the foreign state. "In **every** case in which we have held the act of state doctrine applicable, the relief sought or the defense interposed would have required a court in the United States to declare invalid the official act of a foreign sovereign performed **within its own territory**." *Kirkpatrick*, 493 U.S. 400, 405 (emphasis added); *Underhill v. Hernandez*, 168 U.S. 250, 252 (1897). The law of this Circuit is equally strict in applying this territorial requirement. *McKesson Corp.*, 672 F.3d 1066, 1073; *Riggs Nat'l Corp.*, 163 F.3d 1363, 1367; *World Wide Minerals, Ltd. v. Republic of Kazakhstan*, 296 F.3d 1154, 1165 (D.C. Cir.), *cert. denied*, 537 U.S. 1187 (2002). In fact, **every one** of the cases cited by Defendants, D. Mot., pp. 35-37, explicitly recognizes this limitation. *See. e.g., Doe I v. State of Israel*, 400 F.Supp.2d 86, 113 (D.D.C. 2005) (the plaintiffs claimed "that they were treated illegally by Israeli defendants **on Israeli soil**"); *Roe v. Unocal Corp.*, 70 F.Supp.2d 1073 (C.D. Cal. 1999) (acts of the Burmese government **in Burma**); *Arango v. Guzman Travel Advisors Corp.*, 621 F.2d 1371, 1380 (5th Cir. 1980) (state conduct **in the Dominican Republic** denying the Arangos' entry into that country and effecting their removal). In short, nothing in the act of state doctrine compels this Court to presume the validity of acts of the Israeli Government or its agents on the high seas or on a U.S.-flag vessel – the very gravamen of Plaintiffs' Complaint.[30]

Second, even if the territoriality requirement were met here, the act of state doctrine cannot be invoked when the challenged conduct violates a treaty, as Plaintiffs allege in this case. The

---

[30] Defendants understandably fail to cite *Hourani v. Mirtchev*, *supra*, in which the Court of Appeals hinted in *dicta* at the possibility of a non-territorial application of the act of state doctrine but concluded that "the alleged conduct here is rooted, in all relevant respects, **within foreign sovereign territory**…." *Id.*, at 13 (emphasis added). The Court there concluded that the Kazakh Embassy in Washington was for purposes of the act of state doctrine to be treated as the territory of Kazakhstan.

Supreme Court has held that the doctrine applies only "in the absence of a treaty or other unambiguous agreement regarding controlling legal principles…. [T]he greater the degree of codification or consensus concerning a particular area of international law, the more appropriate it is for the judiciary to render decisions regarding it." *Sabbatino*, 376 U.S., 398, 428.  The D.C. Circuit has explicitly directed that the doctrine not apply when treaty standards govern the case. *Ramirez de Arellano v. Weinberger*, 745 F.2d 1500, 1540 (D.C. Cir. 1984), *cert. granted, judgment vacated on other grounds*, 471 U.S. 1113 (1985)). *Accord Kalamazoo Spice Extraction Co. v. Provisional Military Gov't of Socialist Ethiopia*, 729 F.2d 422, 425 (6th Cir. 1984).

This Court also has acknowledged that "the Act of State Doctrine does not preclude judicial review where, as here, there is a relevant, unambiguous treaty setting forth agreed principles of international law applicable to the situation at hand." *Am. Int'l Grp., Inc. v. Islamic Republic of Iran*, 493 F.Supp. 522, 525 (D.D.C. 1980), *vacated and remanded on other grounds*, 657 F.2d 430 (D.C. Cir. 1981). In this case, the allegations in the Complaint – taken as true for purposes of deciding Defendants' Motion to Dismiss – make out clear violations of numerous treaties of the United States and Israel, including *inter alia* the Fourth Geneva Convention of 1949 Relative to the Protection of Civilian Persons in Time of War; the Convention against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment ("the CAT"); and the Geneva Convention on the High Seas of 1958.  The act of state doctrine does not exempt Israel from judicial scrutiny under these treaty-based "controlling legal principles." *Sabbatino*, 376 U.S., 398, 428.

Third, irrespective of the territoriality requirement and the treaty exception, the act of state doctrine cannot apply when Congress exercises its authority to override it by legislation. Like all creatures of federal common law, the judge-made doctrine bends to the will of the legislature, and Congress has repeatedly exercised that authority.  Famously, the Second Hickenlooper

Amendment, adopted in the aftermath of the *Sabbatino* decision, overrode the act of state doctrine expressly: "[N]o court … shall decline on the ground of the federal act of state doctrine to make a determination on the merits giving effect to the principles of international law…."  22 U.S.C. § 2370(e)(2).  *See also* The Federal Arbitration Act, 9 U.S.C. § 15 ("Enforcement of arbitral agreements, confirmation of arbitral awards, and execution upon judgments based on orders confirming such awards shall not be refused on the basis of the Act of State doctrine.").

Such a statutory override may be by implication, as when applying the doctrine would circumvent or nullify a Congressional directive that cases involving foreign state-sponsored conduct be adjudicated.  In *Daliberti*, *supra*, for example, this Court, *per* Judge Friedman, rejected the act of state defense.  97 F.Supp.2d 38, 54–55.  In light of the amendment to the FSIA in 2008, *supra*, the same analysis controls here. It would eviscerate the statutory regime if alleging a state-sponsored act within the scope of § 1605A automatically triggered the act of state doctrine.[31]

From the fact that the acts alleged to have caused Plaintiffs' injuries were carried out by agents of a sovereign state, it does not follow that they are shielded from judicial scrutiny. Contrary to Defendants' summary suggestion, the act of state doctrine as applied by the Supreme Court and the D.C. Circuit does not derail this case.

**II.      The Complaint States a Claim for Which Relief May Be Granted.**

A motion to dismiss for failure to state a claim pursuant to Rule 12(b)(6) challenges the adequacy of a complaint on its face.  A complaint must be sufficient "to give a defendant fair

---

[31] By analogy, consider claims of state-sponsored torture under the Alien Tort Statute, 28 U.S.C. § 1350. Were the act-of-state defense applicable in such cases, the plaintiffs in proving a required element of the wrong – state sponsorship -- would simultaneously provide an iron-clad shield against liability for it.  For this reason among others, courts have consistently rejected act of state defenses in ATS cases. *See, e.g., In re Estate of Ferdinand Marcos, Human Rights Litig.*, 25 F.3d 1467, 1471 (9th Cir. 1994). Nothing in the Supreme Court's treatment of the ATS alters this reality. *Sosa v. Alvarez-Machain*, 542 U.S. 692 (2004*); Kiobel v. Royal Dutch Petroleum Co*., 133 S.Ct. 1659 (2013).

notice of what the ... claim is and the grounds upon which it rests." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (internal citations omitted).

Under Federal Rule of Civil Procedure 8(a)(2), a complaint must contain a 'short and plain statement of the claim showing that the pleader is entitled to relief.' *Ashcroft v. Iqbal*, 556 U.S. 662, 677 (2007), citing *Twombly*, 550 U.S. 554, 555.  A complaint must contain sufficient factual matter which, if accepted as true, would state a claim to relief that is plausible on its face.  *Iqbal*, 556 U.S., 662, 678 (internal citations omitted).  "A claim has facial plausibility when the pleaded factual content allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id*.  Defendants seek dismissal of this Action not only on the grounds of lack of jurisdiction of the Court to hear it, under Rule 12(b)(1), but also for failure to state a claim for which relief may be granted, under Rule 12(b)(6).  For the purposes of the latter discussion – and, of course, on the assumption that Plaintiffs' arguments overcome the jurisdictional objections – the well-pleaded allegations of the Complaint must be taken as established, and there is no reason to go outside the pleadings to identify further support for them.  *See* Rule 12(d).

The asserted grounds for dismissal under Rule 12(b)(6) are three: that there is no private right of action under the War Crimes Act, that the alleged injuries suffered by Plaintiffs do not rise to the level of torture, and that the claims are barred by applicable statutes of limitation.  None of these arguments would justify dismissing this case at this early stage.

## A.   Plaintiffs Do Not Claim a "Private Right of Action" under the War Crimes Act.

At pages 37-39 of their Motion, Defendants offer an impassioned rebuttal of the argument that the War Crimes Act, 18 U.S.C. § 2441(a), the Geneva Conventions, and the CAT, 1465 U.N.T.S. 85 (entered into force June 28, 1987), do not create "private causes of action."  The problem here, though, is that Plaintiffs do not make the argument that Defendants are addressing.

Plaintiffs have stated causes of action sounding in tort: that is, the common law by which, since time immemorial, persons aggrieved are permitted to sue those who trespassed against them – who, in other words, violated duties of care, and who caused them compensable injuries.  In their Complaint, Plaintiffs cite the War Crimes Act; the CAT; the ICCPR, 999 U.N.T.S. 171 (entered into force Mar. 23, 1976); and the Fourth Geneva Convention, 75 U.N.T.S. 287 (entered into force Oct. 21, 1950), as authorities for the charges that the acts by which they are aggrieved were wrongful.  But they do not claim that their causes of action arise under those texts.

The War Crimes Act, for example, which criminalizes "grave breach[es] of common Article 3" of the Geneva Conventions, 18 U.S.C. § 2441(c)(3), is not cited as the **source** of the obligation not to assault innocent and unarmed civilians on a U.S.-flagged vessel on the high seas. It is referenced in the Complaint (¶¶ 51, 55, 59, and 62) as support for the claim that the acts committed by Defendants' agents were, in fact, wrongs recognized as such not only by the common law, but by international law.  The War Crimes Act, in Plaintiffs' submission, serves as evidence that that the United States subscribes to that view, and joins in the international consensus that these acts cannot be defended as lawful.

Plaintiffs assert that each of the torts alleged in the nine Counts comes within this Court's jurisdiction under 28 U.S.C. § 1605(a)(5).  There is no disagreement with the proposition that the only entrance to the courthouse, in an action against a foreign state and its agencies, is through the FSIA – like the ATS, as the Supreme Court explained in *Sosa*, *supra* – a jurisdictional statute. Plaintiffs have discharged their obligation to provide sufficient factual content from which "to draw the reasonable inference that [Defendants are] liable for the misconduct alleged." *Iqbal*, 556 U.S., 662, 678.  In so doing, Plaintiffs have satisfied the requirement that they "identify a particular

cause of action arising out of a specific source of law." *Acree v. Republic of Iraq*, 370 F.3d 41, 59

(D.C. Cir. 2004), *abrogated on other grounds*, *Republic of Iraq v. Beaty*, 556 U.S. 848 (2009).[32]

Defendants contend that in *Mohamoud v. Rajoub*, 634 F.3d 604, 609 (D.C. Cir. 2011), *aff'd*

*sub nom. Mohamad v. Palestinian Auth.*, 132 S. Ct. 1702 (2012), "the D.C. Circuit has 'cautioned

against … imply[ing] a federal common law claim for a violation of the law of nations.'"  D. Mot.,

p. 38.  But the ellipsis in that quotation is significant.  What the Circuit Court actually said was

that "the Supreme Court in *Sosa* cautioned against **reading [28 U.S.C.] § 1331** to imply a federal

common law claim for a violation of the law of nations."  634 F.3d 604, 609 (D.C. Cir. 2011)

(emphasis added).[33]  But Plaintiffs do not allege § 1331 jurisdiction.  They rely on the statutory

provisions permitting suits against foreign sovereigns, in 28 U.S.C. §§ 1605(a)(5) and 1605A.

There is, therefore, no basis for dismissing this case under Rule 12(b)(6).

**B.  Whether Plaintiffs' Treatment by Defendants' Agents Constituted Torture
Is a Question of Fact Not to Be Resolved on a Rule 12(b)(6) Motion.**

Defendants next argue that the Complaint fails to state a claim because Plaintiffs have

inadequately alleged that the injuries they suffered rose to the level of torture.  The Court need not

tarry long on this argument, because it is self-evidently premature.  Whether Plaintiffs can

demonstrate the severity of the acts committed against them, and the extent and degree of the

suffering they underwent, are certainly questions to be reserved for trial when the Court can have

a chance to make its own assessment of their credibility.  In the case on which Defendants rely,

the D.C. Circuit made this point quite clearly:

---

[32] *Saleh v. Titan Corp.*, 580 F.3d 1 (D.C. Cir. 2009), on which Defendants rely, is distinguishable for a host of reasons.  It is not an FSIA case, and there was no foreign sovereign defendant.  The Circuit determined that suits naming Government contractors (*i.e.*, private actors) as defendants, alleging battlefield misconduct during U.S. military operations in Iraq, were precluded by preemption concerns.

[33] The key issue in *Mohamoud*, in any event, was whether an individual could be sued under the Torture Victims Protection Act, 28 U.S.C. § 1350note.  That was the basis for the grant of *certiorari*, and the Supreme Court unanimously affirmed the dismissal of the case on those grounds.

> The critical issue is the degree of pain and suffering that the alleged torturer intended to, and actually did, inflict upon the victim. The more intense, lasting, or heinous the agony, the more likely it is to be torture. *See* S. Exec. Rep. No. 101-30, at 15 ("The United States understands that, in order to constitute torture, an act must be a deliberate and calculated act of an extremely cruel and inhuman nature, specifically intended to inflict excruciating and agonizing physical or mental pain or suffering.") (internal quotation marks omitted). This understanding thus makes clear that torture does not automatically result whenever individuals in official custody are subjected even to direct physical assault. Not **all** police brutality, not **every** instance of excessive force used against prisoners, is torture under the FSIA.

*Price v. Socialist People's Libyan Arab Jamahiriya*, 294 F.3d 82, 93 (D.C. Cir. 2002).  In that case, brought under the TVPA, the Court of Appeals did **not** affirm the dismissal below, but ordered that the plaintiffs be permitted "to attempt to amend their complaint in an effort to satisfy TVPA's stringent definition of torture." 294 F.3d 82, 94.  The D.C. Circuit held the question whether abusive treatment amounts to torture to be one of fact, and remanded to this Court even though the "complaint says virtually nothing about the purpose of the alleged torture,"

It is at least unseemly, in any event, for Defendants – who nowhere in their Motion deny that Plaintiffs were treated with extreme brutality – to present to this Court as a basis for dismissal the assertion that "it wasn't really so bad."  It is true: compared to the passengers on *The Mavi Marmara*, at least nine of whom were killed, those on the American-flagged vessel *The Challenger I* were fortunate.  But the degree of violence directed at these Plaintiffs was unacceptable, as the Palmer Panel (*supra*, note 2) and the UNHRC (*supra*, note 3) concluded, and as Plaintiffs, as well as other passengers on *The Challenger I*, are prepared to testify at the proper time.

Whether Defendants' conduct was sufficiently brutal and Plaintiffs' injuries sufficiently severe to satisfy the definition of torture simply cannot be assessed at this stage.  At a minimum, however, it is not "hyperbole" – to use Defendants' dismissive phrasing, D. Mot., p. 39 – to allege that it is torture to push someone's face into broken glass; to assault and beat civilians; to shoot

them in the face at close range with rubber bullets; to hold them in fear for their lives, when they knew that deaths had already occurred on at least one other vessel in the flotilla; and to cause permanent partial blindness.   Unlike those in *Price*, Plaintiffs here assuredly **do** describe, in their Complaint, both the nature of their injuries and the reasons, in their understanding, for their brutal treatment by the Israeli Defense Forces.   They will of course have the burden of proving their allegations at trial by a preponderance of the evidence.   But the law does not require them to do so at this stage.   Under applicable notice pleading rules, however, the Complaint should not be dismissed for failure to support Plaintiffs' allegations of torture.[34]

### C.   No Applicable Statute of Limitation Bars This Action.

Nor should the case be dismissed under Rule 12(b)(6) on limitations grounds.   For the following reasons, recognizing that they bear the burden of demonstrating why such tolling is appropriate, Plaintiffs submit that any applicable limitations period should be deemed equitably tolled.   In *Lawrence v. Florida*, 549 U.S. 327, 336 (2007), the Supreme Court laid out the rules: Proponents must show "'(1) that [they have] been pursuing [their] rights diligently, and (2) that some extraordinary circumstance stood in [their] way' and prevented timely filing."   549 U.S. 327, 336, *citing Pace v. DiGuglielmo*, 544 U.S. 408, 418 (2005).   Plaintiffs' explanation is that they and other passengers in the flotilla (as well as the owners of *The Challenger I*) have attempted to secure remedies, *inter alia*, in the courts of Israel, and have been consistently stymied.

In the TVPA, Congress deliberately provided for equitable tolling of claims alleging torture, even beyond the already generous ten-year limitations period contained in that Act, 28 U.S.C. § 1350note, § 2(c).   The Courts have been understanding of the procedural difficulties that plaintiffs in such cases must confront and overcome, frequently including active resistance by the

---

[34] Should the Court nevertheless deem the allegations of torture and other abuse to be insufficient, Plaintiffs should at least be afforded an opportunity to amend the Complaint.

defendant state.  For example, in *Arce v. Garcia*, 434 F.3d 1254 (11th Cir. 2006), the Eleventh

Circuit found that equitable tolling was a sound exercise of the trial judge's discretion, noting that

> Excluded also from calculation of the statute of limitations would be [*inter alia*] the period when a defendant has immunity from suit."  S. Rep. No. 102–249, at 10–11 (emphasis added) (footnote omitted).  Congress clearly intends that courts toll the statute of limitations so long as the defendants remain outside the reach of the United States courts or the courts of other, similarly fair legal systems.

434 F.3d 1254, 1262; *Chavez v. Carranza*, 559 F.3d 486, 493 (6th Cir. 2009) ("When the situation

in a given country precludes the administration of justice, fairness may require equitable tolling.").

Such a claim must be evaluated in light of all of the relevant facts and circumstances.  Here,

Plaintiffs allege that efforts to find judicial redress for their injuries have been unavailing.  But the

doctrine of equitable tolling is, in the end, equitable: its goal is to be fair to all parties.  Where, as

here, the Complaint sets out the claim of such futile pursuit of justice, where Defendants have long

been on notice that these Plaintiffs claim that they were the victims of tortious acts committed on

Defendants' authority, and where the limitations period in closely-analogous jurisdictional statutes

(the TVPA limitations period has been held applicable in ATS cases too: *Doe v. Islamic Salvation

Front*, 257 F. Supp. 2d 115, 119 (D.D.C. 2003))  is easily sufficient to eliminate any timeliness

objection, that equitable discretion should be exercised in Plaintiffs' favor.[35]

### III.     The Prerequisites to Invocation of the Doctrine of *Forum Non Conveniens* Are Not Present.

Finally, Defendants urge this Court to dismiss this case under the *forum non conveniens*

doctrine, arguing that "Israel is a far more appropriate forum than the United States for Plaintiffs

to pursue claims contesting the legality of Israel's national security operations." D. Mot., p. 43.

---

[35] Defendants complain that the allegations concerning other efforts that Plaintiffs have undertaken to vindicate their rights are insufficiently specific.  D. Mot., p. 43.  Should the Court find that argument persuasive, Plaintiffs would respectfully request leave to amend their Complaint to provide additional detail, rather than being left without any judicial remedy at all.

Bypassing this strategic and repeated mischaracterization of the case, it is clear that Defendants' argument is foreclosed by Supreme Court precedent as applied in this Circuit. Under that body of law, before dismissing any action on *forum non conveniens* grounds, the District Court must determine (1) that an adequate alternative forum exists, and, if so, (2) that the balance of private and public interest factors strongly favors trial there. *Piper Aircraft Co. v. Reyno*, 454 U.S. 235, 254 n.22, 257 (1981); *Gulf Oil Corp. v. Gilbert*, 330 U.S. 501, 508 (1947). A plaintiff's choice of forum is entitled to a "substantial presumption" in its favor, *Agudas Chasidei Chabad*, *supra*, 528 F.3d 934, 950, and can be disturbed only in the most compelling circumstances, *Gilbert*, 330 U.S. 501, 508. Defendants pointedly ignore the fact that the presumption is strengthened when, as here, U.S. citizens have chosen an American forum in a transnational case.[36]

 (1) *The alternative forum requirement*. The burden of proving the adequacy of some alternative forum rests squarely on Defendants. *TMR Energy Ltd. v. State Prop. Fund of Ukraine*, 411 F.3d 296, 303 (D.C. Cir. 2005); *El–Fadl v. Cent. Bank of Jordan*, 75 F.3d 668, 677 (D.C. Cir. 1996), *abrogated on other grounds* in *Samantar v. Yousuf*, 560 U.S. 305 (2010). The alternative forum proposed by Defendants in this case is the domestic courts of Israel. D. Mot., pp. 43-44.

This Court is not required to take such proffers at face value, and, with respect, the argument cannot be taken seriously on the current record. Plaintiffs have been unable to obtain compensation – or any judicial procedure to determine their entitlement to compensation – in any forum, Complaint, at ¶ 89: the Government of Israel has consistently failed to offer a meaningful remedy for the wrongs that were undeniably committed. That distinguishes this case from the handful of purely commercial cases in which U.S. courts have understandably deferred to the

---

[36] *See Piper*, 454 U.S. 235, 266 ("The District Court's distinction between resident or citizen plaintiffs and foreign plaintiffs is fully justified. In *Koster* [*v. Lumbermens Mut. Cas. Co.*, 330 U.S. 518, 524 (1947)], the Court indicated that a plaintiff's choice of forum is entitled to greater deference when the plaintiff has chosen the home forum.").

courts of Israel under the *forum non conveniens* doctrine. D. Mot., p. 43. The decision in *Interface Partners Int'l Ltd. v. Hananel*, 575 F.3d 97 (1st Cir. 2009), for example, was not a broad endorsement of the fairness of Israeli courts in the abstract, but a fact-bound affirmance of the trial court's conclusion that, in light of all the facts, the plaintiff's choice of forum for the resolution of a private, commercial case initially litigated in Israel could be overridden. *Id.* at 103.

The issue here is not the **general** suitability of the Israeli courts, but their availability to **these** Plaintiffs against **these** Defendants for **these** violations of law.[37]   Of course, if the Government of Israel is now willing to waive all objections to jurisdiction and justiciability in its domestic courts and to guarantee a fair hearing of the claims arising from the attack on *The Challenger I*,[38] one proper course for the Court could be to dismiss the case conditionally, allowing it to proceed in Israel but retaining supervisory jurisdiction if the Israeli forum turn out to be illusory.  It is certainly within this Court's authority to enter such an order.  *See*, *e.g.*, *MBI Grp., Inc. v. Credit Foncier du Cameroun*, 616 F.3d 568, 572 (D.C. Cir. 2010), and *Stromberg v. Marriott Int'l, Inc.*, 474 F. Supp. 2d 57, 63 (D.D.C.), *aff'd,* 256 F. App'x 359 (D.C. Cir. 2007).

(2) *The convenience factors.* The Court of Appeals for this Circuit has ruled that district courts "need not weigh **any** factors favoring dismissal … if no other forum to which the plaintiff may repair can grant the relief it may obtain in the forum it chose."  *TMR Energy Ltd. v. State Prop. Fund of Ukraine*, 411 F.3d 296, 303 (D.C. Cir. 2005) (citations omitted, emphasis added);

---

[37] Defendants submit that "Israeli courts provide an adequate alternative forum, as numerous courts have held." D. Mot., p. 43. And they inform the Court that the decision in *Kuehne & Nagel Inc. v. A.G.R. Eshcol Overseas, Ltd.*, 2014 WL 4059821, at *6 (S.D.N.Y. Aug. 15, 2014) "collect[ed] cases" standing for that proposition. But the cases "collected" in *Kuehne & Nagel* support a very different conclusion, certainly not relevant here: that "Israel is an adequate alternative forum for fraud and breach of contract claims."

[38] At a minimum, an alternative forum is available only if "the entire case and all parties can come within the jurisdiction of that forum." *Rundquist v. Vapiano SE*, 798 F.Supp.2d 102, 133 (D.D.C. 2011) (*quoting Saqui v. Pride Cent. Am., LLC*, 595 F.3d 206, 211–12 (5th Cir. 2010)). In addition, "[a]n alternative forum is inadequate if the plaintiff will be 'treated unfairly'" there, *MBI Grp., Inc. v. Credit Foncier Du Cameroun*, 616 F.3d 568, 571 (D.C. Cir. 2010) (quoting *Piper Aircraft*, 454 U.S. 235, 255).

*see also Doe v. Exxon Mobil Corp.*, 69 F.Supp.3d 75, 89 (D.D.C. 2014).  Defendants discuss those factors without satisfying the precondition of an adequate alternative forum, but even were the availability of such a forum established, the balance of inconvenience must tilt **decisively** against Plaintiffs under the factors articulated by the Supreme Court in *Gilbert*, *Koster*, and *Piper* before dismissal on this ground could even arguably be warranted.

Defendants cannot pass that test either. Given Plaintiffs' citizenship and residence, the United States is not an "unrelated forum," and the sources of proof are as much here as they are in Israel.  The public documents emerging from the United Nations investigations are readily available, and discovery – including depositions – can be conducted remotely. Under the FSIA, there can be no jury concerns and none of the complex choice-of-law issues that typically arise in transnational diversity cases.  Since 1976, this Court and this Circuit have developed a unique expertise in the logistics of FSIA cases with connections to multiple jurisdictions.  The balance of convenience factors does not tilt toward Defendants at all, let alone decisively, as required under *Gilbert* and its progeny.  Defendants utterly fail to discharge any of their burdens of proof under the *forum non conveniens* doctrine, and a dismissal on this grounds would be inappropriate.

## Conclusion

Defendants insist that this case is of a political nature, and that the allegations of the Complaint escape from judicial scrutiny for that reason.  But as Plaintiffs have demonstrated, this is a tort suit whose adjudication would not cause the Court to rove outside its proper constitutional province.  Defendants are not entitled to immunity from such a suit.

For all of the foregoing reasons, the Motion to Dismiss should be denied.

Respectfully submitted,


/s/ *Steven M. Schneebaum*

_____
Steven M. Schneebaum
    (D.C. Bar No. 956250)
STEVEN M. SCHNEEBAUM, P.C.
1776 K Street, N.W.; Suite #800
Washington, D.C. 20006
Tel: (202) 742-5900
Fax: (202) 449-3835
E-mail: sms@smslawdc.com

Counsel of Record for Plaintiffs


Of counsel:    Ralph G. Steinhardt
GEORGE WASHINGTON UNIVERSITY LAW SCHOOL
2000 H Street, N.W.
Washington, D.C. 20052

Rodney Dixon, QC
TEMPLE GARDEN CHAMBERS
1 Harcourt Buildings
Temple, London EC4Y 9DA
England

Haydee Dijkstal
Sehriban Dogan
c/o STOKE & WHITE
150 Minories
London EC3N 1LS
England

Cynthia L. McCann
STEVEN M. SCHNEEBAUM, P.C.
1776 K Street, N.W.; Suite #800
Washington, D.C. 20006


Dated:  September 19, 2016


46

## CERTIFICATE OF SERVICE

I hereby certify that on this 19th day of September, 2016, I filed the foregoing Plaintiffs' Opposition to

Defendants' Motion to Dismiss with the Court through its ECF system, thereby effecting service on

counsel of record for Defendants:

John B. Bellinger, III, Esq.
Robert N. Weiner, Esq.
Robert A. DeRise, Esq.
ARNOLD & PORTER LLP
601 Massachusetts Avenue, N.W.
Washington, D.C.  20001

and

R. Reeves Anderson, Esq.
ARNOLD & PORTER LLP
370 Seventeenth Street
Suite 4400
Denver, CO  80202

/s/ *Steven M. Schneebaum*
_____
Steven M. Schneebaum

47