IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| DAVID SCHERMERHORN, *et al.*, | )<br>)<br>) |
| Plaintiffs, | )<br>) |
| v. | ) Civil Action No. 16-0049 (ABJ)<br>) |
| STATE OF ISRAEL, *et al.*, | )<br>) |
| Defendants. | )<br>) |

**STATEMENT OF INTEREST
OF THE UNITED STATES OF AMERICA**

Plaintiffs seek compensation for injuries they allegedly sustained when Israel Defense Forces intercepted their U.S.-flagged ship on the high seas. They contend that the Court has jurisdiction over their claims under the Foreign Sovereign Immunities Act's ("FSIA") tort exception, 28 U.S.C. § 1605(a)(5), and terrorism exception, *id*. § 1605A. The United States has a substantial interest in the proper interpretation of FSIA, as litigation against foreign states in U.S. courts can have foreign affairs implications for the United States and can affect the reciprocal treatment of the U.S. Government in the courts of other nations. The United States respectfully submits this Statement of Interest pursuant to 28 U.S.C. § 517[1] to inform the Court that neither exception to immunity invoked by plaintiffs removes Israel's immunity under FSIA in this case. As explained more fully below, injuries sustained aboard U.S.-flagged vessels on the high seas do not occur "in the United States" within the meaning of FSIA's tort exception,

---

[1] That statute authorizes the Attorney General of the United States to send any officer of the Department of Justice "to attend to the interests of the United States in a suit pending in a court of the United States, or in a court of a State, or to attend to any other interest of the United States." 28 U.S.C. § 517.

and Israel is not a designated state sponsor of terrorism as required to remove immunity under the terrorism exception. Accordingly, the Court should dismiss this case for lack of jurisdiction without reaching the additional grounds for dismissal advocated by defendants.

## BACKGROUND

Plaintiffs brought this action against Israel and its Ministries of Defense, Foreign Affairs, Justice, and Public Security, seeking compensation for injuries they allegedly sustained as a result of the Israel Defense Forces' ("IDF") interception of the Gaza Flotilla on May 31, 2010. *See* Compl. ¶¶ 1-3, ECF No. 1 (Jan. 11, 2016). According to the Complaint, the flotilla was "carrying civilian passengers, as well as humanitarian aid and medical supplies intended for delivery to the residents of Gaza." *Id*. ¶ 2. The six-ship flotilla included the U.S.-flagged vessel *Challenger I*, which is owned by Mediterranean Trips, LLC, a Delaware limited liability company. *Id*. ¶ 27. Plaintiffs—two U.S. citizens, one dual U.S./Israeli citizen, and one Belgian citizen—allege that they were passengers on board *Challenger I* when it was intercepted by the IDF "in international waters in the Mediterranean Sea, approximately 70 nautical miles from the coast of the Gaza Strip." *Id*. ¶ 28.

Plaintiffs claim the IDF violated international law and committed various torts during its interception of *Challenger I*. *See id*. ¶¶ 47-78. Among other things, plaintiffs allege that IDF soldiers "slammed [one plaintiff's] head against the deck," "stood on her head," and forced her "to adopt a kneeling position while being hooded for an extended period of time," *id*. ¶ 10; "shot [another plaintiff] in the face with a rubber bullet, breaking her nose," *id*. ¶ 11; and threw a stun grenade that exploded near another plaintiff's face, "leaving him partly blinded in one eye," *id*. ¶ 41. According to plaintiffs, the Israeli Ministry defendants "planned, approved, prepared for,

ordered, and executed" the interception of the flotilla and "had command and control authority over the operation against *Challenger I*." *Id*. ¶ 13.

Plaintiffs raise nine claims: torture (Count 1), cruel and inhuman treatment (Count 2), mutilation or maiming (Count 3), intentionally causing serious bodily injury (Count 4), arbitrary arrest and detention (Count 5), false imprisonment (Count 6), assault and battery (Count 7), intentional infliction of emotional distress (Count 8), and conversion of plaintiffs' personal property (Count 9).  *See id*. ¶¶ 47-78.  They assert jurisdiction over all of these claims under FSIA's tort exception, arguing that injuries sustained aboard a U.S.-flagged vessel on the high seas occur "in the United States" within the meaning of FSIA. *See id*. ¶ 80.  Plaintiffs also assert jurisdiction over the torture claim raised by one of the U.S. citizen plaintiffs under FSIA's terrorism exception, on the theory that the text of 28 U.S.C. § 1605A is broad enough to strip immunity from any foreign state that is alleged to have committed specified acts, whether or not it has been designated as a state sponsor of terrorism by the Executive Branch. *See id*. ¶ 49.

Defendants moved to dismiss the case, arguing, among other things, that plaintiffs' action is barred by FSIA, the political question doctrine, and the act of state doctrine.  The Court invited the United States to "state its views, if any, on [the issues raised in defendants' motion to dismiss] or on other issues it considers relevant to this case" by November 21, 2016.  Order, ECF No. 21 (Sept. 14, 2016); *see* Minute Order (Oct. 21, 2016).

## ARGUMENT

**I.     Torts Committed On Board U.S-Flagged Ships On The High Seas Do Not Occur "In The United States" For Purposes Of FSIA's Tort Exception**

"The Foreign Sovereign Immunities Act 'provides the sole basis for obtaining jurisdiction over a foreign state in the courts of this country.'"  *OBB Personenverkehr AG v. Sachs*, 136 S. Ct. 390, 393 (2015).  Under the Act, a foreign state is "'presumptively immune

3

from the jurisdiction of United States courts' unless one of the Act's express exceptions to sovereign immunity applies." *Id.* at 394.

The first exception on which plaintiffs rely—the tort exception—removes immunity in actions "for personal injury or death, or damage to or loss of property, occurring in the United States and caused by the tortious act or omission" of a foreign state. 28 U.S.C. § 1605(a)(5). The definitions section of FSIA specifies that "[t]he 'United States' includes all territory and waters, continental or insular, subject to the jurisdiction of the United States." *Id.* § 1603(c).

Plaintiffs contend that the tort exception provides jurisdiction in this case because a U.S.-flagged vessel sailing on the high seas is "territory . . . subject to the jurisdiction of the United States." Pls.' Mem. of Points & Authorities in Opp'n to Defs.' Mot. to Dismiss ("Pls.' Opp'n"), at 10, ECF No. 22 (Sept. 19, 2016). In support of their positon, plaintiffs point to statements in various cases indicating that "[t]he deck of a private American vessel . . . is considered, for many purposes, constructively as territory of the United States." *Id.* at 15 (quoting *Ross v. McIntyre*, 140 U.S. 453, 464 (1891)); *see also id.* at 11-15 (citing *United States v. Flores*, 289 U.S. 137, 155 (1933); *S.S. Lotus* (Fr. v. Turk.) 1927 P.C.I.J. (ser. A) No. 10 (Sept. 7)).[2]

Plaintiffs' argument lacks merit. Interpretation of a statute begins with its plain meaning. *See Bennett v. Islamic Republic of Iran*, 618 F.3d 19, 22 (D.C. Cir. 2010). The plain meaning of

---

[2] Plaintiffs appear to use the term "high seas" to refer to all areas beyond the territorial sea of any state, including the high seas as defined in the modern law of the sea, *see* 1982 UN Convention on the Law of the Sea, art. 86, as well as areas of the exclusive economic zone insofar as the coastal state lacks jurisdiction over the activity at issue, *see id.*, arts. 56, 58. *See* Pls.' Opp'n at 10-16; Compl. ¶ 28.

Plaintiffs do not claim that U.S.-flagged vessels on the high seas qualify as "waters, continental or insular, subject to the jurisdiction of the United States," 28 U.S.C. § 1603(c). In any event, ships are not "waters," either literally or figuratively. And the high seas, by definition, are not continental or insular waters. *See* 1982 UN Convention on the Law of the Sea, art. 86.

"territory" signifies land, not the deck of a ship. The root of the term "territory" is "terra," meaning "earth" or "land," and "territory" is defined as "the extent of the *land* under the jurisdiction of a ruler, state, city, etc." THE OXFORD AMERICAN DICTIONARY OF CURRENT ENGLISH 839 (3d ed. 1999) (emphasis added); *see e.g.*, THE AMERICAN HERITAGE DICTIONARY OF THE ENGLISH LANGUAGE 1329 (1st ed. 1976) (defining "territory" as "[a]n area of land; a district; region" and "[t]he land and waters under the jurisdiction of a state, nation, or sovereign"). Moreover, in FSIA, Congress specified that it was referring to "continental or insular" territory, 28 U.S.C. § 1603(c), making clear that the scope of the term "territory" is limited to U.S. land areas and does not extend to the various locations of all U.S.-flagged vessels at any given moment.

In a case involving a similar issue, the Supreme Court "construe[d] the modifying phrase 'continental and insular' to restrict the definition of United States," for purposes of FSIA's tort exception, "to the continental United States and those islands that are part of the United States or its possessions." *Argentine Republic v. Amerada Hess Shipping Corp.*, 488 U.S. 428, 440 (1989). "[A]ny other reading," the Court explained, "would render this phrase nugatory." *Id*. Although *Amerada Hess* addressed the applicability of the tort exception to injuries sustained on board a Liberian-flagged vessel on the high seas, as opposed to a U.S.-flagged vessel, the Supreme Court's conclusion that the high seas are not "territory" within the meaning of FSIA's tort exception is equally applicable here.

Other courts have strictly construed the scope of the phrase "in the United States" for purposes of FSIA's tort exception as well. In *Persinger v. Islamic Republic of Iran*, the D.C. Circuit held that injuries sustained on the premises of U.S. embassies abroad do not occur "in the United States" as required by the exception. 729 F.2d 835, 839 (D.C. Cir. 1984). The court

noted that it is insufficient that the United States has some jurisdiction over its embassies abroad. The modifying phrase "continental or insular," the Court explained, "is rather clearly intended to restrict the definition of the United States to the continental United States and such islands as are part of the United States or are its possessions." *Id*. "The ground upon which our Embassy stands in Tehran does not fall within that definition." *Id*.; *see also McKeel v. Islamic Republic of Iran*, 722 F.2d 582, 588 (9th Cir. 1983) (same).

Plaintiffs' attempt to overcome the plain meaning of the statute by pointing to various statements that, for some purposes, a ship is said to be "part of the territory" of the country whose flag it flies, *i.e.*, "a kind of floating island," Pls.' Opp'n at 12, is unavailing. The "metaphor" or "fiction" of the floating island, as the Supreme Court has called it, *Cunard S.S. Co. v. Mellon*, 262 U.S. 100, 123-124 (1923), does not signify that Congress intended FSIA's tort exception to extend to U.S.-flagged ships on the high seas. Indeed, the Supreme Court has rejected the same argument plaintiffs make here when interpreting other provisions of law.

In *Cunard*, for example, the Supreme Court held that a U.S.-flagged vessel was not "territory" for purposes of the Eighteenth Amendment's prohibition on the sale or transportation of intoxicating liquors to or from "territory subject to the jurisdiction" of the United States. 262 U.S. at 121-23. The Court explained that the statement "that a merchant ship is a part of the territory of the country whose flag she flies . . . is a figure of speech, a metaphor," and "[t]he immediate context and the purport of the [Eighteenth Amendment] show[s] that the term ['territory'] is used in a physical and not a metaphorical sense—that it refers to areas or districts having fixity of location and recognized boundaries." *Id*. at 122-23; *see also Scharrenberg v. Dollar S. S. Co.*, 245 U.S. 122, 127 (1917) ("It is, of course, true that for the purposes of jurisdiction a ship, even on the high seas, is often said to be a part of the territory of the nation

whose flag it flies. But in the physical sense this expression is obviously figurative, and to expand the doctrine to the extent of treating seamen employed on [a U.S.-flagged ship] as working [in the United States] is quite impossible[,] . . . fanciful and unsound and must be denied." (internal citation omitted)); *Smith v. Socialist People's Libyan Arab Jamahiriya*, 101 F.3d 239, 246 (2d Cir. 1996) (concluding bombing of Pan American Flight 103 over Scotland did not fit within FSIA's tort exception: "[e]ven if we assume, without deciding, that for some purposes an American flag aircraft is like an American flag vessel, the fact that a location is subject to an assertion of United States authority does not necessarily mean that it is the 'territory' of the United States for purposes of the FSIA." (internal citation omitted)).

The same reasoning applies here. There is no indication that Congress intended to adopt a figurative or metaphorical meaning of "territory" when it enacted FSIA, particularly in light of Congress' specification that the territory to which it was referring is "continental or insular" territory. *See, e.g.*, *Mohamad v. Palestinian Auth.*, 132 S. Ct. 1702, 1707 (2012) (Before a word will be assumed to have a meaning broader than or different from its ordinary meaning, "there must be *some* indication Congress intended such a result."); *United States v. Ron Pair Enters., Inc.*, 489 U.S. 235, 242 (1989) ("The plain meaning of legislation should be conclusive, except in the 'rare cases in which the literal application of a statute will produce a result demonstrably at odds with the intentions of its drafters.'"). Plaintiffs have not pointed to any legislative history to suggest that Congress intended anything other than the literal meaning of "territory," or that Congress intended the tort exception to extend to U.S.-flagged ships on the high seas. The tort exception "was designed primarily to remove immunity for cases arising from traffic accidents." *MacArthur Area Citizens Ass'n v. Republic of Peru*, 809 F.2d 918, 921 (D.C. Cir. 1987); *see* H.R. REP. NO. 94-1487, at 20-21 (1976), *reprinted in* 1976 U.S.C.C.A.N. 6604, 6618-20.

Although the exception is cast in general terms and thus not limited solely to traffic accidents, this purpose "counsels that the exception should be narrowly construed so as not to encompass the farthest reaches of common law." *MacArthur Area Citizens Ass'n*, 809 F.2d at 921. It would be inconsistent with Congress' purpose (and the plain language of the statute) to extend the exception to provide jurisdiction over cases involving U.S.-flagged vessels on the high seas.[3]

Furthermore, even under plaintiffs' proposed interpretation, the deck of a U.S-flagged ship would only be "territory" for purposes of FSIA's definition of "United States" if it were sailing on the high seas; the moment the ship entered the territorial waters of another country, it would lose its status as "territory." *See* Pls.' Opp'n at 12, 16 & n.12. The Supreme Court has "never engaged" in the sort of "interpretive contortion" that would be necessary to "giv[e] the

---

[3] Testimony from one of the principal draftsmen of FSIA further confirms that Congress intended the ordinary, geographic meaning of "territory:"

> We would like, based on our experience as a litigant abroad to subsume to the jurisdiction of our domestic courts foreign governments and foreign entities who engage in certain activities *on our territory* to the same extent that the U.S. Government is already at the present time subject to the jurisdiction of foreign courts, when it engages in certain activities *on their soil*.
> . . .
>
> [W]e would like to afford our local citizens and entities who deal with foreign governments *in the United States* effective redress through the instrumentality of our courts. If a dispute arises as a result of an activity which a government carries on *in this country*, the most appropriate place to resolve such a dispute would be through the courts, which are, after all, designed to do just that: to resolve the dispute *which has arisen here*.

Immunities of Foreign States: Hearing on H.R. 3493 Before the Subcomm. on Claims and Governmental Relations of the House Comm. on the Judiciary, 93d Cong., 1st Sess. 29 (1973) (testimony of Bruno Ristau, Chief of the Foreign Litigation Unit in the Department of Justice) (emphasis added).

Plaintiffs have failed to point to any U.S. or foreign case in which a court has permitted a lawsuit to proceed against a foreign sovereign for allegedly tortious acts committed on board a vessel flying the flag of the forum state that was sailing on the high seas.

same word, *in the same statutory provision*, different meanings *in different factual contexts*." *United States v. Santos*, 553 U.S. 507, 522 (2008). And this Court should decline to do so here. It is simply improbable that Congress meant to adopt an understanding of the word "territory" that would change based on the location of a ship, particularly without Congress saying so.[4]

Indeed, "[w]hen it desires to do so, Congress knows how to place the high seas," and/or U.S.-flagged ships sailing on them, "within the jurisdictional reach of a statute." *Amerada Hess*, 488 U.S. at 440. For example, in providing jurisdiction over certain criminal acts, Congress has created the "special maritime and territorial jurisdiction of the United States," which expressly extends to, among other things, "[t]he high seas, . . . and any vessel belonging in whole or in part to the United States or any citizen thereof . . . when such vessel is within the admiralty and maritime jurisdiction of the United States and out of the jurisdiction of any particular State." 18 U.S.C. § 7(1); *see also id.* § 2280(b)(1)(A) (providing jurisdiction over the crime of violence against maritime navigation when it is committed, among other things, "against or on board a vessel of the United States"). Similarly, Congress has explicitly empowered the Coast Guard to search and seize vessels "upon the high seas and waters over which the United States has jurisdiction" for "prevention, detection, and suppression of violations of laws of the United States." 14 U.S.C. § 89(a). The absence of similar language in FSIA's tort exception

---

[4] It is similarly improbable that Congress intended the scope of the term "territory" in FSIA to expand or contract based on potential decisions by private and foreign government actors to change the country in which a given ship is registered, as would occur if plaintiff's argument were accepted. *See, e.g.*, 1 THOMAS J. SCHOENBAUM, ADMIRALTY AND MARITIME LAW § 2-21 (5th ed.) (discussing ship registration).

demonstrates that Congress did not intend to remove immunity for alleged torts committed aboard U.S.-flagged vessels on the high seas.[5]

Because the injuries alleged in this case occurred aboard a U.S.-flagged ship beyond U.S. territory or waters, *see* Compl. ¶ 28, they did not occur "in the United States" as required to remove immunity under FSIA's tort exception. Therefore, the tort exception does not provide a basis for jurisdiction over defendants in this case.

## II. Claims Under FSIA's Terrorism Exception Can Be Asserted Only Against Foreign States That Are Designated State Sponsors Of Terrorism

Plaintiffs' contention that FSIA's terrorism exception applies in this case is also meritless. As relevant here, the terrorism exception removes immunity of a foreign state in actions "for personal injury or death that was caused by an act of torture . . . engaged in by an official, employee, or agent of such foreign state while acting within the scope of his or her office, employment, or agency." 28 U.S.C. § 1605A(a)(1). The provision further specifies that "[t]he court shall hear a claim under this section if" certain additional requirements are met, *id.* § 1605A(a)(2), including that "the foreign state was designated as a state sponsor of terrorism at the time the act [at issue] occurred, or was so designated as a result of such act, and . . . either

---

[5] Although only the tort exception is at issue here, other FSIA exceptions and attachment-related provisions also require some connection to the United States. *See, e.g.*, 28 U.S.C. § 1605(a)(2) (providing jurisdiction for actions based upon "an act performed in the United States in connection with a commercial activity of the foreign state elsewhere"); *id.* § 1605(a)(4) (providing jurisdiction where "rights in property in the United States acquired by succession or gift . . . are in issue); *id.* §§ 1609-1611 (permitting attachment of certain "property in the United States of a foreign state"). If the Court were to adopt plaintiffs' broad reading of the phrase "in the United States," it arguably would apply to these provisions as well, broadening their reach and creating potentially anomalous and unintended consequences, particularly in cases where the only link to the United States is a connection to a U.S.-flagged ship. Evading the statute's careful geographic limitations in this manner could lead to foreign relations problems or reciprocal exposure for the United States in foreign courts.

10

remains so designated when the claim is filed . . . or was so designated within the 6-month period before the claim is filed . . . ." *Id*. § 1605A(a)(2)(A)(i).

Plaintiffs maintain that FSIA's terrorism exception provides jurisdiction for the torture claim raised by one of the U.S. citizen plaintiffs. *See* Compl. ¶ 49. Plaintiffs acknowledge that Israel is not currently, and never has been, designated as a state sponsor of terrorism by the Executive Branch, but they argue that the requirements in § 1605A(a)(2) are merely sufficient—not necessary—to remove immunity under the terrorism exception. *See* Pls.' Opp'n at 23-24. Plaintiffs' proffered reading of the statute hinges on changes Congress made to the wording of the terrorism exception in 2008. *See id*. The prior version of the exception stated that "the court shall decline to hear a claim . . . if the foreign state was not designated as a state sponsor of terrorism," Antiterrorism and Effective Death Penalty Act, Pub. L. No. 104-132, § 221, 110 Stat. 1214 (1996), whereas the 2008 amendment that created § 1605A provides that "[t]he court shall hear a claim . . . if . . . the foreign state was designated a state sponsor of terrorism," 28 U.S.C. § 1605A(a)(2)(A)(i). According to plaintiffs, the new provision *allows* a claim to proceed against a designated state sponsor of terrorism but, unlike the prior version, does not require that all claims meet this criterion to go forward. *See* Pls.' Opp'n at 23-24.

Plaintiffs' contention does not withstand scrutiny. The structure of FSIA provides a presumption of immunity: "a foreign state shall be immune from the jurisdiction of the courts of the United States and of the States except as provided in sections 1605 to 1607 of this chapter." 28 U.S.C. § 1604. Therefore, a plaintiff must show that one of the Act's exceptions affirmatively authorizes the court to hear its claim in order to overcome the baseline of immunity provided in § 1604. The terrorism exception permits a court to hear a claim "if . . . the foreign state was designated a state sponsor of terrorism," and does not provide jurisdiction in the

11

absence of such a designation. *Id*. § 1605A. For this reason, courts, including the D.C. Circuit, repeatedly and uniformly have held that designation as a state sponsor of terrorism is a prerequisite to establishing jurisdiction under FSIA's terrorism exception. *See, e.g.*, *Mohammadi v. Islamic Republic of Iran*, 782 F.3d 9, 14 (D.C. Cir. 2015) (observing that § 1605A "requires that [] the foreign country was designated a state sponsor of terrorism at the time [of] the act"); *In re Terrorist Attacks on Sept. 11, 2001*, 714 F.3d 109, 115 n.7 (2d Cir. 2013) (The exception in § 1605A "is only available against a nation that has been designated by the United States government as a state sponsor of terrorism at the time of, or due to, a terrorist act."); *Carpenter v. Republic of Chile*, 610 F.3d 776, 779 (2d Cir. 2010) ("The Republic of Chile has not been designated a state sponsor of terrorism, so this exception does not apply."); *Embassy of Fed. Republic of Nigeria v. Ugwuonye*, 901 F. Supp. 2d 136, 140 (D.D.C. 2012) ("Since Nigeria is not a designated state sponsor of terrorism, this exception is . . . inapplicable.").

Although none of these courts specifically addressed the novel argument plaintiffs make here, the plain meaning of § 1605A is that a court shall hear a claim under the terrorism exception to immunity "*if* . . . the foreign state was designated as a state sponsor of terrorism." 28 U.S.C. § 1605A(a)(2)(A)(i) (emphasis added). To assert that this condition is merely an additional basis to allow a claim to proceed is specious. There would be no need for this condition if the general exception to immunity for the specified acts already extended to all foreign states. *See, e.g.*, *Mackey v. Lanier Collection Agency & Serv., Inc.*, 486 U.S. 825, 837 (1988) (courts should be "hesitant to adopt an interpretation of a congressional enactment which renders superfluous another portion of that same law"). Moreover, there is no reason to think Congress would have set forth the specific and detailed requirements contained in § 1605A(a)(2) if it had intended those provisions to be merely permissive. Indeed, plaintiffs do not identify

what, if any, other requirements might be sufficient for a plaintiff to invoke the terrorism exception if the criteria detailed in § 1605A(a)(2) are not necessary.  And, contrary to the premise of plaintiffs' argument, plaintiffs appear to acknowledge that at least some of the requirements in § 1605A(a)(2) are necessary: plaintiffs only advance the terrorism exception as a basis for jurisdiction for a U.S. citizen plaintiff's torture claim and not the torture claim of the Belgian plaintiff, presumably because the latter would not satisfy the requirement of U.S. nationality set forth in § 1605A(a)(2)(A)(ii).  *See* Compl. ¶ 49.

In addition, it is improbable that Congress made such a drastic change in sovereign immunity principles without acknowledging that it was doing so.  *See Kellogg Brown & Root Servs. Inc. v. United States ex rel. Carter*, 135 S. Ct. 1970, 1977 (2015) ("Fundamental changes in the scope of a statute are not typically accomplished with so subtle a move."); *cf. Dewsnup v. Timm*, 502 U.S. 410, 419 (1992) ("[T]his Court has been reluctant to accept arguments that would interpret the [Bankruptcy] Code . . . to effect a major change in pre-Code practice that is not the subject of at least some discussion in the legislative history.").  Plaintiffs do not point to any legislative history to suggest that Congress intended to remove the designation requirement from FSIA's terrorism exception.  In fact, the House Report accompanying the 2008 amendments explains that § 1605A was intended, among other things, to "consolidate provisions relating to the exception to sovereign immunity for state sponsors of terrorism" and thus to "permit claims to be brought for money damages, including punitive damages, *against a foreign state designated as a state sponsor of terrorism*."  H.R. REP. NO. 110-477, at 1000-01 (2007) (Conf. Rep.) (emphasis added); *see also id.* at 1001 ("Courts would have jurisdiction to hear a claim brought against a foreign state that was designated as a state sponsor of terrorism . . .").

Because Israel is not (and never has been) designated a state sponsor of terrorism, FSIA's terrorism exception also does not provide a basis for jurisdiction over defendants in this case.

### III. Plaintiffs Misstate The Applicable Jurisdictional Standard

Finally, in describing the standard to be applied in determining whether plaintiffs' claims fit within the FSIA exceptions, plaintiffs assert that they "need only show that their claim is 'non-frivolous' at the jurisdictional stage and need not definitively prove [their] claim as they would at the merits stage." Pls.' Opp'n at 7. The D.C. Circuit, however, has applied this non-frivolous standard only in cases involving FSIA's expropriation exception, which removes immunity in cases in which, among other things, "rights in property taken in violation of international law are in issue." 28 U.S.C. § 1605(a)(3); *see, e.g.*, *Simon v. Republic of Hungary*, 812 F.3d 127, 140-41 (D.C. Cir. 2016).[6]

In any event, even with respect to the expropriation exception, the "non-frivolous" standard has been applied only where "the plaintiff's claim on the merits directly mirror[s] the jurisdictional standard" set forth in FSIA. *Simon*, 812 F.3d at 140. When the "jurisdictional and merits inquiries" are not "fully overlap[ping]," the court must undertake a more stringent inquiry that asks "whether plaintiffs' allegations satisfy the jurisdictional standard." *Id*. at 141.

Here, the merits of plaintiffs' claims do not mirror the relevant jurisdictional inquiries. The challenged jurisdictional elements are whether a U.S.-flagged ship sailing on the high seas is "in the United States" within the meaning of FSIA's tort exception and whether FSIA's terrorism exception provides a basis for jurisdiction over claims against foreign states that have not been

---

[6] Some courts in this District have applied the non-frivolous standard to other FSIA exceptions, notwithstanding the different wording of those exceptions. *See de Csepel v. Republic of Hungary*, 169 F. Supp. 3d 143, 156-57 (D.D.C. 2016) (commercial activity exception); *Owens v. Republic of Sudan*, No. 01-2244 (JDB), 2016 WL 1170919, at *22-*24 (D.D.C. Mar. 23, 2016) (terrorism exception).

designated state sponsors of terrorism. Neither of these inquiries are elements of the common law torts plaintiffs allege. *See* Compl. ¶¶ 47-78; Pls.' Opp'n at 38. Therefore, it is not sufficient for plaintiffs to make non-frivolous arguments that their claims satisfy the requirements of the tort or terrorism exceptions. Rather, the Court must resolve the legal questions discussed above to determine whether this case actually satisfies the relevant jurisdictional requirements. *See Simon*, 812 F.3d at 141 (declining to apply frivolousness standard under expropriation exception where plaintiffs asserted common-law claims on the merits but alleged a taking that violated international law to establish jurisdiction); *de Csepel*, 169 F. Supp. 3d at 156-57; *Owens*, 2016 WL 1170919, at *23 (explaining that a court has jurisdiction under FSIA's terrorism exception only if the requirement that the foreign state be a designated state sponsor of terrorism is "actually met"). And, for the reasons explained above, the necessary jurisdictional requirements have not been met here.[7]

## CONCLUSION

For the foregoing reasons, the Court should dismiss this case for lack of jurisdiction. Neither of the FSIA exceptions upon which plaintiffs rely provide a basis for jurisdiction over the claims asserted here. Moreover, because the FSIA issues discussed above are dispositive, the Court need not—and should not—address the remaining arguments raised in defendants' motion to dismiss.

---

[7] The Supreme Court is currently considering whether the D.C. Circuit's application of the non-frivolous standard under FSIA's expropriation exception is proper. *See Venezuela v. Helmerich & Payne Int'l*, No. 15-423 (Sup. Ct.). The United States has filed an *amicus* brief in that case, arguing that the standard is inappropriate (even when the jurisdictional and merits inquiries overlap) and that courts instead must assess whether a claim is legally sufficient to satisfy all of the substantive requirements of a FSIA exception. As explained above, however, even under current D.C. Circuit law, the non-frivolous standard does not apply to the jurisdictional questions at issue in this case.

Respectfully submitted this 21st day of November, 2016,

    BENJAMIN C. MIZER
    Principal Deputy Assistant Attorney General

    CHANNING D. PHILLIPS
    United States Attorney

    ANTHONY J. COPPOLINO
    Deputy Director

    _s/ Michelle R. Bennett_
    MICHELLE R. BENNETT (CO Bar No. 37050)
    Trial Attorney
    United States Department of Justice
    Civil Division, Federal Programs Branch
    20 Massachusetts Avenue N.W. Room 7310
    Washington, D.C. 20530
    Tel: (202) 305-8902
    Fax: (202) 616-8470
    Email: michelle.bennett@usdoj.gov

    *Attorneys for the United States of America*