## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| _____ ) | |
| DAVID SCHERMERHORN, *et al.*, ) | |
| ) | |
| Plaintiffs, ) | |
| ) | |
| v. ) | Civil Action No. 16-0049 (ABJ) |
| ) | |
| STATE OF ISRAEL, *et al.*, ) | |
| ) | |
| Defendants. ) | |
| _____ ) | |

### MEMORANDUM OPINION

Plaintiffs David Schermerhorn, Mary Ann Wright, Huwaida Arraf, and Margriet Deknopper have sued the State of Israel, and its Ministries of Defense, Foreign Affairs, Justice, and Public Security.  On May 31, 2010, plaintiffs were passengers on the *Challenger I*, one of a group of ships seeking to draw public attention to, and to penetrate, the Israeli naval blockade of the Gaza Strip that was in effect at the time.  They seek redress for the physical and emotional injuries that they allege they suffered when the Israeli military boarded their ship in international waters.  *See* Compl. [Dkt. # 1] ¶¶ 1–2, 7, 22–23, 26.

Plaintiffs allege that Israel's actions constituted war crimes in violation of international law, and their complaint includes four counts based on that theory:  Torture (Count 1), Cruel and Inhuman Treatment (Count 2), Mutilation or Maiming (Count 3), and Intentionally Causing Serious Bodily Injury (Count 4).  *Id.* ¶¶ 47–62.  The complaint also includes five tort claims:  Arbitrary Arrest and Detention (Count 5), False Imprisonment (Count 6), Assault and Battery (Count 7), Intentional Infliction of Emotional Distress (Count 8), and Conversion (Count 9).  *Id.* ¶¶ 63–78.

Israel is a foreign sovereign.  Like any other country, it may only be sued in courts in the United States under certain limited circumstances defined by statute.[1]  Israel maintains that there has been no waiver of its sovereign immunity that could make this case possible, and it has moved to dismiss on that ground and others under Federal Rules of Civil Procedure 12(b)(1), 12(b)(2), and 12(b)(6).  Defs.' Rule 12(b) Mot. to Dismiss [Dkt. # 17] ("Defs.' Mot."); Defs.' Mem. in Supp. of Def.'s Mot. [Dkt. # 17-1] ("Defs.' Mem.").  Because the Court finds that Israel has not waived its sovereign immunity under either the tort exception or the terrorism exception to the Foreign Sovereign Immunities Act, 28 U.S.C. § 1602, *et seq.* ("FSIA"), it will grant defendants' motion and dismiss this case for lack of subject matter jurisdiction.  This decision is based solely on the application of statutory principles, and it is not premised upon any consideration of, or determination concerning, whether either the blockade or the military action was justified.

## BACKGROUND

This case arises out of the history of the troubled relationship of the Israelis and the Palestinians, a complex and controversial subject that is not well suited to the sort of summarization that one would include in the "background" section of a legal opinion.  Suffice it to say that the events described in the complaint relate to the ongoing dispute concerning the

---

1       Israel's ministries enjoy sovereign immunity as well.  *See* 28 U.S.C. § 1603(a) (defining "foreign state" to include a "political subdivision of a foreign state or an agency or instrumentality of a foreign state").

disposition of the Gaza Strip in the wake of the 1967 Six Day War, the creation of the Palestinian

Authority in 1994, and the series of violent conflicts and fragile ceasefires that followed.[2]

Plaintiffs were a part of what was called the "Gaza Freedom Flotilla," which aimed "to

draw international public attention to the situation in the Gaza Strip and the effect of the blockade,

to break the blockade, and to deliver humanitarian assistance and supplies to Gaza." Compl. ¶ 24.

The flotilla consisted of six vessels:  the *M.V. Mavi Marmara*, a passenger ship sailing under the

flag of the Union of Comoros; the *M.V. Defne Y*, a cargo vessel sailing under the flag of the

Republic of Kiribati; the *M.V. Gazze*, a cargo vessel sailing under the flag of the Republic of

Turkey; the *M.V. Sfendoni*, a passenger ship sailing under the flag of the Hellenic Republic of

Greece; and the *Challenger I*, a passenger ship sailing under the flag of the United States of

America.  Compl. ¶ 25.  Plaintiffs allege that on May 31, 2010, the IDF "unlawfully intercepted

and attacked" the six vessels.  Compl. ¶ 2.  Since the claims in this case relate solely to the events

that took place on the *Challenger I*, the Court will not set forth the facts concerning the interception

of the other vessels.

The *Challenger I* carried seventeen passengers, including crew; they were American,

British, Irish, Australian, Dutch, Belgian, and Polish nationals who worked as humanitarian

workers, medics, and journalists.  Compl. ¶ 29.  According to plaintiffs, the vessel was carrying

humanitarian aid, including medical equipment and supplies, in addition to "a large amount of

---

2       The Court must decide this matter based on the facts alleged by plaintiffs in the complaint, but it notes that the investigation commissioned by the Israeli government in the wake of the events at issue in this case, which is referenced in the complaint, outlines many of the events that preceded the first steps detailed in the complaint.  *See* The Public Commission to Examine the Maritime Incident of 31 May 2010 (Jan. 2011), http://www.turkel-committee.gov.il/files/wordocs/ 8808report-eng.pdf ("Turkel Report").  Its account differs from plaintiffs' in several respects.

media equipment" such as video cameras, recorders, phones, and GPS locators. *Id.* ¶ 30.[3]
Plaintiffs allege that all of the individuals on the flotilla, including those on the *Challenger I*, were
"subject to security checks for weapons before departure," and that "[a]ll of the passengers and
crew . . . were unarmed during their entire journey." *Id.* ¶¶ 26, 31.

On May 31, 2010, as the flotilla approached the shore, the Israeli navy took action to
enforce the blockade of the Gaza Strip and board the vessels.[4]   According to the complaint, the
boarding of the *Challenger I* was marked by violence.   *See* Compl. ¶¶ 41–46.   Plaintiffs allege that
"at least one stun grenade was used before the IDF soldiers sought to board" the ship. *Id.* ¶ 41.
"The grenade exploded one foot from Plaintiff Schermerhorn's face, leaving him partly blinded in
one eye." *Id.*   The complaint states that the soldiers fired paintball and rubber bullets directly at
the passengers while they were boarding the vessel; plaintiff Deknopper was shot in the face with
a rubber bullet that broke her nose, and another passenger was shot five times in the back with
rubber bullets. *Id.* ¶ 42.   Once onboard, the soldiers detained all of the passengers. *Id.* ¶ 43.
Plaintiff Arraf alleges that he was "forcefully pulled off the stairs and forced to the deck," where
a soldier "slammed [his head] against the deck" and stood on it. *Id.*   Plaintiff Arraf and another

---

3      The Turkel Report states that "[n]o humanitarian supplies were found" on the *Challenger I*, Turkel Report at 181–82, but the Court assumes the truth of plaintiffs' allegations for purposes of this motion.

4      According to the Turkel Report, Israel's attempt to take over the *Mavi Marmara* was met with "violent resistance," including the use of "wooden clubs, iron rods, slingshots, knives . . . [and] firearms." Turkel Report at 149.   The Israelis responded with non-lethal force at first, and then with lethal force. *See id.* at 142–172.   Ten civilian passengers of American and Turkish nationality who were on the *Mavi Marmara* were killed, Compl. ¶ 36, and a number of passengers and IDF personnel were injured.   Turkel Report at 172–73.   The attempt to take over the *Challenger I* was met with significantly less resistance. *See id.* at 181–82.

passenger were "forced to kneel with tight handcuffs while hooded for an extended period of time, despite complaining of breathing difficulties." *Id.*

After the Israelis took control of the *Challenger I*, they directed the ship to the Israeli port of Ashdod.  Compl. ¶ 38.  Plaintiffs allege that while on route to Ashdod, they were assaulted, handcuffed, and forcibly detained; that they were denied toilets and medical care; and that their personal property, including "all media equipment and film footage," was confiscated and never returned.  *Id.* ¶ 45.  When the *Challenger I* arrived in Ashdod, "[s]everal passengers, including Plaintiff Wright[,] were treated violently when they refused to leave the ship." *Id.* ¶ 46.

On January 11, 2016, plaintiffs filed this nine-count action against the State of Israel and its Ministries of Defense, Foreign Affairs, Justice, and Public Security.  Compl.  Count 1, brought by plaintiffs Arraf and Deknopper, alleges that defendants committed the war crime of torture when they banged plaintiff Arraf's head against the deck, stood on her head, hooded her for an extended period of time, and groped her, and when they shot plaintiff Deknopper in the face with a rubber bullet.  Compl. ¶¶ 48–51.  In Count 2, all plaintiffs allege that they were subjected to the war crime of cruel and inhuman treatment.  *Id.* ¶¶ 53–55.  Plaintiff Schermerhorn alleges in Count 3 that the use of the grenade, which caused him to partially lose sight in one eye, constitutes the war crime of mutilation or maiming.  *Id.* ¶¶ 57–59.  Plaintiffs Schermerhorn, Arraf, and Deknopper allege in Count 4 that the IDF's conduct intentionally caused them serious bodily injury, a war crime under international law.  *Id.* ¶¶ 61–62.  All plaintiffs claim that they were subjected to arbitrary arrest and detention (Count 5), false imprisonment (Count 6), assault and battery at the hands of the IDF (Count 7), and the conversion of their personal property (Count 9).  *Id.* ¶¶ 64–73; 76–78.  Finally, in Count 8, all plaintiffs seek damages for intentional infliction of emotional distress.  *Id.* ¶ 75.

Defendants moved to dismiss on August 8, 2016.  Defs.' Mot.; Defs.' Mem.  They argue principally that the Court lacks jurisdiction because Israel and its ministries are immune from suit under the FSIA, Defs.' Mem. at 12–28, and that even if Israel were not immune, the Court lacks jurisdiction under the political question doctrine and the act of state doctrine.  *Id.* at 28–37.  They also argue that each count in the complaint fails to state a claim under Rule 12(b)(6), and that the action should be dismissed under Rule 12(b)(2) under the doctrine of *forum non conveniens* so that the claims can be resolved in Israel.  *Id.* at 37–45.  Plaintiffs opposed the motion, Pls.' Mem. of P. & A. in Opp. to Defs.' Mot. [Dkt. # 22] ("Pls.' Opp."), defendants replied in support of their motion, Defs.' Reply Mem. in Supp. of Defs.' Mot. [Dkt. # 23] ("Defs.' Reply"), and plaintiffs were granted leave to file a brief sur-reply.  Pls.' Sur-Reply in Further Opp. to Defs.' Mot. [Dkt. # 26] ("Pls.' Sur-Reply").

On November 21, 2016, the United States submitted a Statement of Interest in this case pursuant to 28 U.S.C. § 517, taking the position "that neither exception to immunity invoked by plaintiffs removes Israel's immunity under FSIA in this case."  Statement of Interest of the U.S. [Dkt. # 28] ("SOI").  Each side had an opportunity to respond to the government's position.  Min. Order (Nov. 28, 2016); Pls.' Resp. to SOI [Dkt. # 29] ("Pls.' SOI Opp.").  Because the Court agrees with defendants and the United States that it lacks jurisdiction under the FSIA, the case will be dismissed and the Court need not reach any of the other issues.

## STANDARD OF REVIEW

Before the Court may turn to the merits of plaintiffs' allegations, it must first ensure that it has jurisdiction to hear this case.

> Federal courts are courts of limited jurisdiction.  They possess only that
> power authorized by Constitution and statute, which is not to be expanded
> by judicial decree.  It is to be presumed that a cause lies outside this limited

> jurisdiction, and the burden of establishing the contrary rests upon the party asserting jurisdiction.

*Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994) (internal citations omitted).

In addition, "'[i]t is axiomatic that subject matter jurisdiction may not be waived, and that courts may raise the issue *sua sponte*.'" *NetworkIP, LLC v. FCC*, 548 F.3d 116, 120 (D.C. Cir. 2008), quoting *Athens Cmty. Hosp., Inc. v. Schweiker*, 686 F.2d 989, 992 (D.C. Cir. 1982).   Indeed, a federal court must raise the issue because it is "forbidden – as a court of limited jurisdiction – from acting beyond [its] authority."   *Id.*, citing *Akinseye v. District of Columbia*, 339 F.3d 970, 971 (D.C. Cir. 2003).

Under Federal Rule of Civil Procedure 12(b)(1), plaintiffs bear the burden of establishing jurisdiction by a preponderance of the evidence.   *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992); *Shekoyan v. Sibley Int'l Corp.*, 217 F. Supp. 2d 59, 63 (D.D.C. 2002).   "[B]ecause subject-matter jurisdiction is 'an Art[icle] III as well as a statutory requirement . . . no action of the parties can confer subject-matter jurisdiction upon a federal court.'"   *Akinseye*, 339 F.3d at 971, quoting *Ins. Corp. of Ir., Ltd. v. Compagnie des Bauxites de Guinee*, 456 U.S. 694, 702 (1982).

In ruling upon a motion to dismiss for failure to state a claim, a court may ordinarily consider only "the facts alleged in the complaint, documents attached as exhibits or incorporated by reference in the complaint, and matters about which the Court may take judicial notice."   *Gustave-Schmidt v. Chao*, 226 F. Supp. 2d 191, 196 (D.D.C. 2002), citing *EEOC v. St. Francis Xavier Parochial Sch.*, 117 F.3d 621, 624–25 (D.C. Cir. 1997).   When considering a motion to dismiss for lack of jurisdiction, however, the court "is not limited to the allegations of the complaint."   *Hohri v. United States*, 782 F.2d 227, 241 (D.C. Cir. 1986), *vacated on other grounds*, 482 U.S. 64 (1987).   Rather, "a court may consider such materials outside the pleadings as it deems appropriate to resolve the question [of] whether it has jurisdiction to hear the case."   *Scolaro v.*

7

*D.C. Bd. of Elections & Ethics*, 104 F. Supp. 2d 18, 22 (D.D.C. 2000), citing *Herbert v. Nat'l Acad. of Scis.*, 974 F.2d 192, 197 (D.C. Cir. 1992); *see also Jerome Stevens Pharm., Inc. v. FDA*, 402 F.3d 1249, 1253 (D.C. Cir. 2005).

## ANALYSIS

Under the Foreign Sovereign Immunities Act, "a foreign state is presumptively immune from the jurisdiction of United States courts," and "unless a specified exception applies, a federal court lacks subject-matter jurisdiction over a claim against a foreign state." *Saudi Arabia v. Nelson*, 507 U.S. 349, 355 (1993); *see* 28 U.S.C. § 1604 ("a foreign state shall be immune from the jurisdiction of the courts of the United States and of the States except as provided in sections 1605 to 1607 of this chapter"). The exceptions set forth in the statute provide "the sole basis for obtaining jurisdiction over a foreign state in the courts of this country." *OBB Personenverkehr AG v. Sachs*, 136 S. Ct. 390, 393 (2015), quoting *Argentine Republic v. Amerada Hess Shipping Corp.*, 488 U.S. 428, 443 (1989) (internal quotation marks omitted); *see also Simon v. Republic of Hungary*, 812 F.3d 127, 135 (D.C. Cir. 2016). Because "subject matter jurisdiction in any such action depends on the existence of one of the specified exceptions . . . [a]t the threshold of every action in a district court against a foreign state . . . the court must satisfy itself that one of the exceptions applies." *Verlinden B.V. v. Cent. Bank of Nigeria*, 461 U.S. 480, 493–94 (1983); *see also Belize Social Dev. Ltd. v. Government of Belize*, 794 F.3d 99, 101 (D.C. Cir. 2015) (describing the FSIA's terms as "absolute"); *Jerez v. Republic of Cuba*, 775 F.3d 419, 423–24 (D.C. Cir. 2014), citing *Mwani v. bin Laden*, 417 F.3d 1, 15 (D.C. Cir. 2005). And given the "comprehensive" nature of the FSIA, "any sort of immunity defense made by a foreign sovereign in an American court must stand on the Act's text. Or it must fall." *Republic of Argentina v. NML Capital, Ltd.*, 134 S. Ct. 2250, 2255–56 (2014).

## I.     The applicable jurisdictional standard

Plaintiffs predicate their assertion of the Court's jurisdiction on two exceptions to the FSIA: the non-commercial tort exception, 28 U.S.C. § 1605(a)(5), and the terrorism exception, 28 U.S.C. § 1605A.  When a defendant contests the legal sufficiency of plaintiff's jurisdictional claims, "the standard is similar to that of Rule 12(b)(6), under which dismissal is warranted if no plausible inferences can be drawn from the facts alleged that, if proven, would provide grounds for relief." *Prince v. Socialist People's Libyan Arab Jamahiriya*, 294 F.3d 82, 93 (D.C. Cir. 2002).

Plaintiffs cite *de Csepel v. Republic of Hungary*, 169 F. Supp. 3d 143 (D.D.C. 2016) for the proposition that, "[w]here, as here, the claims on the merits set out in the Complaint directly mirror the jurisdictional standard, Plaintiffs 'need only show that [their] claim is 'non-frivolous' at the jurisdictional stage and need not definitely prove [their] claim as [they] would at the merits stage.'"  Pls.' Opp. at 7, quoting *de Csepel*, 169 F. Supp. 3d at 156.  But this case does not present the situation discussed in *de Csepel,* and a closer look at the case law reveals that the more lenient standard is not applicable in this case.

The court in *de Csepel* pointed to the D.C. Circuit's opinions in *Simon v. Republic of Hungary,* 812 F.3d at 141, and *Helmerich & Payne International Drilling Co. v Bolivarian Republic of Venezuela,* 784 F.3d 804, 812 (D.C. Cir. 2015), when it noted that under certain circumstances, a lower standard of proof could apply at the jurisdictional stage.[5]  *de Csepel*, 169 F.3d at 156.  In *Simon,* the court explained:

> In prior FSIA cases *involving the expropriation exception*, this court has held that, in assessing whether "rights in property taken in violation of international law are in issue," the plaintiff need only make a "non-

---

[5]     The Supreme Court is currently considering whether the D.C. Circuit's application of the non-frivolous standard in expropriation cases is appropriate, or whether expropriation cases should be assessed under the usual jurisdictional standard.  *See Helmerich & Payne Int'l Drilling Co. v. Bolivarian Republic of Venezuela*, 784 F.3d 804 (D.C. Cir. 2015), *cert. granted*, 136 S. Ct. 2539 (2016).

> frivolous" showing at the jurisdictional stage.  That is because, *in those cases*, the plaintiff's claim on the merits directly mirrored the jurisdictional standard.

*Simon*, 812 F.3d at 140 (emphasis added), quoting 28 U.S.C. 1605(a)(3).  The court then went on to explain that the non-frivolous standard would not apply to the dispute before it:

> When, as here, the jurisdictional and merits inquiries do not overlap, there is no occasion to apply the "exceptionally low bar" of non-frivolousness at the jurisdictional stage.  To establish jurisdiction in such a situation, we therefore ask for more than merely a non-frivolous argument.  Instead, we assess whether the plaintiffs' allegations satisfy the jurisdictional standard.

*Id.* at 141 (internal citations omitted).  This admonition was repeated in *de Csespel*:

> Thus, when facts independent of the necessary elements of a plaintiff's substantive cause of action must be established, courts "ask for more than a non-frivolous argument."

169 F. Supp. 3d at 156, quoting *Simon,* 812 F. 3d at 141.

Here, plaintiffs are not invoking the expropriation exception, and the merits inquiry does not mirror the jurisdictional standard.  In Counts 1 through 4, plaintiffs allege that certain acts committed by the defendants constitute causes of action "defined in international instruments and treaties . . . as well as customary international law," Compl. ¶¶ 51, 55, 59, 62, and in Counts 5 through 9, they allege that the facts add up to common law torts.  *See id.* ¶¶ 66, 70, 73, 75, 78.  The elements that must be established to give rise to jurisdiction under the non-commercial tort exception are:  a demand for money damages; a claim against a foreign state for personal injury or death, or damage to or loss of property; occurring in the United States; and caused by the tortious act of the foreign state or an official or employee of the foreign state while acting in the scope of employment.  28 U.S.C. § 1605(a)(5).  And the elements that must be satisfied under the terrorism exception are:  a demand for money damages; a claim against a foreign state for personal injury or death; caused by an act of torture, extrajudicial killing, aircraft sabotage, hostage taking, or the

provision of material support; *if* (1) the foreign state was designated as a state sponsor of terrorism at the time of the act or as a result of the act; (2) the claimant or victim was a U.S. national, a member of the armed forces, a U.S. government employee or a government contractor; and (3) the claimant afforded the foreign state an opportunity to arbitrate, if the act occurred in the foreign state against which the claim has been brought.  28 U.S.C. § 1605A(a).  Since the disputed elements in this case – that is, whether, for purposes of the commercial tort exception, the alleged torts occurred "in the United States," and whether, for purposes of the terrorism exception, the foreign country being sued has been designated a state sponsor of terrorism at the time of the act – are not elements of any of the underlying claims, the Court will not apply the lower threshold of proof to those inquiries.  This is not inconsistent with the decision by the *de Csepel* court to apply the less stringent standard to the one element of the jurisdictional inquiry that was also necessary to establish the underlying claim, and to that element only.  *See* 169 F. Supp. 3d at 157.[6]

## II.   Because the alleged torts did not occur within the United States, the non-commercial tort exception does not apply.

Plaintiffs contend first that the Court may exercise jurisdiction over each count in the complaint under the non-commercial tort exception to the FSIA.  *See* Compl. ¶ 80.  That exception provides:

> A foreign state shall not be immune from the jurisdiction of courts of the United States or of the States in any case . . . in which money damages are sought against a foreign state for personal injury or death, or damage to or loss of property, occurring in the United States and caused by the tortious act or omission of that foreign state or of any official or employee of that foreign state while acting within the scope of his office or employment . . . .

---

6      The parties' difference of opinion about the evidentiary standard at this stage does not bear on the outcome of this motion in any event, since the grant of the motion to dismiss rests on legal grounds and is not premised on the strength of plaintiffs' factual showing.

28 U.S.C. § 1605(a)(5).[7]

"Congress' primary purpose in enacting § 1605(a)(5) was to eliminate a foreign state's immunity for traffic accidents and other torts committed in the United States, for which liability is imposed under domestic tort law." *Amerada Hess*, 488 U.S. at 439–40.   The D.C. Circuit has cautioned against converting the non-commercial tort exception "into a broad exception for all alleged torts that bear some relationship to the United States." *Asociacion de Reclamantes v. United Mexican States*, 735 F.2d 1517, 1525 (D.C. Cir. 1984).   The exception only applies to personal injury or other harm "occurring in the United States," and the FSIA defines "United States" to include "all territory and waters, continental or insular, subject to the jurisdiction of the United States."   28 U.S.C. § 1603(c).[8]

Plaintiffs maintain that a vessel flying the American flag falls within this definition, Pl.'s Opp. at 9–16, but their argument does not accord with the law in this circuit.   In *Persinger v. Islamic Republic of Iran*, 729 F.2d 835, 837–39 (D.C. Cir. 1984), the D.C. Circuit addressed whether a claim against Iran arising out of the hostage crisis at the American embassy in Tehran could be heard in a United States court under the non-commercial tort exception.   The D.C. Circuit

---

7        There are two exceptions to the non-commercial tort exception.  The first, known as the discretionary function exception, provides that a foreign state's immunity is not waived with respect to "any claim based upon the exercise or performance or the failure to exercise or perform a discretionary function regardless of whether the discretion be abused."  *Id.* § 1605(a)(5)(A).  And the second, known as the intentional tort exception,  provides that immunity is not waived for certain enumerated intentional torts, such as slander, misrepresentation, and deceit.  *Id.* § (a)(5)(B).  Because the Court concludes that the alleged torts did not occur "in the United States," it need not reach defendants' alternative argument that the discretionary function exception would be an additional bar to plaintiffs' claims.  *See* Defs.' Mem. at 23–26.

8        The term "insular" in this context refers to "those islands that are part of the United States or its possessions."  *Amerada Hess*, 488 U.S. at 440.

explained that the statutory definition of "United States" that appears in § 1603(c) was meant to limit the Court's jurisdiction:

> Congress used the words "continental or insular" to modify the scope of the phrase "all territory and waters . . . subject to the jurisdiction of the United States." The latter phrase, if it stood alone, might lead to the conclusion that any territory over which the United States exercises any form of jurisdiction constitutes the "United States" for purposes of the FSIA. Since the United States has some jurisdiction over its embassy in Iran, it would then follow that Iran had no immunity for tortious acts committed on the Embassy grounds. We think, however, that the modifying words make this construction too awkward to be countenanced. If the definition meant all territory subject to any form of United States jurisdiction, the words "continental or insular" would be surplusage: all territory is continental or insular. The modifying phrase is rather clearly intended to restrict the definition of the United States to the continental United States and such islands that are part of the United States or are its possessions.

*Id.* at 839. Because "[t]he ground upon which our Embassy stands in Tehran does not fall within [the statutory] definition," the Court concluded that "Iran enjoy[ed] sovereign immunity" in that case. *Id.* at 837.

Applying this reasoning, the definition of "in the United States" would not include an American vessel in international waters. Plaintiffs attempt to distinguish *Persinger* by arguing that unlike an embassy, which is fixed within the territory of the receiving state, a flagged vessel is deemed to be within the territory of the country whose flag is flown onboard as a matter of international law. Pls.' Opp. at 9–15, citing *The Case of the S.S. Lotus [Fr. v. Turk.]*, 1927 P.C.I.J. ser. A. No. 10 at 45, http://www.worldcourts.com/pcij/eng/decisions/1927.09.07_lotus.htm ("[I]t has appeared expedient to extend to merchant vessels on the high seas the jurisdiction of the authorities of the State whose flag they fly. These vessels and their crews are answerable only to the law of the flag, a situation which is often described by saying . . . that these vessels constitute a detached and floating portion of the national territory.").

While the "floating island" theory may be "a principle that antedates the Republic," Pls.' Opp. at 13, quoting *United States v. Riker*, 670 F.2d 987, 988 (11th Cir. 1982), the Supreme Court has explained that the theory "is a figure of speech, a metaphor," and the Court has made clear that when the law uses the term "territory" in a "physical and not a metaphorical sense," it is referring to "areas or districts having fixity of location and recognized boundaries." *Cunard S.S. Co. v. Mellon*, 262 U.S. 100, 122–23 (1923) (holding that a U.S.-flagged vessel was not in the "territory" of the United States for purposes of the Eighteenth Amendment's prohibition on the sale of intoxicating liquors to or from "territory subject to the jurisdiction" of the United States).

The Second Circuit rejected reasoning similar to that advanced by the plaintiffs in *Smith v. Socialist People's Libyan Arab Jamahiriya. See* 101 F.3d 239 (2d Cir. 1996). The plaintiffs in *Smith*, the families of a group of passengers and employees aboard Pan Am Flight 103, sued Libya for its alleged complicity in the bombing of that flight over Lockerbie, Scotland. *Id.* at 241. Their theory was that "Pan Am Flight 103 should be considered to have been 'territory' of the United States for purposes of the FSIA . . . rely[ing] on the principle that a nautical vessel 'is deemed to a be part of the territory' of 'the sovereignty whose flag it flies.'" *Id.* at 246, quoting *United States v. Flores*, 289 U.S. 137, 155 (1933). The Second Circuit disagreed and explained:

> Even if we assume, without deciding, that for some purposes an American flag aircraft is like an American flag vessel, the fact that a location is subject to an assertion of United States authority does not necessarily mean that it is the "territory" of the United States for purposes of the FSIA . . . . If FSIA immunity prevails in United States embassies, it cannot be displaced with respect to United States aircraft flying over a foreign land.

*Id.* at 246 (internal citation omitted).

So, even if the Court were to assume that the *Challenger I* could be considered subject to certain U.S. laws as a U.S.-flagged ship, it does not necessarily follow that the vessel is within the "territory" of the United States for purposes of the FSIA.

Therefore, the Court finds that the non-commercial tort exception does not apply, because a tort committed on a U.S.-flagged vessel in international waters is not committed "in the United States" for purposes of the FSIA.  So Count 1 – to the extent that it is premised on the non-commercial tort exception – and the remaining counts, will be dismissed for lack of subject matter jurisdiction.

### III.   Because Israel has not been designated as a "state sponsor of terrorism," the terrorism exception does not apply.

Plaintiffs Araff and Deknopper maintain that the Court has jurisdiction under the terrorism exception, 28 U.S.C. § 1605A, over their claim in Count 1 that defendants tortured them.  *See* Compl. ¶¶ 5, 49.  The terrorism exception abrogates immunity in cases:

> in which money damages are sought against a foreign state for personal injury or death that was caused by an act of torture, extrajudicial killing, aircraft sabotage, hostage taking, or the provision of material support or resources for such an act if such act or provision of material support is engaged in by an official, employee, or agent of such foreign state while acting in the scope of his or her office, employment or agency.

28 U.S.C. § 1605A(a)(1).

The FSIA specifies the conditions under which the terrorism exception may be invoked.  A court "shall hear a claim" if three conditions are satisfied:  (1) "the foreign state was designated as a state sponsor of terrorism at the time the act . . . occurred, or was so designated as a result of the act;" (2) "the claimant or the victim was, at the time the act . . . occurred," a U.S. national, a member of the armed forces, an employee of the United States government, or a U.S. government contractor acting within the scope of the contractor's employment; and (3) "in a case in which the act occurred in the foreign state against which the claim has been brought, the claimant has afforded the foreign state a reasonable opportunity to arbitrate the claim in accordance with the accepted international rules of arbitration."  *Id.* § 1605A(a)(2).

With respect to the first requirement, the statute defines the term "state sponsor of terrorism" to mean:

> [A] country the government of which the Secretary of State has determined, for purposes of section 6(j) of the Export Administration Act of 1979 (50 U.S.C. App. 2405(j)), section 620A of the Foreign Assistance Act of 1961 (22 U.S.C. § 2371), section 40 of the Arms Export Control Act (22 U.S.C. § 2780), or any other provision of law, is a government that has repeatedly provided support for acts of international terrorism.

28 U.S.C. § 1605A(h)(6).   The Secretary of State currently designates three countries – Iran, Sudan, and Syria – as state sponsors of terrorism.   *See* "State Sponsors of Terrorism," http://www.state.gov/j/ct/list/c14151.htm.

Plaintiffs recognize that Israel is not on the list, but they point to the legislative history of the current version of the exception and argue that the designation is not a necessary precondition to the abrogation of sovereign immunity.   *See* Pls.' Opp. at 22–25.   The previous version of the terrorism exception provided:

> [T]he court shall decline to hear a claim under this paragraph – (A) if the foreign state was not designated as a state sponsor of terrorism . . . at the time the act occurred, unless later so designated as a result of such act.

Antiterrorism & Effective Death Penalty Act of 1996, § 221, Pub. L. No. 104–132, 110 Stat 1214 (1996), *codified at* 28 U.S.C. § 1605(a)(7).   In 2008, Congress repealed section 1605(a)(7) and enacted the present version of the terrorism exception – renumbered as 28 U.S.C. § 1605A. National Defense Authorization Act for Fiscal Year 2008, § 1083, Pub. L. No. 110–181, 122 Stat 3 (2008).   The amended statute is no longer cast in terms of when the court must *decline* to hear a claim – what plaintiffs call a "red light," Pl.'s Opp. at 23; instead, the statute now details the circumstances when the court "*shall* hear a claim."   28 U.S.C. § 1605A(a)(2) (emphasis added). According to plaintiffs, "[t]he language adopted by Congress in 2008 abandoned the designation requirement . . . and left open the possibility that a non-designated state could be a defendant under

16

the new § 1605A exception."  Pls.' Opp. at 24.  Plaintiffs add that this lawsuit presents "a case of first impression, requiring the Court for the first time to apply the explicit text of § 1605A as it is, not as it was."  *Id.* at 25.

But the D.C. Circuit has grappled with the new language, and it observed that former section 1605(a)(7) "is materially identical to current section 1605A."  *Weinstein v. Islamic Republic of Iran*, 831 F.3d 470, 482 n.22 (D.C. Cir. 2016).  And the D.C. Circuit has joined its sister circuits around the country in concluding that any assertion of immunity based on 28 U.S.C. § 1605A "requires that [] the foreign country was designated a 'state sponsor of terrorism at the time [of] the act."  *Mohammadi v. Islamic Republic of Iran*, 785 F.3d 9, 14 (D.C. Cir. 2015); *accord Bennett v. Islamic Republic of Iran*, 825 F.3d 949, 955 (9th Cir. 2016) (terrorism exception "strip[s] a foreign state of its sovereign immunity when (1) the United States officially designates the foreign state a state sponsor of terrorism," and (2) the foreign state is sued for an act of terrorism); *In re Terrorist Attacks on Sept. 11, 2001*, 714 F.3d 109, 115 n.7 (2d Cir. 2013) (noting that the terrorism exception "is only available against a nation that has been designated by the United States government as a state sponsor of terrorism at the time of, or due to, a terrorist act."); *Lubian v. Republic of Cuba*, 440 F. App'x 866, 868 (11th Cir. 2011) (affirming the dismissal of a complaint where because the "requirement[]" that "the foreign state must have been designated a 'state sponsor of terrorism' when the predicate act occurred" was not satisfied); *see also Owens v. Republic of Sudan*, 174 F. Supp. 3d 242, 273 (D.D.C. 2016) (concluding that "[s]ubsection (a)(2)"

of the terrorism exception "contains three collateral requirements," including that "that the foreign state was designated as a state sponsor of terrorism").[9]

And in any event, plaintiffs misread the statute as a whole.  The Court must begin with the presumption that Israel is immune from suit.  28 U.S.C. § 1604; *see also Simon*, 812 F.3d at 135 (beginning its analysis with the "baseline grant of immunity," and then assessing whether any exceptions to immunity apply).  The terrorism exception provides that a court "shall hear a claim" if "the foreign state was designated as a state sponsor of terrorism at the time the act . . . occurred, or was so designated as a result of the act."  28 U.S.C. § 1605A(a)(2).  Israel is not, and has never been, designated as a state sponsor of terrorism.  So the presumption of immunity has not been overcome in this case.  Therefore the Court lacks jurisdiction over plaintiff's claim of torture in Count 1 to the extent that Count 1 is premised on the terrorism exception.

---

9       Plaintiffs find support in a recent Supreme Court decision – *Bank Markazi v. Peterson*, 136 S. Ct. 1310 (2016).  Pls.' Opp. at 22, 24.  In that case, the majority opinion summarized the terrorism exception in a single sentence – "American nationals may file suit against state sponsors of terrorism in the courts of the United States."  *Bank Markazi*, 136 S. Ct. at 1317.  Plaintiffs note that the Court's statement of law "says nothing about any requirement that a sovereign be designated by the Secretary of State as a sponsor of terrorism before a case against it may proceed."  Pls.' Opp. at 24.  The *Bank Markazi* opinion dealt with a separation-of-powers question related to the complex statutes that apply when victims of state-sponsored terrorism attempt to collect on judgments in certain cases, *see Bank Markazi*, 136 S. Ct. at 1317, and nothing about the Court's concise statement purports to adopt the broad interpretation advanced by plaintiffs here, which is contrary to the plain language of the FSIA.

**CONCLUSION**

For the foregoing reasons, the Court concludes that there has been no waiver of sovereign immunity that would enable the Court to exercise subject matter jurisdiction over this dispute.  The complaint will be dismissed with prejudice.  A separate order will issue.


AMY BERMAN JACKSON
United States District Judge

DATE:  January 25, 2017